UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| ALEXANDRO PUGA, ET AL, | ) | CASE NO:  2:15-CV-00073 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| ABOUT TYME TRANSPORT, INC, | ) | Tuesday, July 18, 2017 |
| ET AL, | ) | |
| | ) | (10:26 a.m. to 12:08 p.m.) |
| Defendants. | ) | ( 1:33 p.m. to  3:01 p.m.) |


TESTIMONY OF ROGER ALLEN DURING JURY TRIAL - DAY TWO

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



APPEARANCES:            See page 2


Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Officer: Brad Standlee

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR</u>:


Plaintiffs:                    RICHARD W. HUNNICUTT, III, ESQ.
                               JOSEPHINE LUE, ESQ.
                               Law Offices of Thomas J. Henry
                               521 Starr St.
                               Corpus Christi, TX 78401


Also present:                  ALEXANDRO PUGA
                               NORMA PUGA


RCX Solutions:                 WILLIAM R. MOYE, ESQ.
                               ANDREW J. MC CLUGGAGE, ESQ.
                               Thompson Coe Cousins & Irons
                               One Riverway, Suite 1400
                               Houston, TX 77056

Also present:                  RANDY CLIFTON

3

INDEX

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROGER CHARLES ALLEN | 4 | 42/86 | 138 | 149 |

| PLAINTIFFS' EXHIBIT | RECEIVED |
|---|---|
| 55A | 5 |

Allen - Direct / By Mr. Hunnicutt                    4

1    **Corpus Christi, Texas; Tuesday, July 18, 2017; 10:26 a.m.**

2        **(Partial transcript; testimony of Roger Allen)**

3        **(Jurors present)**

4            **MR. HUNNICUTT:**  Your Honor, at this time we call

5    Mr. Roger Allen.

6            **THE COURT:**  Good morning.

7            **THE WITNESS:**  Good morning.

8            **THE COURT:**  Would you raise your right hand?

9           **ROGER CHARLES ALLEN, PLAINTIFFS' WITNESS SWORN**

10           **THE WITNESS:** So help me God.

11           **THE CLERK:**  Thank you, sir.

12           **THE COURT:**  You can have a seat right there.

13           **MR. HUNNICUTT:**  All right, are you ready, sir?

14           **THE WITNESS:**  Yes, sir.

15                        **DIRECT EXAMINATION**

16   **BY MR. HUNNICUTT:**

17   Q    Okay.  Sir, would you state your full legal name for the

18   record?

19   A    Roger Charles Allen.

20   Q    All right, and, Mr. Allen, you and I just met a year or

21   two ago, correct?

22   A    That's correct, sir.

23   Q    Okay.  What do you do for a living?

24   A    I'm a transportation consultant to deal with commercial

25   motor vehicles and fleet vehicles and also an expert witness.

1   Q    Okay.  Be -- on the break before you took the stand you

2   handed me a copy of your current resume, correct?

3   A    Excuse me, yes, sir, that's correct.

4   Q    Okay.  Is all of the information on this resume true and

5   correct to the best of your knowledge?

6   A    Yes, sir, it is.

7   Q    Does anything need to be added or changed?

8   A    No, sir.  No, sir.

9        **MR. HUNNICUTT:**  Your Honor, we would offer as

10  Plaintiffs' Exhibit Number 55A and we're giving you the letter

11  designation because there's a much larger file that -- that a

12  bunch of the information doesn't need to come in.

13       **MR. MOYE:**  Is this not a presented document?  Is this

14  a --

15       **MR. HUNNICUTT:**  Yeah, this technically wasn't pre-

16  admitted because I didn't offer that entire big document, but

17  this was produced in discovery.

18       **MR. MOYE:**  So long as I have it in discovery no

19  objection, your Honor.

20       **THE COURT:**  It's admitted.

21   **(Plaintiffs' Exhibit Number 55A was received in evidence)**

22  **BY MR. HUNNICUTT:**

23  Q    Okay, and, Mr. Allen, the jury can read your resume later,

24  we're not going to go line-by-line through it, but you've

25  testified before, right?

```
                     Allen - Direct / By Mr. Hunnicutt            6
```

1   A    Oh, yes, sir.

2   Q    Okay.  So you know what we're doing.  I need you to

3   summarize your experience, training and education that is

4   relevant to your opinions you're giving today.  Would you tell

5   the jury what makes you a commercial transportation and safety

6   consultant?

7   A    I personally have been working in the trucking industry

8   since 1959.  Trucking goes back in my entire family from back

9   in the 1920s, but since I started there is no job in the

10  trucking industry I haven't done, everything from in the

11  office, billing clerk, dispatcher, safety director, general

12  manager, and I've even owned my own companies.

13           I've also driven 18-wheelers, I've logged over 2

14  million miles driving.  I've had several different types of

15  operations.

16           I also was a truck broker for 11 years.  I can't tell

17  you how many people that I taught to train -- or trained on how

18  to be drivers.  I've put on safety classes for numerous

19  companies as part of my job.  I have been investigating truck

20  wrecks since back in the 1970s.

21           I started RGK Consultants in 1995.  We was doing a

22  lot of work at the time with motor carriers to help them

23  understand the regulations and stay in compliance with

24  regulations and how to train their drivers.  We've put on

25  training classes for them and whatever they needed.

                     Allen - Direct / By Mr. Hunnicutt                    7

 1            I've also helped companies prepare and walk them

 2   through DOT audits, so that's where the Department of

 3   Transportation is coming in to make sure they're staying in

 4   compliance.

 5   Q    Okay.  So you just summed up how many years of trucking

 6   experience?

 7   A    I started in 1959, sir, when I was 17 years old.

 8   Q    Okay, so whatever that math is, coming up on 60, I guess,

 9   in 2019?

10   A    Yes, sir.

11   Q    All right.  The -- let me -- let me focus on a couple of

12   things.  You've mentioned RGK Consultants, LLC.  Is that your

13   company?

14   A    That's the company that my wife and I own, we started it

15   in 1995.

16   Q    Okay, and what is -- what does RGK stand for?

17   A    Okay, the R my name, Roger, my wife's name is Gloria and

18   my daughter's name is Kelly, that's where the RGK came from --

19   came from.

20   Q    Okay.  Now at -- you mentioned that RGK Consultants has

21   actually been hired by trucking companies to -- to assist them

22   with DOT compliance and safety, correct?

23   A    Oh, yes, sir.

24   Q    Okay.  So any company like RCX Solutions or About Tyme

25   they can call you up and one of the things you can do is assist

Allen - Direct / By Mr. Hunnicutt                    8

1   them and make sure they comply?

2   A     That's correct, sir.

3   Q     Okay.  Have you ever worked as a broker?

4   A     Yes, sir, I was an insurance broker for 11 years back in

5   the '70s and '80s.

6   Q     Okay.  And so are you familiar with the -- the rules and

7   regulations under the Federal Motor Carrier Act for motor

8   carriers?

9   A     Yes, sir.

10  Q     For brokers?

11  A     Yes, sir.

12  Q     Okay.  Have you also consulted with brokerage companies on

13  compliance issues?

14  A     Yes, sir, and also attorneys representing brokerage

15  companies.

16  Q     Okay.  Now here today we hired you for forensic purposes,

17  meaning for litigation, correct?

18  A     That's correct, sir.

19  Q     Okay.  And you're not working for free, are you?

20  A     Oh, no, sir.

21  Q     You've brought a big box with you.  By the way, where'd

22  you come in from?

23  A     I live in Friendswood, Texas and that gray box down there

24  is my entire file.

25  Q     Okay.  Before we get into to what you reviewed to prepare

1  opinions in this case approximately how much work does it take

2  to prepare opinions in a case such as this?

3  A    Well, it depends on a lot, how much paperwork, how many

4  depositions there are, what's produced.  It takes a lot of time

5  to go through and make sure every -- sure everything's been

6  produced and looking at all of the depositions.  I think we

7  have billed about $9,000 so far.

8  Q    Okay.  Now before we get into your opinions let's talk

9  about what you reviewed to -- to render opinions in this case.

10  What did you review?

11  A    Attached to my report is a complete list of all of the

12  documents.  Starting on Page 1 it lists every -- all of the

13  documents reviewed and it goes up through Page 3.  There's 38

14  different items that was produced to me, there's -- when I

15  wrote my report, and then I have 10 items of reference material

16  that I have reviewed.

17  Q    Okay, well, we don't need to list off every single thing

18  you've reviewed, but is it your understanding that you've

19  received and reviewed all of the relevant depositions?

20  A    That's my understanding, correct, sir.

21  Q    Okay.  In other words, we didn't send you the medical

22  doctors' depositions --

23  A    Oh, no, sir.

24  Q    -- because that's -- that's not relevant to your field?

25  A    That's correct, sir.

Allen - Direct / By Mr. Hunnicutt                    10

1    Q    Okay.  But in terms of the RCX employees you saw the

2    deposition of Randy Clifton?

3    A    Yes, sir.

4    Q    Jonathan Neal.

5    A    Yes, sir.

6    Q    Jason Butler.

7    A    Yes, sir.

8    Q    Allan Crump.

9    A    Yes, sir.

10   Q    Et cetera?

11   A    Yes, sir.

12   Q    Okay.  You also received a copy of all of the documents

13   that were produced by other entities in this case, correct?

14   A    That is true, sir.

15   Q    You've received the documents produced by Xtra Lease?

16   A    True.

17   Q    You received documents produced by About Tyme?

18   A    Correct.

19   Q    You're received documents produced by RCX Solutions?

20   A    Correct.

21   Q    Okay.  And, specifically, have you seen the Trailer

22   Interchange Agreement that RCX Solutions has produced in this

23   case?

24   A    I have, sir.

25   Q    The RCX Solutions Carrier Agreement that was produced in

1    this case?

2    A    Yes, sir.

3    Q    The -- the Bill of Lading that was produced in this case?

4    A    Correct.

5    Q    And the Xtra Lease Equipment Rental Agreement?

6    A    Correct.

7    Q    Okay.  And like I said I am not going to go through every

8    document that's in your file, but there's a lot more documents

9    than those, correct?

10   A    Oh, yes, sir.

11   Q    I just rattled off some of the -- some of the key

12   depositions and key documents that are relevant, correct?

13   A    Correct, sir.

14   Q    All right.  Now you said you have reference materials?

15   A    Yes, sir.

16   Q    Once again we don't have to list them, but just give the

17   jury an idea of what sorts of reference materials you've

18   brought.

19   A    Well, one thing, is the Federal Motor Carrier Safety

20   Regulations which is this book here, and there's a CDL manual

21   which every State puts out the driver studies to get his

22   commercial driver's license.

23        Then there's some books, preventable accident, what's

24   a preventable accident and how you determine, and that book's

25   put out by the Federal Government, the Department of

1    Transportation, Motor Carrier.

2            And then there's some National Safety Council

3    material to do with commercial vehicles, and then there's two

4    books that are used in truck driving schools throughout the

5    country called Bumper to Bumper and Truck Driving Handbook.

6    These are basically truck driving 101 that when drivers are

7    trying to learn to drive and be able to pass all of the tests.

8    Q    Okay.  If at any point in time you need to -- in response

9    to questions from either attorney you need to look up

10   information you brought those reference materials with you.

11   A    I did, sir, they're down in my gray box.

12   Q    Okay.  Let's talk about your opinions now.

13           Based on your review of the documents and deposition

14   testimony were you able to come up with an opinion -- with

15   opinions about the compliance with the Federal Motor Carrier

16   Act with respect to the transactions that were -- occurred?

17   A    I have, sir.

18   Q    Okay.  Before we get into the opinions let's take a second

19   and explain to the jury the relationship in a general

20   situation, just help them understand when you've got a

21   customer, you've got a broker, you've got a carrier, describe

22   the inner -- the roles of those.

23   A    Okay.  Well, let's start with a truck broker.  A truck

24   broker is a middle person between the shipper and the motor

25   carrier that's going to haul -- haul it.  The shipper will

1  contract with the broker, say "We want you to arrange

2  transportation for our shipments going to wherever they're

3  going."

4         Then the broker will then line up potential carriers

5  that are authorized by the Department of Transportation under

6  the Federal Regulations.  And when the shipper gives them a

7  load then they'll assign it to a motor carrier.

8         Then that motor carrier -- the broker pays the motor

9  carrier, they agree on a price, then the broker pays the

10  carrier once the transportation is completed.

11  Q    Okay.  Can just anybody or any company be a broker?

12  A    Oh, no, sir.

13  Q    Okay.  What do you have to do to --

14         Well, let's explain that.  Is that regulated?

15  A    It is very regulated.  The transportation trucking

16  industry is one of the highest, most highly regulated industry

17  in the United States.

18  Q    Okay.  And just from your training perspective what -- why

19  is that?

20  A    Because it's all about safety on the highway making sure

21  companies are safe, make sure everybody are following the

22  regulation.  It's to promote safety on the highway and to

23  protect the general moving public.

24  Q    Okay.  So in order for a company to become -- to be a

25  broker in a --in one of these transportation deals or

1    arrangements what do they have to do?

2    A    Okay, before 2015 they had to fill out a form which was

3    called an OP-1.  If you was going to get motor carrier

4    authority, contract or private haul, or if you was going to be

5    a broker you had to -- it's like submitting an application for

6    a loan, you had to submit this to the DOT and there's a -- lots

7    of items that you have to agree that you will be knowledgeable

8    of and you will have trained your people and everybody to make

9    sure they're in compliance and will stay in compliance with

10   these regulations.

11        Once the OP-1 is submitted to the DOT it's reviewed,

12   they check -- check it out, and make sure that you're being who

13   you are and you're being in -- you're going to agree to be in

14   compliance with the regulations.

15   Q    Okay, and then what's the next step?

16   A    And then the next step, once they have decided to give you

17   your authority, whether it's motor carrier or broker, then they

18   will send you a certificate showing the date, the -- or the

19   date that it becomes effective and it will say either "motor

20   carrier authority" or "broker authority" or if a carrier files

21   for both they can get both once they have been checked out.

22   Q    Okay.  And is this -- is this effective date, is it

23   limited or once you get it you have to reapply or --

24   A    No.  Once you get it it's yours unless you violate some of

25   the rules in there and they come in and do an audit, and then

```
                    Allen - Direct / By Mr. Hunnicutt              15
```

 1   they can revoke your authority at any time if they want.

 2   Q    Okay.  And under what circumstances does a broker's

 3   license get suspended?

 4   A    From -- for doing improper -- improper documentation; not

 5   following what the regulations says a broker is supposed to do;

 6   not filing -- now they do have to file a yearly -- yeah, a

 7   yearly form, and I forget what that number is, so if they don't

 8   continuing filing those then they can be suspended there, but

 9   mostly a broker's authority will be cancelled because of some

10   violation of the regulations.

11   Q    Okay.  What happens if a company just decides, you know

12   what, I'm just going to be a bad boy, shame on me, I want to go

13   ahead and broker this deal?  What does the Federal Government

14   do?

15   A    Well, may I ask -- clarify your question?  Are you talking

16   about a motor carrier once it --

17   Q    No, broker.  We're on brokers.

18   A    Okay.  Okay.

19   Q    Just wants to be a broker.  Okay, let me try the question

20   over again without the vernacular.

21        What happens if a company brokers a deal, and -- or

22   they're trying to claim they're brokering a deal and they don't

23   have broker's authority?

24   A    Well, first of all it makes the agreement, whatever

25   they're doing, it doesn't make it a legal move.

```
                   Allen - Direct / By Mr. Hunnicutt                16
```

1         **MR. MOYE:**  Objection, your Honor, calls for a legal

2   conclusion based on the legality of the document.

3         **THE COURT:**  Sustained.

4   **BY MR. HUNNICUTT:**

5   Q    Let me rephrase that, let me rephrase the question.

6         Would it then be a violation of the Federal statutes

7   if somebody tries to broker a deal and doesn't have the

8   broker's license?

9   A    That's correct.  It would be a violation of the <u>Federal</u>

10  <u>Motor Carrier Safety Regulations</u>.

11  Q    Okay.  And if a -- if there's been a violation, if a

12  broker tries to broker a deal, is that a valid agreement under

13  the DOT?

14  A    No, it's not.

15        **MR. MOYE:**  Objection, your Honor.  I don't know what

16  agreement he's talking about.  If he's talking about any

17  contracts amongst the parties that would call for a legal

18  conclusion on its validity.

19        **THE COURT:**  Sustained as phrased.

20  **BY MR. HUNNICUTT:**

21  Q    Okay.  What are the penalties if somebody violates these

22  rules about you're not supposed to pretend you're a broker if

23  you don't have a broker's license?

24  A    Civil penalties up to $10,000.  And they also can order a

25  cease and desist order from them ever doing it again.

1    Q    Okay.  It's that serious?

2    A    Very serious.

3    Q    It's that serious?

4    A    Yes, very serious because it could -- if you have a motor

5    carrier authority it can affect your motor carrier authority

6    also.

7    Q    Okay.  Now let me ask this:  what if -- what if they --

8    somebody owns two companies and they had a broker's license at

9    one point on one company but it got suspended, and then they

10   tried to broker a deal on their other company that just has a

11   carriers license, is -- is that in violation of the DOT

12   regulations?

13   A    Absolutely.

14   Q    Okay, why is that?

15   A    Because the carrier that doesn't have the broker, it's

16   doing -- it's not following the regulations and it's doing

17   transportation that it's not qualified to do because it doesn't

18   have the appropriate license.  To broker loads you have to be

19   registered and have a broker license.

20   Q    Okay.  Now if somebody is going to claim that they're a

21   broker, even though they don't have a broker's license, and

22   they have -- they have an arrangement with somebody to

23   transport a load for one of their customers, if it's really a

24   broker what is a broker supposed to do?  What are they supposed

25   to keep?  What are they supposed to file?

1   A    A broker will enter into an agreement with a motor carrier

2   and it will be a broker agreement with that motor carrier.  The

3   broker will get a copy of their operating authority so they

4   make sure that they have the proper authority and they would

5   have a signed contract between the two.

6          Now once they decide to give them a load then there's

7   different names for it, they will give them a confirmation

8   sheet or a -- there's a couple different names, but anyway it

9   will show where to pick the shipment up, where it's going to,

10  and what the agreed on rate is.

11  Q    Okay.  So based on your -- your experience in training

12  companies on how to properly be a broker, as well as your

13  experience when you were a broker, just based on all of your

14  experience what is a broker supposed to have in -- are they

15  supposed to have a file on a broker deal?

16  A    Sure, they will have a file that will have the signed

17  agreement and a copy of the operating authority from the motor

18  carrier that they're going to use.

19  Q    Okay.  And I understand in the statute, without going

20  through all of them, there's a list of things they're supposed

21  to investigate, get copies of and put into that file, right?

22  A    Oh, yes, sir.

23  Q    Okay.  The -- let's talk about the broker's agreement.

24         Is there any broker agreement that's been produced in

25  this case for RCX Solutions as a broker?

                        Allen - Direct / By Mr. Hunnicutt                    19

1    A    No, sir, there has not.

2    Q    And that broker agreement is -- what is supposed to be

3    between RCX Solutions and would that be with Sunset in this

4    case or ALBEA L'Oreal?

5    A    Okay, say the question over again, sir?

6    Q    Yeah, sure.  The broker's agreement that -- there's

7    supposed to be one and there isn't.

8    A    Correct, there isn't any.

9    Q    Okay, who -- who was supposed to be a party to that

10   agreement?

11   A    That would have -- an application would have been the

12   broker agreement between the shipper authority and then Sunset.

13   Q    Okay.  Now we do know from deposition testimony that

14   Sunset was a broker?

15   A    That's correct, sir.

16   Q    Go ahead and tell the jury what the relationship between

17   -- before we get to About Tyme, you understand there was a

18   longstanding relationship between Sunset, the broker, RCX

19   Solutions as a carrier and ALBEA L'Oreal that wanted these

20   empty makeup cases transported?

21   A    Yes, sir, they had a long relation.

22   Q    Okay.  So what was the interrelationship between those

23   three parties?

24   A    Okay.  Sunset was a broker, RCX was a carrier that was

25   working at -- for Sunset and they were both owned by the same

Allen - Direct / By Mr. Hunnicutt                    20

1   people.  Now, in this -- so that's where the relation was, RCX

2   was going to haul loads for Sunset.

3   Q    Okay.  Is there any document between Sunset Transportation

4   and RCX Solutions that's been produces showing that -- well,

5   does that happen sometimes where you have two brokers?

6          MR. MOYE:  I would object to conversations about

7   documents.  This is a Pretrial ruling about documents that

8   weren't asked for, but somehow the suggestion it should have

9   been produced and that's violative of that, Judge.

10         MR. HUNNICUTT:  I -- I disagree.

11         THE COURT:  Yeah, I'm not -- what are you asking?

12         MR. HUNNICUTT:  I'm just trying to give the jury an

13  understanding of how the interrelationship of the parties

14  really exist.  I can rephrase, I don't need to talk about the

15  documents again.

16         THE COURT:  Okay.

17  BY MR. HUNNICUTT:

18  Q    Is it possible to have more than one broker in a deal?

19  A    It would be possible, correct.

20  Q    Okay.  So if somebody is -- and we're talking

21  hypothetically now, not this case, but if there's a situation

22  where there's a shipper and there's already one broker, and for

23  some reason they -- that -- that broker that's already there,

24  wants to share its brokerage, or the client wants to have a

25  second broker, how does that work?

1  A    Well, okay, we refer to that as being a double broker.  A

2  broker gets a shipment from the shipper and for some reason he

3  can't provide transportation, he can contact another broker or

4  a transportation company that has a broker license and give

5  them that load.

6            Now if they give it to a transportation company then

7  they could haul it.  If they give it to a transportation

8  company that has broker authority then that company would be

9  allowed to broker it out to somebody else.

10 Q    Okay.  So I guess, in other words, just because Sunset may

11 have a valid broker's license RCX Solutions or another company

12 can't piggyback onto that license?

13 A    Oh, no, sir.  They have to have their own separate

14 license.

15 Q    Okay.  And then -- so they have to have their own separate

16 -- these broker's documents that you talked about that are

17 supposed to exist have to exist?

18 A    That's correct, sir.

19 Q    Okay.  Based on your review of the deposition testimony do

20 you have an understanding of the difference between RCX

21 Solutions, the carrier, and RCX Supply Chain, the broker?

22 A    I do, sir.

23 Q    Okay.  Explain to the jury the difference between those

24 two companies.

25 A    RCX Solutions is a motor carrier.  They have company

Allen - Direct / By Mr. Hunnicutt                        22

1   trucks with company drivers, and then they also have leased

2   equipment.  The leased equipment they put drivers on, but these

3   are now all employees of RCX.

4           RCX Supply Chain is strictly a broker.  The only

5   thing they can do is broker loads so they can't transport it,

6   they are strictly a broker, that's all their license allows

7   them to do.

8   Q    Okay.  What was the status of their broker -- of RCX

9   Supply Chain's broker's license at the time of -- of the

10  arrangement basis of this lawsuit?

11  A    It had been suspended, not in effect.

12  Q    For approximately -- for approximately how long?

13  A    I don't remember it off the top of my head, sir, I'm

14  sorry.

15  Q    Okay, that -- fair enough.  But no doubt in your mind it

16  was a suspended license?

17  A    It was, sir.

18  Q    Okay.  Did you see in the deposition testimony that RCX

19  Solutions, RCX Supply Chain and Sunset Transportation all

20  office from the same address?

21  A    That's correct, sir.

22  Q    Okay.  Based on your review of the documents do you have

23  an opinion as to whether this arrangement between About Tyme

24  and Ron Brown and RCX Solutions was a broker deal or a lease

25  arrangement?

Allen - Direct / By Mr. Hunnicutt                               23

1   A    Well, it couldn't be a broker deal because they didn't

2   have a broker license, so the only way they could hire Brown at

3   About Tyme would be through an arrangement and which should

4   have been a lease agreement.

5   Q    Okay.  Does -- does RCX Solutions -- according to the

6   deposition testimony do they ever hire outside carriers?

7   A    No, they do not.

8   Q    The -- all of the witnesses agreed from RCX Solutions,

9   correct me if I'm wrong, that RCX Solutions only hires their

10  own drivers and lease drivers?

11  A    That's correct, sir.

12  Q    Okay.  If -- if Randy Clifton's companies are going to use

13  an outside carrier all of the witnesses said they used what

14  company?

15  A    Say -- that would be through RX Solutions --

16  Q    Yeah.

17  A    The -- maybe I misunderstood the question.

18  Q    No, let me try the question again.

19         Randy Clifton is the owner/President of both RCX

20  Solutions and RCX Supply Chain?

21  A    Correct.

22  Q    What did -- which company did all of the witnesses say

23  they -- is always used when they are going to use an outside

24  carrier?

25  A    RCX Solutions.

1   Q    RCX Solutions uses outside carriers?

2   A    Wait a minute, wait a minute.  I'm sorry.  I got -- let me

3   make that Supply Chain, I'm sorry, sir.

4   Q    Okay.  Because brokers use outside carriers?

5   A    Oh, yes, sir, that's what brokers do, they use carriers

6   with the authority.

7   Q    Okay.  Because if you're -- if you just have a broker's

8   license and you are not also a carrier yourself that's all you

9   can do?

10   A    That's correct.

11   Q    And -- hold on --

12        Have you heard of a Trailer Interchange Agreement?

13   A    Oh, yes, sir.

14   Q    What is a trailer interchange agreement?

15   A    The best way to explain it if you've got two motor

16   carriers that has operating authority, and they want -- one

17   company wants to use a trailer of another company you have to

18   have either a lease agreement or an interchange agreement,

19   which that then is the one carrier authorization to haul that

20   trailer under their authority for a certain period of time.

21   Q    Okay.  What does a trailer interchange agreement have to

22   have in it according to the Federal Motor Carrier Regulations?

23   A    Okay, there has to be numerous items in it.  Number 1 --

24        **MR. MOYE:**  Your Honor, I object as a -- can we

25   approach?

Allen - Direct / By Mr. Hunnicutt                    25

1          **THE COURT:**  Yes.

2      **(Begin bench conference)**

3          **MR. MOYE:**  He's trying to get this witness to say

4  that the trailer interchange is about because it didn't meet

5  certain Federal standards.  Rule 26 requires that to be a

6  disclosed opinion to me.  He didn't disclose a single opinion

7  about the validity of the interchange agreement, the sum total

8  of his opinions exclusively --

9          **THE COURT:**  (indiscernible) is that where you're

10  going?

11          **MR. HUNNICUTT:**  That is where I'm going, and it is,

12  it's in his deposition testimony.

13          **MR. MOYE:**  It's not in his deposition testimony.

14  Judge, here's his opinions.  The only opinions he can

15  use in reference to what he said it should have been released

16  with us and he should have a written lease.  (indiscernible)

17  report.

18          **THE COURT:**  (indiscernible), let me see where he says

19  it is --

20          **MR. HUNNICUTT:**  I can -- I didn't know we were going

21  to talk about this.

22          **THE COURT:**  Okay.  (indiscernible).

23      **(Pause)**

24          **MR. HUNNICUTT:**  Mr. Moye -- this is in Mr. Moye's

25  examination.  He's asking about the interchange agreement and

1   he was --

2            THE COURT:  Do you want to show him?

3            MR. HUNNICUTT:  Page 134, the discussion about

4   interchange is earlier, it started from here.

5            MR. MOYE:  Yeah, well, that's -- that's why him

6   saying the interchange, Number 1, is not valid because he's

7   making a legal interpretation of the lease between Xtra Lease

8   and About Tyme -- and us.

9            MR. HUNNICUTT:  I'm not going to phrase it as a

10  legality --

11           THE COURT:  What are you asking?

12           MR. HUNNICUTT:  Okay, I'm asking what -- what -- you

13  can't just have an interchange agreement with -- and just make

14  it a Federal rule.

15           THE COURT:  Okay, so there's requirements there, and

16  then where are you going from that?

17           MR. HUNNICUTT:  That's all I'm going to ask.

18           THE COURT:  Okay, he can ask that.

19           MR. MOYE:  (indiscernible) he doesn't talk about the

20  validity of it, that's fine, because it's not a disclosed

21  opinion, but he says the contracts not valid, that's not

22  disclosed.

23           MR. HUNNICUTT:  He says it's not a valid interchange,

24  that's one of his reasons why it's not, but I won't have him

25  say it's is not legal.

Allen - Direct / By Mr. Hunnicutt                    27

1              **THE COURT:**  That's legal conclusions, what he's

2   saying then.

3              **MR. HUNNICUTT:**  I won't ask for a legal conclusion,

4   I'll just ask if it it's -- like I have been that would be

5   in --

6              **THE COURT:**  He can do that.

7              **MR. MOYE:**  Violation of --

8              **THE COURT:**  Violation is (indiscernible).  The

9   violation of the regulation.

10             **MR. HUNNICUTT:**  Yes.

11             **MR. MOYE:**  Your Honor, he didn't -- he has not

12  disclosed a violation of the regulation, he's given me two

13  opinions in this whole case.  I didn't take any discovery about

14  violation of the regulation on the interchange agreement, that

15  should have been disclosed.

16             **THE COURT:**  Okay.

17             **MR. MOYE:**  He just says it can't be sublet, so that

18  why he's seen as not valid, that's the only basis for it.

19             **THE COURT:**  And is that one of the requirements

20  (indiscernible)?  He can ask about the requirements and whether

21  that's a violation --

22             **MR. HUNNICUTT:**  (indiscernible).

23             **THE COURT:**  So overruled.

24       **(End bench conference)**

25  //

Allen - Direct / By Mr. Hunnicutt                    28

**BY MR. HUNNICUTT:**

2   Q    All right, Mr. Allen, does the Federal Motor Carrier

3   Safety Regulations have certain requirements of what's supposed

4   to be in the Trailer Exchange Agreement?

5   A    It has.

6   Q    And what are those?

7   A    It's covered under Federal Regulation 376.31 "Interchange

8   of Equipment."

9        **MR. HUNNICUTT:**   And -- well, without going through

10  all of them could you pull up Plaintiffs' Exhibit Number 24,

11  the Trailer Interchange Agreement, Mr. Hoyt?

12  Q    You have reviewed the Trailer Interchange Agreement, have

13  you not?

14  A    I have, sir.

15  Q    Okay.  Is there -- is -- are there any violations of the

16  regulations for this Trailer Interchange Agreement?

17  A    The way this Interchange Agreement is set up, yes, there

18  -- it is in violation.

19  Q    What are the violations?

20  A    Well, for one thing it required to -- for this trailer

21  interchange it would have to have a description of the vehicle

22  being interchanged, the trailer, identification of equipment is

23  what the regulation says.

24       So -- and a copy of this interchange, along with

25  identification would have to be carried with the trailer at all

1    times.

2    Q    Okay, now when you say "identification of the equipment,"

3    what sort of identification is there supposed to be in a

4    Trailer Interchange Agreement?  Is that like a VIN number or --

5    A    Okay, it could be license plate numbers, or I assume it

6    could be a number of it, it could be the make, VIN number, all

7    of this is what you normally see on an Interchange Agreement.

8    Q    Okay.

9         **MR. HUNNICUTT:**  Go ahead and focus the full document.

10   Q    In looking page after page is there any identification of

11   the specific trailer that Ronald Brown was pulling on the night

12   in question?

13   A    No, sir, there wasn't.

14   Q    Is there any identification of the true owner of the -- of

15   the trailer in this Trailer Interchange Agreement?

16   A    No, there is not.

17   Q    So if you were a consultant hired by the company to come

18   in to help them see if they could pass a DOT audit what would

19   you tell them about this particular Trailer Interchange

20   Agreement?

21   A    That it's not in compliance with the regulations and

22   you've got to change it.

23   Q    Okay.  Now why -- why is it that -- and I'm asking you not

24   as a legislature because you didn't write the law, but based on

25   your training what is your understanding as to why a Trailer

Allen - Direct / By Mr. Hunnicutt                    30

1    Interchange Agreement has to specify the equipment?

2    A    Very simple, if you don't have the person pulling the

3    trailer at the time, don't have information showing that you

4    have permission to have that trailer, specifically showing that

5    trailer, you'd be pulled over for a moving violation or

6    inspection, the officer could -- would have to assume that your

7    -- the trailer is stolen, that's the reason you carry that

8    documented so you know -- anybody knows that you have that

9    particular trailer under a legal Interchange Agreement.

10           **THE COURT:**  Who's going off over here?  It just

11   stopped.  Okay, go ahead.

12   **BY MR. HUNNICUTT:**

13   Q    So it's like when -- is that similar to -- for us personal

14   automobiles, we're supposed to have a vehicle registration,

15   that there's supposed to be something to show that -- that it's

16   our vehicle?

17   A    Sure.  It's just like when you lease a vehicle from a car

18   rental company you're given a copy of the rental agreement and

19   that shows that you have permission to use that vehicle.

20   Q    Okay.  So this Trailer Interchange Agreement, in addition

21   to not identifying the trailer that is specifically in

22   question, it doesn't say anything about Xtra Lease?

23   A    No, sir, it does not.

24   Q    Okay.

25           **MR. HUNNICUTT:**  Could you pull up the Xtra Lease

1   agreement?

2   Q    Did you review the Xtra Lease agreement to rent the

3   equipment to RCX Solutions?

4   A    Yes, sir, I have.  Many of the companies I had worked for,

5   my own companies, I had leased equipment, I'm very familiar

6   with these lease agreements.

7   Q    Okay.  And this -- this document, as you can see the PO

8   number, it's authorized by Randy Clifton?

9   A    That's correct.

10  Q    Okay.  This is Plaintiffs' Exhibit Number 43 for the

11  record.

12        Does this agreement, and there's many pages of fine

13  print.

14        **MR. HUNNICUTT:**  Could you go ahead and go to the --

15  to the -- I think it's the third page over.  There we go.  And

16  you don't need to zoom in on anything right now.

17  Q    But there's a lot of - a lot of terms on this lease, isn't

18  there?

19  A    There is, sir.

20  Q    And is that typical?

21  A    Pardon?

22  Q    Is that typical?

23  A    Oh, yes, sir.

24  Q    Okay.  What does the lease -- does the lease allow RCX

25  Solutions to -- is there anything you've seen in the deposition

Allen - Direct / By Mr. Hunnicutt                    32

1    testimony to show you that anyone from RCX Solutions asked

2    permission from Xtra Lease to turn around and lease that

3    trailer under a Trailer Interchange Agreement to Ron Brown?

4    A    No, sir.

5    Q    Okay.  So the Trailer Interchange Agreement is in

6    violation -- is in violation of the Federal regulations and it

7    is being done without the authority from Xtra Lease?

8    A    That would be correct, sir.

9    Q    Okay.  Now, let's -- let's -- let's switch the scenario.

10          If Mr. Brown, in this arrangement, is actually

11   leasing the vehicle from RCX Solutions, then does he have to

12   have a Trailer Interchange Agreement?

13   A    He would have to have a Trailer Interchange Agreement or

14   there would have to be a lease agreement.

15   Q    Okay, and that's why I said if there's an agreement for

16   him to use it like a lease then you don't have to do the

17   Trailer Interchange Agreement?

18   A    That would be correct, sir.

19   Q    Okay.  Now, are -- is there a -- are there regulations

20   that cover that situation about what is required if you're

21   going to be a leased driver --

22   A    Correct.

23   Q    -- for a company?  Okay.

24          And now we're back to RCX Solutions.  They have two

25   types of drivers, full time employees and leased drivers,

1    right?

2    A    Correct.

3    Q    Now full time employees, they can -- they can pull the

4    trailer under Xtra Lease -- that is leased from Xtra Lease

5    without getting permission, right?

6    A    Yes, sir, because the trailer is leased to RCX.

7    Q    Okay.

8    A    So it's part of their fleet.

9    Q    How about leased drivers?  Can they pull and not be in

10   violation of Xtra Lease's lease?

11   A    If they -- they are -- if they're --

12          **MR. MOYE:**  Objection, your Honor.  That calls for a

13   legal interpretation of Xtra Lease's lease contract.  He's

14   asking him to interpret the validity --

15          **MR. HUNNICUTT:**  I'll -- I'll rephrase.

16          **THE COURT:**  Sustained.

17   **BY MR. HUNNICUTT:**

18   Q    Okay.  Xtra Lease is a huge company, isn't it?

19   A    Oh, very huge.

20   Q    Thousands of trailers?

21   A    Oh, yes, sir, all over the country.

22   Q    Okay.  And so you've encountered many times, personally as

23   well as a consultant, situations where a company is leasing

24   trailers?

25   A    Absolutely.

1   Q    All right.  Based on your experience if a company is just

2   a motor carrier and they have two classes of employees and

3   lease drivers to satisfy the rules and regulations and the

4   leasing company, as long as they're using their drivers,

5   employees or lease drivers are -- will they be in compliance,

6   at least in terms of -- of using the trailer?

7   A    That would be correct, sir, they would be.

8   Q    Okay.  Now let's talk about the arrangement between Ronald

9   Brown and Randy Clifton.

10          None of us have the benefit of Mr. Brown's side of

11  what happened, correct?

12  A    Correct.

13  Q    Okay.  And you've read Mr. Clifton's deposition?

14  A    I have.

15  Q    All right.  In your opinion is his attempt to call himself

16  a broker in violation of the Federal rules?

17  A    It is.

18  Q    Why?

19  A    Because he doesn't have the broker license to be able to

20  broker loads.

21  Q    Okay.

22          **MR. HUNNICUTT:**  Let's pull up Plaintiffs' Exhibit

23  Number 19, please?

24  Q    The defense -- the Defendants also rely on Plaintiffs'

25  Exhibit Number 19, the Carrier Agreement.  Can -- I don't know

Allen - Direct / By Mr. Hunnicutt                35

1    if you can read it on your screen, can you read the first

2    "Whereas" under the "Witnesseth?"

3    A          "Broker represent is acting -- actively engaging in

4               business of selling and offering sale and/or

5               negotiating transportation of freight, goods,

6               merchandise on behalf of carrier and other providers

7               of motor vehicle transportation."

8    Q    Stop right there.  Now in this document RCX Solutions is

9    listing itself as the broker, correct?

10   A    It is.

11   Q    Okay.  Is that a false statement in this document based on

12   your understanding of RCX Solutions as a company?

13            **MR. MOYE:**  Objection, foundation, calls for

14   speculation and it's also the falsity of it implicates a

15   legal --

16            **THE COURT:**  Sustained as phrased.  Rephrase your

17   question.

18   **BY MR. HUNNICUTT:**

19   Q    Okay.  Have you seen any evidence that RCX Solutions has

20   ever held a valid broker's license?

21   A    No, sir, I have not.

22   Q    Have you seen any evidence that RCX Solutions has been

23   actively engaged in the business of brokering?

24   A    No, sir, I have not.

25   Q    In this document the carrier, Mr. Brown, makes certain

1    representations, correct?

2    A    That's true, sir.

3    Q    Okay.  And the alleged broker is making representations

4    about what they do?

5    A    That's correct, sir.

6    Q    Okay.  Based on your understanding of RCX Solutions not

7    having a broker's license and not ever brokering deals did they

8    represent something false to Mr. Brown in this document?

9            MR. MOYE:  I'll re-urge my objection, Judge.

10           THE COURT:  Overruled.

11   BY MR. HUNNICUTT:

12   Q    You can answer.

13   A    Oh, I'm sorry, I didn't hear that.  They are

14   misrepresenting what they are, they not a broker, they're a

15   motor carrier.

16   Q    Okay.  Now Mr. Brown was hauling this trailer and if he

17   hadn't died, but he just got pulled over by a DOT compliance

18   officer, relying on misrepresentation that RCX Solutions is, in

19   fact, a broker, and relying on the Trailer Interchange

20   Agreement, what would happen?  What would DOT do?

21           MR. MOYE:  Objection, calls for speculation, no

22   foundation.

23           MR. HUNNICUTT:  Your Honor, the foundation is -- it's

24   clearly established that he actually trains companies in DOT

25   compliance.

Allen - Direct / By Mr. Hunnicutt                    37

1          **THE COURT:**  Overruled.  You can answer.

2          **THE WITNESS:**  Okay, would you state that question

3    again please, sir.

4          **MR. HUNNICUTT:**  Yes.

5    **BY MR. HUNNICUTT:**

6    Q    Okay, Mr. Brown relies on this statement, this false

7    statement that they're a broker.

8    A    Correct.

9    Q    And that they've been doing brokering.

10   A    Correct.

11   Q    Okay, and he relies on this Trailer Interchange

12   Agreement --

13   A    Correct.

14   Q    -- which doesn't actually specify the trailer.  What

15   happens if he gets stopped?

16   A    If he gets stopped they're going to put him out of service

17   until they investigate and find out who the owner of the

18   trailer is and did they have authority to be pulling that

19   trailer because the documentation clearly doesn't show that

20   they had the proper authority to pull the trailer at the time.

21   Q    Okay.

22         **MR. HUNNICUTT:**  Could you pull up the Bill of Lading,

23   Plaintiffs' Exhibit Number 23?

24   Q    You have reviewed the Bill of Lading?

25   A    I have, sir.

1    Q    Okay.  Now there's already been some discussion about

2    you've got some documents after your report, some documents

3    before your report.

4              In cases, and I'm talking generally, do you sometimes

5    have cases where -- where as discovery goes you get some

6    documents first and then you get more documents as the

7    attorneys continue to research and investigate?

8    A    That's normal.

9    Q    Okay.  Let's take a look at the Bill of Lading, look at

10   the top part.

11             Who is listed as the carrier?

12   A    That would be over on the right-hand side, down, it says

13   "Carrier Name Sunset-RCX."

14   Q    Okay.  And do you see how there's -- there's different

15   fonts there?  It's like Sunset appears to be the same sized

16   print as the carrier name and then RCX the slash is bigger?

17   A    Yes, sir.

18   Q    And it's -- it's also bigger like the actual trailer

19   number or serial number, right?

20   A    Right.

21   Q    Okay.  Looking over at the "Shipper" we have it's coming

22   from --the Ship From is ALBEA Cosmetics America and it's going

23   to L'Oreal USA, right?

24   A    That's correct, sir.

25   Q    Okay.  Third party charges to L'Oreal, correct?

1  A    Correct.

2  Q    All right.

3        MR. HUNNICUTT:  Now, go back to the full document,

4  Mr. Hoyt.

5  Q    Now based on this Bill of Lading and what we just saw

6  about who's listed as the carrier there's a place for a

7  representative of the carrier to sign, correct?

8  A    That's correct.

9  Q    And down there at the bottom we see what has been

10 represented to be Ronald Brown's signature for the carrier,

11 correct?

12 A    Correct, because it actually says carries -- Carrier

13 signature and pickup date.

14 Q    Okay.  And, once again, what carrier is he signing on

15 behalf of?

16 A    RCX.

17        MR. MOYE:  Objection, speculation, Judge.

18        THE COURT:  Overruled.

19        MR. HUNNICUTT:  All right.

20 BY MR. HUNNICUTT:

21 Q    That's the way you'd read a Bill of Lading, correct?

22 A    Oh, absolutely, sir.

23 Q    Okay.  Now let me ask you this:  If RCX Solutions sent one

24 of their full time drivers on this job, which we know that

25 actually was supposed to happen, he had an equipment failure,

1  right?

2  A     That's my understanding, yes, sir.

3  Q     Okay.  So if RCX Solutions sends their own driver, where

4  does the driver sign?

5  A     He would sign in the same place.

6  Q     Exactly like Ron Brown had signed?

7  A     That's correct, sir.

8  Q     Okay.  If it's a leased driver for RCX Solutions where

9  would that person sign when they pick up the load?

10  A     The same place, sir, because he's representing the

11  carrier.

12  Q     And a leased driver would still use RCX at the top of the

13  form?

14  A     That would be correct, sir.

15  Q     Okay.  If it's an outside carrier, if About Tyme was

16  actually an outside carrier then who is supposed to be listed

17  as the carrier on this Bill of Lading?

18  A     About Tyme.

19  Q     And then --

20  A     It would have been Sunset/About Tyme.

21  Q     Okay, and is that what you do, you list the broker and

22  then slash the carrier?

23  A     That would be correct, sir.

24  Q     Okay.  Let me switch topics on you.  The --

25            MR. HUNNICUTT:  I'm sorry, I'm almost done, your

1   Honor, I'm just checking my notes.

2   Q    All right, in your training of commercial motor vehicle

3   drivers, do you cover hydroplaning?

4   A    Oh, yes, sir.

5   Q    And what do you tell the drivers to do if they start to

6   experience hydroplaning?

7            MR. MOYE:  Objection, your Honor.  He's not tendered

8   as a witness on this issue.

9            THE COURT:  What's the relevance through this

10  witness?

11           MR. HUNNICUTT:  Well, he -- he trains truck drivers

12  in how to handle a situation like hydroplaning.

13           THE COURT:  Did he give -- did he give opinions on

14  that?  Is that what he's an ex -- tendered as an expert on?

15           MR. HUNNICUTT:  He did have in his report that Ron

16  Brown was negligent.

17           MR. MOYE:  Which -- can we approach?

18           THE COURT:  Yes.

19       **(Begin bench conference)**

20           MR. MOYE:  We excluded all of the driving opinions on

21  this gentleman and this is a driving opinion --

22           THE COURT:  This is an appropriate witness for that.

23           MR. HUNNICUTT:  I was just going to cover the

24  training because it -- Mr. Moye's question --

25           THE COURT:  That's not --

Allen - Cross / By Mr. Moye                                42

1        **MR. HUNNICUTT:**  -- rebuttals this.  Mr. Moye's

2   questioning on the police officer.

3        **THE COURT:**  That's -- sustained.

4        **MR. HUNNICUTT:**  Okay.

5     **(End bench conference)**

6        **MR. HUNNICUTT:**  Pass the witness.

7                    **CROSS EXAMINATION**

8   **BY MR. MOYE:**

9   Q    Good afternoon, Mr. Allen.

10  A    Good afternoon, sir.  I guess it's still morning.

11  Q    We meet again.

12  A    Yes, sir.

13  Q    You have been very courteous to Mr. Hunnicutt and answered

14  only the question he asked of you.  Would you do the same for

15  me?

16  A    I would try, sir.

17  Q    All right.  Because you understand it's important not to

18  waste the jury's time, right?

19  A    Yes, sir.

20  Q    Okay.  And you testified under oath thousands of times?

21  A    No; I've given over 500 depositions, sir.

22  Q    Five hundred.  And you've testified in 30 states.

23  A    I'm sorry, sir?

24  Q    You've testified in 30 states.

25  A    "States" did you say?

Allen - Cross / By Mr. Moye                                      43

1   Q    I read your website.  You said, "I've testified in 30

2   states."  So, I'm asking you --

3   A    Well --

4   Q    -- if you've testified in 30 states.

5   A    I was trying to -- I didn't understand what your last word

6   was.  That sounds about right, sir.

7   Q    At any point today -- I grew up in a little town called

8   Bridge City, Texas, but I went to school on the East Coast, and

9   I started talking faster.  So, if I talk too fast, tell me to

10  slow down.  Got it?

11  A    Thank you, sir.

12  Q    Fantastic.  And you have testified in 30 and advertised on

13  your website that you're looking forward to testifying in the

14  last 20, right?

15  A    Sure.

16  Q    Because you have a nationwide plaintiffs' trucking

17  practice, right?

18  A    Well, sir, I do nationwide work.  That's correct, sir.

19  Q    You have a nationwide plaintiffs' expert practice.  Is

20  that right?

21  A    What do you mean "practice," sir?  I'm a consultant.  I do

22  cases all over the country.

23  Q    Okay.  For the plaintiffs.

24  A    Well, sir, I do defense cases, too.

25  Q    Okay.  We'll talk about that.  You know the plaintiffs in

                    Allen - Cross / By Mr. Moye                    44

1    lawsuits are the one bringing the claim, right?

2    A    Yes, sir.

3    Q    And, so, when I use the word "plaintiffs," you know what

4    I'm talking about.

5    A    Sure.

6    Q    Okay.  Do you know what "witness bias" is, sir?

7    A    Why don't you tell me, sir.

8    Q    Well, let's let Google tell us.  For a demonstrative I'll

9    offer a Google definition of "bias" that says:

10            "Prejudice in favor of or against one thing, person,

11            or group compared with another, usually in a way we

12            consider unfair."

13            Is that a fair definition for me to use of "bias"

14   with you today, sir?

15   A    Yes, sir.

16   Q    Okay.  And one group could be plaintiffs and another group

17   could be defendants per that definition, right?

18   A    Could be, sir.

19   Q    Okay.  And if expert appears to be biased, that's not fair

20   to the jury, is it?

21   A    No, it isn't, sir.  It -- my opinions are based on facts,

22   sir, not for who I'm working for.

23   Q    Again, we had an agreement you would answer my question.

24   My question was, generically speaking, if a witness is biased,

25   it's unfair to the jury.  Is that a fair statement, sir?

Allen - Cross / By Mr. Moye                     45

1   A    Yeah, that would be fair.

2   Q    And you would tell them, "Ladies and gentlemen, you are

3   free to discredit biased opinions," wouldn't you?

4   A    Yeah, I guess I would, sir.

5   Q    Okay.  Because a witness in your capacity as an expert is

6   supposed to assist the jury in appreciating facts they don't

7   see in their day-to-day lives.  Is that a fair definition?

8   A    Yes, sir.  That's what I try to do, sir.

9   Q    Not supposed to be a hired gun, are you?

10  A    That's correct, sir.

11  Q    Supposed to consider all of the available evidence before

12  making an opinion.

13  A    That's --

14  Q    Right?

15  A    That's correct, sir.

16  Q    You're a biased witness in favor of the plaintiffs in this

17  case, are you not?

18  A    Sir, all my opinions are based on the facts of the case.

19  They lean towards the plaintiff, but it's all based on facts,

20  sir.

21  Q    Okay.  Well, you are a part of plaintiffs' team, are you

22  not?

23  A    Well, because that they hired me, so that's all I can say,

24  sir.

25  Q    When I asked you under oath, and I said you consider

Allen - Cross / By Mr. Moye                                46

1    yourself part of plaintiffs' team, do you remember saying,

2    "Yes"?

3    A    I said I guess I would be, sir.

4    Q    And you want them to win their lawsuit, don't you?

5    A    Sir, I -- that's the decision of the jury to make.  I'm

6    only here --

7    Q    And you haven't testified differently, sir.

8         **(Pause)**

9         **MR. MOYE:**  Your Honor, may I approach with the

10   witness's deposition?

11        **THE COURT:**  Yes.  Yes.

12   **BY MR. MOYE:**

13   Q    Mr. Allen, I'm going to hand you a copy of your

14   deposition.  That's you on September 27th, 2016.  I was at your

15   office in Friendswood, wasn't I?

16   A    You was, sir.

17   Q    And I asked you to tell us the truth, right?

18   A    And I did, sir.

19   Q    And that court reporter swore you in and you raised your

20   hand and said, "I'm going to tell the truth," right?

21   A    That's correct, sir.

22   Q    And you absolutely knew everything you said to me I was

23   going to bring up here today in front of these fine folks,

24   right?

25   A    That's fine, sir, because I --

Allen - Cross / By Mr. Moye                    47

1   Q    Okay.  Well, turn to page five, line 15.  We'll start at

2   nine.

3              "QUESTION:  I read some prior testimony of yours, and

4              you frequently used the term, 'We won that case' or

5              'We won that appeal.'  Do you consider yourself part

6              of plaintiffs' team in this case?

7              "ANSWER:  I guess I would be."

8              "QUESTION:  Do you hope the plaintiffs, or the Pugas,

9              win their lawsuit?

10             "ANSWER:  I'm sorry?

11             "QUESTION:  Do you hope the Pugas win their lawsuit?

12             "ANSWER:  Based on the facts, yes, sir."

13             Did I read that correct, sir?

14  A    You did, sir.  And that's what I said based on the facts.

15  Correct, sir.

16  Q    Sir, I didn't have a question.  I asked you if I read it

17  correctly.

18  A    Yes, sir.

19  Q    So the answer to that question was "yes."

20  A    Yes, sir.

21  Q    All right.  Federal Court rules require you to keep a list

22  of the last four years of testimony, right?

23  A    Yes, sir.

24  Q    And you do that; you do it accurately, don't you?

25  A    The best I can, sir.

EXCEPTIONAL REPORTING SERVICES, INC

Allen - Cross / By Mr. Moye                                    48

1   Q    So, cases you testified in -- you have that in file

2   materials, don't you?

3   A    I'm sorry, sir?

4   Q    You have your testimony list in your file materials, don't

5   you?

6   A    Uh, I believe I do, sir.

7   Q    All right.  Well, we scroll through; that's page one, page

8   two, three, four, five, six, seven, eight, nine, ten, eleven,

9   12, 13, 14, 15, 16, 17, 18, 19, 20, 23.  Twenty-three pages in

10  the last four years you've testified for the plaintiffs, fair?

11  A    That's fair, sir.

12  Q    I counted them up.  That's 144 times.

13  A    Okay, sir.

14  Q    No reason to disagree with that?

15  A    No, sir.

16  Q    Unless I counted wrong, but maybe it's 142, 143.  And you

17  got -- that was dedicated to plaintiffs' work.

18  A    That's correct.

19  Q    Right?

20  A    That's correct.

21  Q    And we turn the page, defense cases.  You've got three.

22  Don't you?  Do you see it?

23  A    I do, sir.

24  Q    One of them is a criminal case, isn't it?

25  A    That's correct, sir.

Allen - Cross / By Mr. Moye                                     49

1   Q    That's not testifying for a defendant in a civil case, is

2   it?

3   A    Sir, again, these are just strictly trials and

4   depositions.  Those are all I testified for defendant.  I agree

5   with you, sir.

6   Q    Okay.  So, my question -- the answer to my question was

7   "yes."

8   A    Yes.

9   Q    All right.  So, the first one is a criminal case, so we're

10  down to two times in the last four years you've testified for

11  the defendant.  Those on the bottom?  Correct?

12  A    Yes, sir.

13  Q    Both of those cases you testified against the truck

14  driver.  I read them.  You represented the shipper, didn't you?

15  A    Sir, I'm not really sure.  I don't remember them, sir.

16  Q    All right.  Sitting here today, you don't remember in the

17  last four years the only two times you testified for the

18  defendant, and you don't remember the facts of the case to tell

19  us who you were against.

20  A    Well, wait a minute, sir.  Let's go back to

21  (indiscernible).  You said I -- I represented who, sir?

22  Q    You represented the shipper in both of those cases, and

23  both times you gave testimony against the trucking company and

24  the truck driver; is that true, sir?

25  A    That was a trucking case.  That would be correct.

EXCEPTIONAL REPORTING SERVICES, INC

1   Q     Okay.

2   A     Uh --

3   Q     So, now we have --

4   A     Uh --

5   Q     -- the last four years, every single time you've

6   testified, 147 to zero, has been against a truck company and a

7   truck driver, right?

8   A     Or a bus driver.

9   Q     And 144 of them on behalf of the plaintiffs bringing a

10  lawsuit, right?

11  A     Whatever number that was, yes, sir.

12  Q     Okay.  In the last two years you've got 16 cases with

13  Mr. Henry's office, don't you?

14  A     That sounds about right.

15  Q     And how many current cases do you have, notwithstanding

16  just testimony?  How many cases do you have right now that

17  you've been hired by this law firm?

18  A     I'm not real sure, sir; five or six, maybe.

19  Q     Just five or six?

20  A     That -- that's all I can remember off the top of my head,

21  sir.

22  Q     Well, the 16 times you've testified for them, that's over

23  15 percent of what you've done in the last two years.  So, are

24  you sure it's just five or six total cases you've got left?

25  A     Sir, that's -- that's not the total business.  That's

1   based on trials and depositions, sir.

2   Q    Okay.

3   A    That's not a good, fair representation of the --

4   Q    We agreed you would answer my question.  I specifically

5   used the word "testify."  The lawyer who hired you is free to

6   ask you whatever he wants.  My questions are my questions.

7   Testimony.  Sixteen times for Mr. Henry's offices; 15 percent

8   of what you've done in the last two years alone.

9   A    Whatever that figure is, sir.

10  Q    All right.  No reason to dispute it.

11  A    No, sir.

12  Q    You mentioned on your curriculum vitae, your resume, that

13  you have references available upon request; on the bottom

14  there.  Remember at your deposition I asked you to give me one

15  human being in the state of Texas that represents the

16  defendants and you couldn't do it?  Can you do it now?

17  A    Sir, I can't remember names off the top of my head.  My

18  office does that.  I'm sorry.  I just don't remember names off

19  the top of my head.

20  Q    Okay.  Can you tell me the name of a single defense lawyer

21  in the United States that you have a case with today?

22  A    Sir, we've got 15, I think, defense cases right now.  I

23  don't remember the attorneys' names.  Sir, I'm sorry.  I have

24  trouble remembering names.  That's the reason I keep a lot of

25  the notes I do.

Allen - Cross / By Mr. Moye                                    52

1   Q    You still hold the opinion you're not biased?

2   A    Yes, sir, I do.

3   Q    Okay.

4   A    I give my opinions based on facts of the case, sir.

5   Q    You have been paid about $9,000 you said in this case,

6   right?

7   A    I said approximately.  Correct.

8   Q    Okay.  And, in fairness, I have experts; they're going to

9   want to get paid, too, so I'm -- I'm not concerned about the

10  getting paid concept there, but it's $9,000, right?

11  A    It's approximately, sir.

12  Q    Is that an average case?

13  A    About average, yes, sir.

14  Q    Okay.  Obviously, some might have been more; some might be

15  less.  We'll take that as an average case.  I can take that

16  representation, right?

17  A    I would guess it would be, sir.

18  Q    Okay.  And your personal hourly rate is what?

19  A    Three fifty an hour, sir.

20  Q    Okay.  When did you start doing this?  Nineteen ninety-

21  five?

22  A    Uh, correct, sir.  That's when I formed the company.

23  Q    And you actually got started by a plaintiffs' lawyer,

24  right?

25  A    No, I really got started by the law professors of South

1    Texas Law School, is who helped set me up in business, sir.

2    Q    John Ansley (phonetic).

3    A    Yes, sir.

4    Q    Who is your attorney in a case you had, right?  Against

5    the City of Houston?

6    A    Well, he -- he was a co-attorney.  He wasn't an attorney I

7    hired.  But --

8    Q    So, when I asked the question about a plaintiffs' attorney

9    setting you up in business, the answer to that is, yes, that's

10   what happened, right?

11   A    Sir, I considered him as -- as a law professor, and he was

12   working the case, but I didn't hire him, sir.

13   Q    Well, when he worked the case, he talked to you about

14   trucking, and then he referred you over to one of his buddies

15   named Reed Morgan, didn't he?

16   A    That's true, sir.

17   Q    Did you do a case for Reed Morgan?

18   A    I did, sir.

19   Q    Was that your first case as a consultant for plaintiffs in

20   trucking cases?

21   A    It was, sir.

22   Q    That name rings a bell.  What's he -- what's he -- does he

23   have any famous cases?

24   A    He -- he was the attorney that handled the McDonald's

25   coffee spill case.

Allen - Cross / By Mr. Moye                              54

1   Q    And that's how you got your start, from that gentleman.

2   A    That was the first case I was referred in; I was referred

3   to him by Mr. John Ansley.

4   Q    Three fifty an hour; does that include flat fee work on

5   report writing?

6   A    Okay.  That's my fee.  Correct.

7   Q    Different question.  If you sit down and write a report,

8   is there a flat fee associated with that, or is it three fifty

9   an hour, however long it takes it takes, I'm billing my time?

10  A    No, according to our retainer agreement, we have a flat

11  rate for reports, sir.

12  Q    What's the flat rate for the report?

13  A    It's either three -- three thousand or thirty-five

14  hundred, sir.  I don't remember without looking at my --

15  without looking at it.

16  Q    The RGK Consultant business that Mr. Hunnicutt visited

17  with you about, there are other experts there, are there not?

18  A    There is.

19  Q    And are they -- they're not employees of yours; they're

20  outside contractors of yours?

21  A    That's correct, sir.

22  Q    And they do things like accident reconstruction or brake

23  inspections or CVR downloads, (indiscernible) crash tools,

24  those sort of things?

25  A    That's correct, sir.

Allen - Cross / By Mr. Moye                          55

1    Q    And you have office staff there, do you not?

2    A    Sure.

3    Q    I believe your wife might be the office manager?

4    A    True.

5    Q    Your daughter is a assistant of some sort, correct?

6    A    True.

7    Q    And they help in the business.

8    A    True.

9    Q    Do they have CDS?

10   A    Do they?  No, sir.

11   Q    Do they have any affiliation with professional driving

12   other than being you're her husband and they're daughter?

13   A    No, sir.

14   Q    They don't have any technical skill regarding trucking.

15   A    No, sir.

16   Q    They summarize your depositions at $200 an hour, don't

17   they?

18   A    That's what we charge, sir.

19   Q    Okay.  So, the office manager and the secretary in your

20   office, both lovely, I'm sure, with no technical skill, charge

21   $200 an hour to read something, type it up, and hand it to you,

22   to put in your file.

23   A    Our charge for -- is $200 an hour.  The -- Kelly doesn't

24   do deposition summaries.  It'd be Gloria, myself, Aaron, or

25   Carol.  Those are the only ones that does deposition summaries,

1    sir.

2    Q    Okay.  Well, let's talk about Carol, then.  Carol doesn't

3    work for you, does she?

4    A    She's an independent contractor. She is -- she worked --

5    did work for a lot of different attorneys through -- throughout

6    Texas summarizing depositions.  She's been working for me for

7    about 10 years.

8    Q    Is she a lawyer?

9    A    No, sir.

10   Q    Is she a paralegal?

11   A    I think at one time she was, sir.

12   Q    Is she a paralegal now, sir?

13   A    I can't answer that question, sir.

14   Q    And when she summarizes -- could have summarized

15   depositions in this case.

16   A    Do what, sir?

17   Q    Carol could have summarized depositions in this case; you

18   don't know.

19   A    I don't remember, no, sir.

20   Q    Okay.  Now, Carol, then, summarizes depositions; you pay

21   her, what, $25 an hour to do that?

22   A    Sir, I don't know what we pay her.  My wife takes care of

23   all that.

24   Q    Sitting here today, you can't tell me anything that you

25   pay Carol, and you've worked for her (sic) for 10 years

Allen - Cross / By Mr. Moye                              57

1   summarizing your depositions.

2   A    Sir, I don't handle the bills.  That's not my -- my job

3   with the company.  That's what my wife does, sir.

4   Q    Okay.  Well, you all turn around and charge the clients

5   $200 an hour for Carol's work, don't you?

6   A    That's what our agreed charge is, sir.

7   Q    You don't pay Carol $200.  You mark her time up to make

8   money on your files for no reason, with no work and no effort.

9   Is that fair, sir?

10  A    Her rate is marked up, yes, sir.  That's what we do.

11  That's -- that's a fact.

12  Q    Think that's fair?

13  A    I'm sorry, sir?

14  Q    Do you think that's fair?

15  A    Well, sir, that's how businesses make money.  They -- they

16  take the product and pay one thing and they mark it up.  That's

17  normal in a business, sir.

18  Q    I'm going to take your words.  You're in the business of

19  making money, aren't you, sir?

20  A    Well, sir, everybody that has a business is in the

21  business of making money, sir.

22  Q    Okay.  Well, did anyone in this case send your bill back

23  and say, "I'm not paying $200 an hour for someone to summarize

24  depositions that's not technical skilled and done by Carol"?

25  Nobody did that, did they?

Allen - Cross / By Mr. Moye                                     58

1    A     No, sir.

2    Q     They paid the bill in full.

3    A     They did, sir.

4    Q     No questions asked.

5    A     No, sir.

6    Q     So, were you still driving buses for the school district

7    when you started your consulting business?

8    A     Correct.  I drove buses for the school district up until

9    1999, sir.

10   Q     Okay.  So, if you've done just the four years' worth of

11   testimony we've seen, just the four years of testimony, just

12   giving testimony, not all the other work, just testimony, your

13   company's made $1.4 million.  Ten thousand a file, 144 files,

14   right?

15   A     Sir, I can't answer that question.  I do -- don't do the

16   bookkeeping, sir.

17   Q     Do you all make over a million dollars a year over there

18   at RGK?

19   A     Uh, oh, no, sir.

20   Q     "No, sir."  But you don't know about the bills, but you

21   can tell me, "No, not a million dollars, Mr. Moye"?

22   A     Well, I know -- I know we -- we've never made a million

23   dollars, sir.  I can tell you that, because we have a lot of

24   expenses, too, sir.

25   Q     Oh, so, net.  But the gross could easily be over a million

1   dollars, I bet, right?

2   A    If it has been, it's only been in the last year or two,

3   sir.

4   Q    Okay.  Still consider yourself a non-biased witness?

5   A    That's correct, sir.

6   Q    Okay.  You have affiliated in your professional life with

7   certain organizations.  Some of them are on your C.V., right?

8   A    That's true, sir.

9   Q    One of those organizations is called -- I had to look it

10  up -- Association of Plaintiff Interstate Trucking Lawyers of

11  America, APITLA.  You've been affiliated with them, haven't

12  you?

13  A    I believe for one year, a long time ago, sir.

14  Q    One year you put their logo on your website.

15  A    One year, sir, we did it.  When I got more involved and

16  found out what the opera- -- they were doing, I withdrew and

17  quit being associated with them, sir.

18  Q    No; you told me you quit because you didn't get any

19  referrals.  Right?

20  A    Well, yes, based on what they told me they were going to

21  do, so it was not being run as we was told it was going to do,

22  sir.

23  Q    You advertised on your website a page specific to trucking

24  lawyers that represent the plaintiffs, and you didn't get

25  enough referrals from it, so you took it off.

Allen - Cross / By Mr. Moye                                    60

1    A    I never got any referrals, sir.  I -- they -- what they

2    said they were going to do they didn't do.  That's the reason I

3    withdrew from them, sir.

4    Q    And you remember seeing their material.  It was really

5    aggressive, really pro plaintiff, with titles of speeches like,

6    "How to Win Big Bucks in Your Trucking Case."  That's a group

7    you associated with; that's a group you advertised on your own

8    website, didn't you?

9    A    One year, sir.

10   Q    The answer to my question is "yes"?

11   A    Well, I thought I did.  I said for one year, sir.

12   Q    AAJ, American Association of Justice.  You know those

13   folks, too, don't you?

14   A    Absolutely, sir.

15   Q    Plaintiffs' lawyer group, is it not?

16   A    It is, sir.

17   Q    And you've gone to their conventions every year, twice a

18   year, for the last, what, 15 years?

19   A    Approximately.

20   Q    Okay.  I can't even join that, can I?  Defense lawyer.

21   They don't let defense lawyers in.

22   A    I -- I don't think so, sir.

23   Q    All right.  Well, you haven't seen their application that

24   said I can't even apply?  It's okay.

25   A    I haven't seen an application.

Allen - Cross / By Mr. Moye                           61

1    Q    All right.  So, you're basing that on no knowledge about

2    anything other than you know it's a plaintiffs' group?

3    A    True.

4    Q    True.  Every two years you go out and get a booth to try

5    to get more referrals from plaintiffs' lawyers, right?

6    A    True.

7    Q    You've spoken at their events.

8    A    I have, sir.

9    Q    You gave a speech about how to educate about the dangers

10   of a big truck, right?

11   A    That wasn't -- that was a title of the conference.  That

12   wasn't my title, sir.

13   Q    Well, then, you attended the conference and paid money to

14   attend a conference where that was the subject matter, right?

15   A    True; but it wasn't my subject, sir.

16   Q    Well, do you ever go to the seminars when they offer

17   presentations like "Pretrial Strategies to Eliminate Sympathy

18   for the Defendant"?  An organization you're sponsoring.  Did

19   you know that's what they talk about?

20   A    Sir, I don't know anything about what you just said, sir.

21   Q    Similar topics:  "Preparing the Plaintiff for Deposition

22   using Psychodrama."

23   A    I don't know anything about that, sir.

24   Q    So, you don't have a clue what you're sponsoring?  You're

25   putting your money out there.

Allen - Cross / By Mr. Moye                                62

1    A    Sir, I'm a vendor.  I pay a fee to put up a booth at these

2    conventions.  That's what I do, sir.

3    Q    Well, you also donate to their political action committee,

4    do you not, sir?

5    A    Once or twice I did, sir.

6    Q    You are a contributor to the Friends of Justice, which is

7    a plaintiffs' lawyers' political action committee.   True or

8    not true, sir?

9    A    I did one time, sir.

10   Q    One time.  You've got a plaque in your office.  I saw it

11   when we visited earlier this year.

12   A    That's correct, sir.  One time.

13   Q    Proud enough of it to put it on a plaque, hang it on the

14   wall for everybody to see.  Right?

15   A    Yes, sir.

16   Q    Still don't think you're biased to the plaintiffs in this

17   case?

18   A    I am not biased, sir.  My opinions are based on the facts

19   of the case, sir.

20   Q    Conference 360 listed on your C.V.  You remember that?

21   A    Yes, sir.

22   Q    You've attended their seminars, have you not, sir?

23   A    I have, sir.

24   Q    You've sponsored their seminars.  Is that true, sir?

25   A    Not sponsored; attended as a vendor, sir.  I paid --

Allen - Cross / By Mr. Moye                          63

1   Q    Okay.  Attended as a vendor; paid money to be there.

2   Right?

3   A    As a vendor.  Correct, sir.

4   Q    Sure, but you paid to show up and try to get referrals,

5   right?

6   A    That's correct, sir, when I --

7   Q    And, again, Advocacy 360.  You've seen the materials.

8   Aggressive, pro-plaintiff, how to win big bucks, how to win

9   your case.  Right?

10  A    Right, that may have been the names of the conferences,

11  sir, but it had -- I -- it isn't what I was doing there.

12  Q    What about seminar topics about disputing motor carrier

13  authority and making brokerage claims, or brokers -- how to get

14  more money out of brokerage?  You've never seen that?

15  A    No, sir, I have not.

16  Q    Never.

17  A    No, sir.

18  Q    Not one?

19  A    No.

20  Q    Never seen seminar topics about thinking outside the box;

21  let's go after the shippers, and let's go after the brokers.

22  You've never seen that?

23  A    I've never seen documents like that.  Have I involved --

24  been involved cases like that?  Lots of them, sir.

25  Q    The seminars you sponsor, you don't know if that happens.

Allen - Cross / By Mr. Moye                              64

1  A    Sir, you want to say "sponsor."  I don't consider it

2  sponsoring.  It's a fee I pay to attend.

3  Q    Okay.

4  A    That's all I can tell you, sir.

5  Q    We'll move on.  You've got in your curriculum vitae --

6  where is it here?  "Houston Trial Lawyer luncheon, speaker,

7  18-wheeler case."  Remember that?

8  A    Yes, sir.

9  Q    That's pretty benign and innocuous, just putting "speaker,

10 18-wheeler case," isn't it?

11 A    Yes, sir, and I sat there and my speech was in regards to

12 the Federal Motor Carrier safety regulations and when the

13 federal regulations became -- were adopted and what the reason

14 they were there for, sir.

15 Q    And you sat on stage with other people, room full of

16 plaintiffs' lawyers, and you sat on stage with a title of the

17 seminar, "18-Wheeler Case, the Final Frontier, Helping the Car

18 Wreck Attorney make the Big-Rig Case Bigger."  That's the name

19 of the seminar you attended and spoke at.  Fair?

20 A    I don't remember, sir.  I have -- had nothing to do with

21 making the title.  I was invited by the Houston Trial Lawyers

22 to come in and speak.  And that's what --

23 Q    You don't -- you don't care if the title's right; you're

24 just going to show up, get paid --

25          **MR. HUNNICUTT:**  Your Honor, I do need to object.

EXCEPTIONAL REPORTING SERVICES, INC

1  He's cutting him off.

2          THE COURT:  Sustained.

3          MR. HUNNICUTT:  I've been letting it --

4          THE COURT:  Sustained.

5  BY MR. MOYE:

6  Q    You didn't have any say in the title, but when they called

7  you, you showed up.

8          MR. HUNNICUTT:  Your Honor, since the objection was

9  sustained, may he finish his answer --

10          THE COURT:  Yes.

11          MR. HUNNICUTT:  -- from the prior question?

12          THE COURT:  Well, you can answer.

13          MR. MOYE:  Well, I'll withdraw my question.

14          THE COURT:  Well, you can answer the question.

15          THE WITNESS:  Okay.  I don't have any say-so of what

16  the topics are as far as the seminars.  All I'm asked to do is

17  speak.  They will maybe tell me, "We want you to talk about

18  safe driving," "We want to talk about the federal regulations"

19  or "state regulations," and then I give a speech based on that.

20  I have nothing to do what the title of the conference is about.

21  BY MR. MOYE:

22  Q    And you couldn't wait to get there and start getting your

23  referrals on a topic called "Helping the Car Wreck Lawyer Make

24  their Big-Rig Case Bigger," right?  Did you leave?

25  A    Sir, I was invited by attorneys to come and speak, and

1    that's exactly what I did, sir.

2    Q    Did you leave when you found -- did you find that topic

3    offensive and not fair and biased?

4    A    No, sir, because I was there to talk about one thing, and

5    I give my speech, and then I left.

6    Q    All right.  Well, there's a defense group, too, called

7    Defense Research Institute, DRI, right?

8    A    Yes, sir, and I have attended their conventions as a

9    vendor and paid a fee to present there, too, sir.

10   Q    They won't let you speak.

11   A    They won't let me speak.  In 2004 they told me they were

12   going to let me speak, but they haven't done it.

13   Q    Thirteen years ago they were going to let you speak; you

14   haven't spoken since, and we know they won't let you speak.

15   Right?

16   A    Sir, I was --

17          MR. HUNNICUTT:  Your Honor, that -- that's assuming

18   facts not in evidence.  Counsel's got --

19          THE COURT:  Where are you getting that from?  You're

20   being a little argumentative.

21          MR. MOYE:  Well --

22          THE COURT:  I mean, I don't know where you're getting

23   that from.

24          MR. MOYE:  Well, I'm getting it --

25          THE COURT:  If you want to show me --

Allen - Cross / By Mr. Moye                    67

1        **MR. MOYE:**  -- from the case he testified in.  Well,

2   you know what?  He said they won't let him speak and he said

3   2005, so we can move on, Judge.

4        **THE WITNESS:**  May I -- may I make a correction?

5        **THE COURT:**  Yes, you can respond.

6        **THE WITNESS:**  That's a wrong statement, sir.  I

7   didn't say 2005.  I said 2014 they said they were putting me on

8   the speaker's list.  I didn't go to them back that long ago.  I

9   don't remember, sir.  I've been to two of them.  And I paid a

10  fee to be a vendor.  That's exactly what I did.  I have been so

11  honest with you, sir.  I've told you exactly what's happening.

12  **BY MR. MOYE:**

13  Q    I've read a ten-foot-high stack of your former testimony.

14  You say that every time; "Oh, next year," "Oh, next year," "Oh,

15  next year."  You've never spoken at their event, have you, sir?

16       **MR. HUNNICUTT:**  Your Honor, objection.

17  Argumentative.

18       **THE COURT:**  Well, you can answer the question.

19  Overruled.

20       **THE WITNESS:**  Sir, they -- I've told you, first of

21  all, they only have a seminar every two years in regards to

22  trucking.  All I can tell you, I've been to two of them; I

23  don't remember the years; but in 2014 they told me I was going

24  to be put on the list.  I have never been called.  That's all I

25  can tell you.  That's all I know, sir.

1  **BY MR. MOYE:**

2  Q    Okay.  Your C.V.; Mr. Hunnicutt asked -- asked you, "Has

3  anything been added or changed," right?

4  A    I believe so, sir.

5  Q    Well, you had an old C.V. where you list the following:

6  National Association of Testifying Experts.  Didn't you?

7  A    Oh, my gosh, sir.  That goes back 15 years ago or more.

8  Q    It was a group found on your C.V., though, right?

9  A    Sir, that group isn't around, hasn't been for years, sir.

10 Q    So, when you have past affiliations --

11 A    Well --

12 Q    -- you didn't list it, though, did you, sir?

13 A    No, sir.  You asked for a current C.V.  We've given you a

14 current C.V.

15 Q    Okay.  Well, the currentness is a historical look at who

16 Roger Allen is, right?  You listed the first job you had in

17 trucking.

18 A    That's true, sir.

19 Q    And you used to list this group.  You don't list it now

20 because it's a group you started to train expert witnesses on

21 how to give testimony.  Is that why it's not listed, sir?

22 A    You're wrong.

23 Q    I'm wrong?

24 A    I did not start that group.  Mr. Don Asa started that

25 group, not me.

Allen - Cross / By Mr. Moye                            69

1   Q    Mr. Don Asa at DSA Consultants out in Phoenix, Arizona,

2   who you had a business relationship with.

3   A    D & A Consultants.

4   Q    D & A.

5   A    That's correct, I did.  I did not start that group, sir.

6   Q    Well, you were part of the group, who you used to list on

7   your C.V., who you don't anymore, in the business of training

8   expert witnesses.  At least that's true, right?

9   A    I was there as an associate.  I did not do any training.

10  It was Mr. Don Asa's company.  He asked me to be on the board.

11  I was.  I did not do any training; I did not do anything to

12  promote it.  It was only effective maybe a year, sir.

13  Q    Why did you put it on your old C.V. and not now?  Why did

14  you take it off?

15  A    Because, sir, it's not around.  It hasn't been for

16  probably 15, 18 years, sir.

17  Q    It's because you don't want defense lawyers asking you

18  about it.  That's why you took it off, right?

19  A    I disagree with you, sir.

20  Q    Okay.  Well, your website.  You maintain a website, do you

21  not, sir?

22  A    I do, sir.

23  Q    And we pulled it up here as a demonstrative.  I'm not

24  trying to offer it into evidence.  Are you familiar with your

25  own website?

Allen - Cross / By Mr. Moye                     70

1  A    Well, if my wife updated it; I think I saw this, but I

2  don't remember.

3  Q    In your deposition I said, "Do you approve all of the

4  content on your website," and you said, "Yes, I do."  Is that

5  still the case?

6  A    Yes, it would be.  I think I saw it just before it was put

7  up.

8  Q    Well, on the very first page, where you market your

9  services, spoliation, and then questions for driver

10 depositions, questions for company reps, questions for safety

11 reps, you're advertising the plaintiffs' lawyers to call you,

12 and you would give them an outline on how to do their scope.

13 That's what that means, doesn't it, sir?

14 A    That's what I do for -- as part of litigation work, sir.

15 That's true.

16 Q    Front page of your website.  Right?

17 A    I don't know if it's the front page, sir.

18 Q    Okay.  Still don't consider yourself biased?

19 A    I am not biased, sir.  I base -- everything is based on

20 facts, sir.

21 Q    Do you have a CDL?

22 A    I do, sir.

23 Q    The only time you use that CDL is to drive your big truck

24 to plaintiffs' lawyers conventions to show them how a truck

25 works, right?

1   A    That's not the only time, but I -- I have done that in the

2   past.

3   Q    Remember in your deposition I asked you if there are any

4   strengths in my case?

5   A    Based on the facts, I told you no.

6   Q    Not a single one.

7   A    Based on the facts and what I knew.  I answered your

8   questions, sir, and I answered very truthful.

9   Q    Do you feel that way right now?

10  A    I do, sir.

11  Q    And there's not a single weakness to their case, is there?

12  Not one.

13  A    Sir, my opinions are based on the facts of the case, sir.

14  Q    Is the answer to my question yes or no?  Now, you're

15  identified as the expert witness in this case, hired by the

16  plaintiffs; a single weakness in their case?

17  A    No, sir, I do not see any.

18  Q    Not one.

19       **(Pause)**

20       You wrote a report; it's in your file, correct?

21  A    It is, sir.

22  Q    Well, you know what?  Before we get there -- remember

23  Mr. Hunnicutt, just as a foundational issue here, asked you

24  questions about the company testimony and whether they hire

25  outside carriers?

1  A    Yes, sir.

2  Q    And you said the testimony was they never did.

3  A    Uh, (indiscernible) don't.  That's their own testimony,

4  sir.

5  Q    Do you remember deposition testimony of Randy Clifton

6  taken December 10th, 2015, before your report February, 2016?

7  You remember if he said anything about the company hiring

8  outside carriers?

9  A    Sir, I don't remember what he said in his depo without

10 looking at it.

11 Q    Well, then, how do you answer Mr. Hunnicutt's question if

12 you don't remember what people said in their depositions?

13 A    Sir, I can't remember everything.  I try to do my best.  I

14 answered his question.  If I know the answer, I will answer.

15 If I don't, I'll look it up, sir.

16 Q    You just told him 20 minutes ago that that's what the

17 testimony said.  I asked you one minute ago, and you say, "I

18 don't remember."

19 A    Well, I didn't realize you was quoting the same thing that

20 he said.  If you said the same thing, sir, I'm sorry.  I'm

21 trying to answer your questions, sir.

22 Q    Okay.  Well, do you want to read this depo now?  We can

23 talk about it, because it darn sure says they hired outside

24 carriers.

25          MR. HUNNICUTT:  Your Honor, I -- I was just looking

Allen - Cross / By Mr. Moye                73

 1   in the word index.  "Outside" doesn't appear.

 2          MR. MOYE:  It does, too.

 3          THE COURT:  Okay.  You all need to stop being

 4   argumentative.  Direct your objections to the Court, and you

 5   need to show his lawyer you're referencing what part of the

 6   deposition.

 7          MR. MOYE:  I will use the ELMO, Judge, and turn to

 8   page 24 of Mr. Clifton's deposition.

 9          THE COURT:  Are you asking him a question from there?

10          MR. MOYE:  Yes.  I'm asking if this -- what he

11   just --

12          THE COURT:  Okay.  Well, why are you yelling at me?

13          MR. MOYE:  Oh, I'm sorry.  I'm not.  I'm sorry.

14          THE COURT:  I'm just asking you --

15          MR. MOYE:  I'm sorry.

16          THE COURT:  -- are you asking --

17          MR. MOYE:  I'm sorry.

18          THE COURT:  -- a question from there?

19          MR. MOYE:  I -- I'm going to make my goal --

20          THE COURT:  Because there are certain rules we need

21   to follow --

22          MR. MOYE:  Correct.

23          THE COURT:  -- when we use depositions.

24          MR. MOYE:  Correct.

25          THE COURT:  I am making sure they're being followed.

Allen - Cross / By Mr. Moye                    74

1   I don't need to be yelled at.

2            **MR. MOYE:**  You -- and my apologies for that.  I --

3            **THE COURT:**  Accepted.  Let's move on.

4            **MR. MOYE:**  -- get too excited.

5   **BY MR. MOYE:**

6   Q    You testified, sir -- I'll lay the predicate.  You

7   testified, sir, that the company employee depositions, there

8   was no mention of an outside carrier.  Do you remember that

9   testimony 25 minutes ago, sir?

10  A    Say it again, please, sir?

11  Q    Sure.  When Mr. Hunnicutt asked you questions, and he

12  said, "The only two type of drivers they hire are employee

13  drivers and lease drivers; they don't have outside carriers,"

14  do you remember that question?

15  A    I do, sir.

16  Q    Okay.  And do you remember how you answered that question?

17  A    I said that's my understanding.

18  Q    Okay.  When we look at -- you had Mr. Clifton's deposition

19  before you gave a report?  Right?

20  A    I believe so, sir.

21  Q    Did you prepare for this trial today?

22  A    I did, sir.

23  Q    Did you review Mr. Clifton's deposition?

24  A    I did.

25  Q    Okay.  And in reviewing -- well, before the report and

1    before this trial, you didn't see the question:

2              "Would Mr. Ronald Brown be considered to be one of

3              your leased drivers?"

4              Witness:  "No, sir, he would be just actually --

5              well, I guess you'd say, outside carrier is what we

6              call them.

7              "What is the difference, in your mind, between an

8              outside carrier and a leased driver for the company?"

9              "One of the owner operators you describe an outside

10             carrier, they run under their own authority for the

11             DOT; they're responsible for their own DOT

12             regulations; they are basically a complete separate

13             entity recognized by the Texas Department of

14             Transportation."

15             That's what this says.

16   A    That's what that says, sir.

17   Q    So, there is testimony from the company that they had

18   outside carriers before this load was hauled.

19   A    What they -- I understand they testified to, under some

20   set of logistics, they don't use outside carriers; they're used

21   under the broker division.  That's what the testimony I

22   remember, sir.

23   Q    We just saw it on the ELMO.  We just saw it.

24   A    Well, sir, I understand.  But that wouldn't be the case in

25   this case, because they, again, there had to be a lease

Allen - Cross / By Mr. Moye                              76

1   agreement, there had to be interchange agreement, and all the

2   paperwork doesn't agree, sir, and it doesn't -- it's not in

3   compliance with the federal regulations.

4   Q    Okay.  Well, if you didn't see it, you didn't see it.

5        You wrote your written report, did you not?

6   A    I did, sir.

7   Q    Appreciate the importance in federal court of having your

8   opinions, and the document signed, by you.  Right?

9   A    Yes, sir.

10  Q    Do you have your report in your file?

11  A    I've got it in front of me, sir.

12  Q    Twenty-four pages dated February 1st, 2016?

13  A    That would be correct, sir.

14  Q    Signed by you.

15  A    That would be correct, sir.

16  Q    Which means you verified all the information was true

17  before you put your signature on it, right?

18  A    True, sir.

19  Q    Had an opportunity to change anything that wasn't true at

20  the time, right?

21  A    True, sir.

22  Q    No way you'd sign a federal Rule 26 report unless you had

23  a chance to make sure it was accurate and all the facts were

24  there, right?

25  A    That's correct, sir, based on what I was there -- what I

Allen - Cross / By Mr. Moye                    77

1    was talking about, that's correct, sir.

2    Q    These are your words.  You dictated them and someone typed

3    them up.

4    A    That --

5    Q    Right?

6    A    That's correct, sir.

7    Q    You stand behind them to this day, do you not, sir?

8    A    I do.

9    Q    It's the only written report, and you haven't written

10   another one.

11   A    No, sir, I have not.

12   Q    Your report is not based on what happened, but what you

13   think was supposed to happen.  Is that true, sir?

14   A    Based on the regulations, that's what was required to

15   happen.

16   Q    So, the answer to my question is "Yes, my report is based

17   on what was supposed to happen, not what did happen," right?

18   A    Based on what is required by the federal regulations for

19   the -- him to be in compliance, that's correct, sir.

20   Q    All right.

21   A    I pointed out the mistakes that had been made.

22   Q    You reviewed some materials before you would have written

23   that report.  You just can't willy-nilly start putting words on

24   a piece of paper; you've got to have some foundation for that.

25   A    True, sir.

Allen - Cross / By Mr. Moye                    78

1  Q    And you reviewed some things, and they are part of that

2  box you have next to you.

3  A    True.

4  Q    Now, I'm going to guess there are some documents in that

5  box that have highlights on them.

6  A    I highlight a lot of stuff, sir.  We've talked about that.

7  Q    We talked about it at your deposition where I said, "If

8  there's highlights on the document, those highlights are

9  yours."

10 A    That's correct, sir.

11 Q    And they're not the office manager's or the assistant's or

12 Carol's highlights.

13 A    That's correct, sir.

14 Q    And I don't know Carol's last name, so I'm calling her

15 "Carol."  I don't disrespect Carol.  I don't think you remember

16 her last name either.

17 A    It's Canion (phonetic).  I just couldn't remember it that

18 day, sir.

19 Q    Ms. Canion.  That file you have next to you, if there's

20 something highlighted, you had a highlighter in your hand

21 because you thought it was relevant, right?

22 A    It could be, sir.  It may stand out, may make me think

23 about something, maybe that question gets answered later; so,

24 it always doesn't mean something, but it's just kind of take

25 notice, and maybe later on it will or will not.

Allen - Cross / By Mr. Moye                           79

1   Q    I'm going to use your phrase, "make you think about

2   something."  So, you highlighted things to make you think about

3   something later.

4   A    Maybe.

5   Q    Maybe.

6   A    It depends, sir.

7   Q    All right.  And you also, in that report -- or, sorry, the

8   file materials, you stamp it when it comes in, right?

9   A    The office is supposed to date stamp when we get

10  documents.  That's true, sir.

11  Q    All right.  So, you wrote your Rule 26 report and all of

12  your opinions in the case; you had Randy Clifton's deposition;

13  yes?

14  A    Yes, sir.

15  Q    Which uses the word "outside carriers."  You read it.

16  A    That's what he said, sir.

17  Q    Did you get his affidavit before you wrote the report?

18       **(Pause)**

19       You know what?  We'll have a break soon and we can

20  housekeep on the break.  I'm going to keep the train moving as

21  long as I can.

22       You had another deposition in your file, too, did you

23  not?  Robert Thomas?  This is all before you wrote your report.

24  A    Robert Thomas?  Yes, sir, I had his.

25  Q    Okay.  You had the carrier agreement, did you not?

Allen - Cross / By Mr. Moye                                    80

1    A    I did, sir.

2    Q    Okay.  The only two depositions you had when you wrote

3    your report -- three depositions -- you had Robert Thomas from

4    About Tyme, Randy Clifton from RCX, and the driver named Saenz

5    (phonetic) Johnson.  That's it?

6    A    That's all the three that I had at the time.

7    Q    So, from the deposition sworn testimony standpoint, you

8    made your opinions in writing based only on those three

9    depositions.

10   A    My report is based on the documentation I had at the time

11   I wrote that report, sir.

12   Q    Okay.  And the documentation you had at the time included

13   carrier agreement, right?

14   A    Yeah -- yes, sir.

15   Q    Did not include the bill of lading, did it?

16   A    It did not, sir.

17   Q    Because you wrote your report in February, you weren't

18   deposed until September 27th, both in 2016, and, golly, you got

19   the bill of lading the night before your deposition, did you

20   not?

21   A    That sounds right, sir.

22   Q    Not a single word in the report of your opinions in this

23   case about the bill of lading, is there, sir?

24        MR. HUNNICUTT:  Your Honor, it's really an unfair

25   question because the bill of lading wasn't produced in

Allen - Cross / By Mr. Moye                    81

1  discovery until after his report.

2            **MR. MOYE:**  That is fundamentally not true.  That was

3  produced in the first disclosures in November.

4            **THE COURT:**  You can --

5            **MR. HUNNICUTT:**  That's not --

6            **THE COURT:**  You can --

7            **MR. HUNNICUTT:**  Cross examine.

8            **THE COURT:**  -- redirect on that issue.

9  **BY MR. MOYE:**

10  Q    Trailer interchange agreement.

11  A    Didn't have it before my depo, correct.

12  Q    Well, let's look.  Do you have volume four --

13  A    Well, wait a minute, sir.

14  Q    -- of your index?

15  A    Pardon me, sir.  Let me check something.  Yes, I do, sir.

16  Q    Volume four of your index has Bates labels what to what?

17  A    RCX 1 through RCX 212.

18  Q    Okay.  And you didn't get those documents, that category

19  of documents, Bates stamped that way, until the night before

20  your deposition, right?

21  A    I think so, sir.

22  Q    Okay.  Well, when you wrote your written report, all your

23  opinions in it, you had Randy Clifton saying, "We brokered that

24  load to About Tyme under their DOT authority as an outside

25  carrier."  That's the genesis of that, correct?

1   A     Correct.

2   Q     And you have Robert Thomas from About Tyme, who said,

3   "That load was hauled by Ronald Brown in our tractor, placarded

4   with an About Tyme logo on the side, under our DOT authority."

5   He said that.

6   A     That's correct.

7   Q     And you had a carrier agreement that defined RCX Solutions

8   as broker and About Tyme as carrier, right?

9   A     There is a document that it's mis- --

10  Q     I know you don't like it, but it said what it said.

11          **THE COURT:**  Okay.  That's argumentative.

12          **MR. MOYE:**  My apologies.

13  **BY MR. MOYE:**

14  Q     It said what it said.  Right?

15  A     It said what it said, sir.

16  Q     Okay.  So, in that world of documentation, the entire

17  story was About Tyme saying, "It's us, it's our authority," and

18  RCX saying, "It's their authority."  The two people that said

19  it are the only people you relied on, right?

20  A     Sir, again, that's what they said, but they're -- I'll --

21  it's not in compliance with the regulations of what they was

22  doing, and that's what I have testified to.  That's what my

23  report is about.  They weren't in compliance.  They weren't

24  doing things as the Federal Motor Carrier Regulations require

25  them to do it.

Allen - Cross / By Mr. Moye                          83

1    Q    Because your opinion in this case has always been they

2    didn't do what they were supposed to do.  You're not really

3    commenting on the roles they had at the time and what they

4    agreed to do.  Is that fair, sir?

5    A    Based on the operating authority that had been granted to

6    them by the Department of Transportation, they were not doing

7    what was required under those agreements.

8    Q    And my question is very different.  My question is, your

9    sum total of opinions, everything you can offer this jury, is

10   based on what you think was supposed to happen, not what the

11   people involved said did happen, right?

12   A    It's not what I'm saying; it's what the regulation says

13   they were required to do, sir.

14   Q    So, you're not giving any opinions about the roles of any

15   party in this case now?

16   A    Sir, they couldn't do what they did.  They didn't have the

17   correct authority to do -- what they said they did, was doing,

18   is in direct conflict with the federal regulations and conflict

19   of what their operating authority said they could do.

20   Q    What if they had a brokerage license?  What if RCX had a

21   brokerage license and they don't broker this load, and About

22   Tyme tractor gets involved in the crash?  You wouldn't be here,

23   would you?

24   A    No, sir.  But it -- that wasn't done, sir.

25   Q    So, the sum total of your opinions is, they didn't have a

Allen - Cross / By Mr. Moye                                84

1   broker's license, right?

2   A    They weren't in compliance with the Federal Motor Carrier

3   Safety Regulations, sir.

4   Q    My question is different, sir.  My question is, the sum

5   total of your opinions are built on the fact that there was not

6   a broker's license, right?

7   A    That's just part of it, sir.  None of these documents they

8   have produced is in compliance.  The trailer interchange

9   agreement is not in compliance.  The carrier agreement is not

10  in compliance.  None of those documents are in compliance with

11  the regulations, sir.  None of them.

12  Q    Why do you care if About Tyme says, "It's us," and RCX

13  says, "It's them"?  Why do you care?

14  A    Because, sir, RCX is the motor carrier, and when they got

15  their authority, they told the Government -- they filled out an

16  OP-1 saying, "Hey, if you grant us authority, we will know the

17  Federal Motor Carrier Safety Regulations, we will follow, and

18  we will make sure we have safety standards in place to make

19  sure everybody in our company follows them."  You didn't do

20  that, sir.

21  Q    And they're bad boys because they didn't have a brokerage

22  license.  But that doesn't change anything, because that means

23  they're an unlicensed broker, and that's it, right?

24  A    They can't do what they did.  They're in violation.  They

25  can't operate as a broker.  They're claiming, even advertising

                    Allen - Cross / By Mr. Moye                    85

1   to the public, like you say I do, they are a broker.  And, sir,

2   they're not.  They're misrepresenting to the shipping world

3   that they are a broker when they don't have the proper

4   authority to do it, sir.

5            THE COURT:  Let's stop right there.  Let's go ahead

6   and recess for lunch.  Please remember your instructions.

7   Don't discuss the case with anyone at all, not even with each

8   other.  Don't attempt to get any information about the case

9   outside the courtroom, and don't send any texts or get on

10  social media about the case.  Thank you for your attention this

11  morning.  You can return at 1:30.

12            COURT SECURITY OFFICER:  All rise.

13       **(The jury exited the courtroom at 12:07 p.m.)**

14       **(Pause; voices and whispers off the record)**

15            THE COURT:  You can step down, sir.

16            THE WITNESS:  Thank you.

17       **(Pause; voices and whispers off the record)**

18            THE COURT:  Counsel, apparently one of the jurors, I

19  guess, told the officer -- and I'm just relating this -- said

20  something about some medical terms that were used that he

21  didn't -- he or she; I don't know who the juror was -- did not

22  know what it meant.  I'm just throwing that out there.  We're

23  assuming things will be cleared up through depositions or --

24            MR. MOYE:  Medical terms?

25            THE COURT:  Some medical term; didn't mention what.

1          **MR. MOYE:**  I don't know (indiscernible).

2          **THE COURT:**  Yeah.  Just any time anybody tells me

3     anything, I kind of unload it, because I don't want it to

4     later -- "Well, why didn't she tell us?"

5          **(Recess was taken from 12:08 p.m. until 1:33 p.m.)**

6          **THE COURT:**  Okay, the witness can come back on the

7     stand.  We ready?

8          **(Witness retakes stand)**

9          **COURT SECURITY OFFICER:**  All rise.

10         **(Jury enters at 1:33 p.m.)**

11         **THE COURT:**  You can have a seat and we'll continue.

12         **MR. MOYE:**  Thank you, Judge.  Mr. Allen, did you have

13    a nice lunch?

14         **THE WITNESS:**  Yes, sir.

15         **MR. MOYE:**  Did you review any documents?

16         **THE WITNESS:**  No, sir.

17         **MR. MOYE:**  I called my wife, she told me to be

18    mindful of my passion so I'll try to do that the second half of

19    the hearing this afternoon.

20                    **CROSS EXAMINATION (CONTINUED)**

21    BY MR. MOYE:

22    Q    We were talking earlier about -- let me just some

23    clarification before we get down the road too deep.  In

24    Mr. Hunnicutt's examination with you, you mentioned that you

25    also do DOT audits and train trucking companies and truck

Allen - Cross / By Mr. Moye                    87

1    drivers; do you remember that?

2    A     Yes, sir.

3    Q     You haven't done that in years, though, have you, sir?

4    A     Probably five years ago when I actually put on training

5    classes, true.

6    Q     And when I was discussing with you the bill of lading,

7    there was a comment made that we didn't produce it or we didn't

8    have it to you guys, and I said, well, we produced it in

9    November.  Well, I looked, my apologies, we produced it in

10   January.  So when you wrote your report, you had an entry

11   before you wrote your report receiving Defendant RCX's

12   responses to request for production; do you not, sir?

13   A     (No audible response)

14   Q     Actually, in fairness to you, I don't see it.  So you

15   never received production documents that were sent in January,

16   did you?

17   A     If I did, sir, it would have been the day before my depo.

18   Q     So if there for the documents that you received the night

19   before the deposition Bates one through 212, that they were

20   produced and signed for via green card on January 8th, that was

21   before your report, right?  That's just what the calendar says.

22   A     I can't -- sir, I don't know when they received them.  I

23   didn't have them when I wrote my report.

24   Q     Okay.  Well, you want to get all the documents necessary

25   to make opinions in any case you're hired, right?

1   A    Sir, I -- my reports are based on documents that I have,

2   and that's what I did, sir.

3   Q    My question, though, is a little different, though,

4   Mr. Allen.  It's your wish that you have everything available

5   to you before you write a report; is that true, sir?

6   A    Well, that'd be true.

7   Q    So when we look at the materials reviewed page on your

8   report, the second thing listed is Plaintiffs' first amended

9   complaint, right?

10   A    Yes, sir.

11   Q    And that document was the legal document wherein the Pugas

12   had brought a lawsuit against About Tyme, Xtra Lease, and RCX,

13   right?

14   A    Yes, sir.

15   Q    And you received that document before you wrote your Rule

16   26 report.

17   A    True.

18   Q    You received a second amended complaint as well in this

19   case, did you not?

20   A    True.

21   Q    And the second amended complaint you received after your

22   Rule 26 report, right?

23   A    I'm not sure, sir, without seeing the -- when we --

24   Q    Well, you have an inventory list on the front of your work

25   product, do you not, sir?

Allen - Cross / By Mr. Moye                     89

1   A    No, sir, I don't, other than my index.

2   Q    Your index, I'm sorry.

3   A    Yeah.

4   Q    I'll use your word, index.

5   A    Yes, sir.

6   Q    When you write your report, you have an index where you

7   can put a date down when you got something.

8   A    Yes, sir, basically this is an index the way my file's set

9   up.  And there was -- there's actually five volumes but there

10  was four volumes at that time and it shows what's in each

11  volume of my file, sir.

12  Q    Okay, well, in this document, I took the liberty of taking

13  your Bates stamps which you said indicate when you received it

14  and learned that you had the first amended complaint January

15  16, before you wrote your report February of '16, and you got

16  Plaintiffs' second amended complaint July, 2016, which would

17  have been after your report but before your deposition.

18  A    Sir, I --

19  Q    Do you have any reason to disagree with that?

20  A    Without looking at it, seeing when it's stamped, I can't

21  answer that question, sir.

22  Q    Okay.  Well, when you wrote your report, you had a

23  complaint by the Plaintiffs that sued About Tyme, Xtra Lease,

24  and RCX; we know that, right?

25  A    Yes, sir.

Allen - Cross / By Mr. Moye                    90

1   Q     And before you gave a deposition, you had a complaint that

2   only sued RCX; is that true, sir?  Second amended complaint

3   only sued RCX.

4   A     Sir, again, without checking and seeing the dates come in,

5   I can't answer that.  Whatever I had when I wrote the report

6   would be listed there, sir.  That's --

7   Q     Okay.  Well, do you have your file in front of you with

8   the tabs?

9   A     I'm sorry?

10  Q     Do you have the tabbed file in front of you?

11  A     Down in my box.

12  Q     Well, let's look at Plaintiffs' second amended complaint,

13  and this document has at the top just one defendant listed,

14  right?

15  A     That's true, sir.

16  Q     Okay, so the only defendant in the second amended

17  complaint in July when you received it was RCX Solutions.

18  A     That's what that document says, sir.

19  Q     Okay, and --

20        **MR. MOYE:**  You can take that away.

21  Q     -- the documents you had between report and depo is the

22  interchange and the bill of lading, right?

23        **(Pause)**

24  A     Those documents came in after my report, true.

25  Q     But before your deposition.

Allen - Cross / By Mr. Moye                                    91

1   A    Before my deposition, correct.

2   Q    And there are other documents that have been produced.

3   For example, there are 40 plus rate confirmation sheets

4   produced in this case that list Jason Butler, RCX, and the

5   brokership; have you ever seen those?

6   A    I'm not sure, sir, without looking at them.

7   Q    Okay, when I asked you in your deposition and you said you

8   didn't know if you'd received them yet.  Since the deposition

9   have you received any documents?

10  A    Since the deposition?

11  Q    Correct.

12  A    No, sir, other than what I got the day before my

13  deposition that we talked about.

14  Q    So I can rely on the fact that if you have documents in

15  your file, they are inventoried in your inventory list we just

16  saw.

17  A    Well, they should be.  If something was left off, I mean,

18  I'm not going to say it wasn't, but as far as I know,

19  everything was there when I report or when we -- you did my

20  deposition, sir.

21  Q    And a blank lease agreement, you never received that form

22  from RCX Solutions, have you?

23       **(Pause)**

24  A    You said blank lease agreement?

25  Q    Sure.  We produced -- so we're all on the same page, we

Allen - Cross / By Mr. Moye                                    92

1    produced a set of files of our leased drivers and their driver

2    qualification materials and everything associated with what the

3    company did for their leased drivers.  Have you seen those

4    documents, sir?

5    A    Not that I know, sir.  I don't think so.

6    Q    Your report --

7              **MR. HUNNICUTT:**  Your Honor, may we approach?

8              **THE COURT:**  Yes.

9         **(Begin bench conference)**

10             **MR. HUNNICUTT:**  The Court had ordered our motion in

11   limine that the expert reports not be admitted into evidence.

12             **THE COURT:**  Right.

13             **MR. HUNNICUTT:**  And if he's going to start showing

14   the report, I'm going to say he's waived and that I get to

15   introduce the report.

16             **MR. MOYE:**  It's not evidence, it's demonstrative

17   purposes.  The (indiscernible)

18             **MR. HUNNICUTT:**  (Indiscernible)

19             **MR. MOYE:**  -- work product.

20             **MR. HUNNICUTT:**  (Indiscernible)

21             **THE COURT:**  You can ask him about it and then I guess

22   he's not agreeing with something in the report, you can show

23   him.  But they're not admitted into evidence.  He can certainly

24   use the report to (indiscernible)

25             **MR. HUNNICUTT:**  Yes, he can use it but you can't say

1   that something's demonstrative to get around the hearsay rule.

2   Demonstrative is for things like when I did the training

3   (indiscernible)

4           THE COURT:  What are you using it for?

5           MR. MOYE:  It's his work product.  I have to lay the

6   predicate of what his opinions were.  Under Rule 26 when he

7   made them, that's what they were.

8           MR. HUNNICUTT:  And that's usually done orally.

9           THE COURT:  Well, but he's also questioning what

10  documents did you have, and this specifically says what he had

11  and he can use it.  It's not going back to the jury.  There are

12  some limitations.  You can't just sit there and read it into

13  the record or anything like that.

14          MR. HUNNICUTT:  Okay, then --

15          MR. MOYE:  (Indiscernible)

16          THE COURT:  Yeah, it's --

17          MR. MOYE:  (Indiscernible)

18          MR. HUNNICUTT:  Then can I do the same thing?

19          THE COURT:  You can use it.  It's not going into

20  evidence but you can (indiscernible)

21          MR. HUNNICUTT:  Understood, understood.

22          THE COURT:  -- the witness.

23          MR. MOYE:  Thank you.

24      **(End bench conference)**

25  //

1   **BY MR. MOYE:**

2   Q    Mr. Allen, you have your file in front of you.

3   A    I have my report in front of me.

4   Q    And you have it literally in front of you, it's not in

5   that gray box?

6   A    My report, yes.

7   Q    Okay, and you had it in your possession there to refer to

8   because you knew I'd ask some questions about your opinions

9   (indiscernible)

10  A    I had what I refer to as my deposition trial folder which

11  I showed you at my deposition that I have and I have that exact

12  folder which you marked as an exhibit, sir.

13  Q    And your expert report written February 1st, 2016, who was

14  it authored to?

15  A    Was what?

16  Q    Was authored to Mr. Hunnicutt.

17  A    Yes, sir.

18  Q    And it was signed by you on page 24.

19  A    Correct.

20  Q    And there's not a word in here that says "arrangement,"

21  does it?

22  A    Yes.

23  Q    The word "arrangement" is not used once in 24 pages in

24  this report, is it, sir?

25  A    I don't think it says "arrangement."  It talks about

Allen - Cross / By Mr. Moye                         95

 1  leases and everything else there.

 2  Q    And under the fact section there -- and for the record,

 3  I'm not offering your report into evidence but I'm going to

 4  refer to some of your opinions.  You have fact section where

 5  you list certain facts about the accident.

 6  A    Sir, everything under facts comes right off the police

 7  report.  All I'm doing is requoting what the police report, so

 8  facts is what the police report was based on.

 9  Q    So the three paragraphs that are there under "facts,"

10  those are all from the police report.

11  A    That's correct, sir.

12  Q    Where in the police report does it say:  "Unit two was

13  owned by Xtra Lease and leased to RCX Solutions, Inc. out of

14  St. Louis, Missouri?"

15  A    Okay, I corrected that because at the -- that's what we

16  thought was because it showed -- I don't have the police report

17  in front of me.  But that's the reason this all changed, it

18  showed Xtra Lease if I remember correctly, sir.

19  Q    Okay, well, and you just told us that all this came from

20  the police report.

21  A    Well, yes, sir, --

22  Q    Not all of it, fair?

23  A    I stand corrected.

24  Q    And --

25  A    I --

EXCEPTIONAL REPORTING SERVICES, INC

1  Q    I'm sorry.

2  A    The police --

3  Q    I'm a little passionate, so please finish.

4  A    The police report said Xtra Lease.  Well, I knew that

5  something was wrong with that.  And then when I finally figured

6  out what was going on, Xtra Lease wasn't in control of the

7  trailer, RCX was, because that's part of the lease agreement

8  between a carrier.  Once they have it in their possession, they

9  are in control of it.

10 Q    That's not in the police report anywhere.  You put that

11 under the fact section of your report, did you not?

12 A    Yes, sir, but it still is a fact, sir.

13 Q    Well, a fact is also that unit one was owned and being

14 operated by About Tyme Transport, Inc. of Little Rock,

15 Arkansas; that is also a fact, is it not, sir?

16 A    I agree with that, sir.

17 Q    "Being operated by" were your words, were they not, sir?

18 A    The -- that's what it says, they're -- because it still

19 had the -- they have to place their name and DOT number on

20 their unit.  What was involved in the accident had their name

21 and DOT number, and that's where the police report got that

22 information and they put it on there, sir.

23 Q    Did that tractor say "RCX" on the outside of it?

24 A    No, sir, it should -- it didn't, but it should have.

25 Q    And my question again, sir, is simply just whether it did

Allen - Cross / By Mr. Moye                                    97

1   or didn't.  So it did not say "RCX Solutions" on the side of

2   that tractor.

3   A     No, sir, it did not.

4   Q     And we know that from Mr. Thomas's testimony that it

5   didn't have -- or it didn't have the RCX Solutions anywhere

6   listed on it, right?

7   A     That'd be correct, sir.

8   Q     Well, later, on page nine -- well, we have another

9   statement -- I'm sorry, page 14.  Under a section you offered

10  for Ronald Brown, you made a statement that says:  "Ronald

11  Brown was an employee of About Tyme and was in the course and

12  scope of his employment on January 9th, 2015."  Did I read that

13  right?

14  A     You did, you read it right, sir.

15  Q     And that's not listed in the police report anywhere, is

16  it, sir?

17  A     No, but it shows him driving the truck, sir, so --

18  Q     My question was, is the words "course and scope" listed

19  anywhere in the police report, sir?

20  A     No, sir, it shows him as the driver of that commercial

21  vehicle at the time that of that incident.

22  Q     So the words "course and scope of his employment" are

23  words that Roger Allen typed and signed for, right?

24  A     Correct, sir, because he was an employee, so that means he

25  was in the course and scope of his employment at that time,

1  sir.  He was driving their vehicle.

2  Q    And then your report has various complaints about both

3  about Tyme, Mr. Brown, and also RCX, fair?

4  A    That's correct, sir.

5  Q    And you actually lead your report off with About Tyme, do

6  you not, sir?

7  A    I leave the report off of what, sir?

8  Q    You lead off -- you have your faction section and then you

9  go into About Tyme Transport, right?

10 A    Oh, yes, sir, yes, sir.

11 Q    Then you have 11 and a half pages of various concerns and

12 complaints about About Tyme; is that true, sir?

13 A    Sounds about right, sir.

14 Q    And then you have on page 13, 19 violations that you claim

15 are committed by About Tyme.

16 A    Yes, sir.  Most say regards to not having the proper

17 recordkeeping as required by a motor carrier.

18 Q    So you -- again, when you were asked to give your clients

19 your opinions in this case, you listed 19 violations by About

20 Tyme.

21 A    I did, sir, but there's a violation about RCX, too, sir.

22 That's my job, is to look at and see who's in compliance and

23 who isn't.  And my -- that's what my opinions are based on, the

24 facts of what there is, what there's not, and what there should

25 be, sir.

                    Allen - Cross / By Mr. Moye                    99

1    Q    You have --

2    A    It's all facts.

3    Q    I'm sorry, I stepped on you again.  I'm sorry, did you --

4    were you finished?

5    A    It's all facts, sir.

6    Q    Facts?

7    A    Yes, sir.

8    Q    Nineteen separate violations against About Tyme.  These

9    are motor carrier violations, are they not?

10   A    They are motor carrier violations that a motor carrier is

11   required to follow and what drivers are followed.

12   Q    These violations don't apply to someone who's a leased

13   driver on someone else's authority, do they, sir?

14   A    I disagree with you, sir, because he was an employee of

15   About Tyme, but when he posts a load for somebody else, he's

16   now also an employee of that company while he's under dispatch,

17   sir, --

18   Q    And --

19   A    -- so he can be two -- have two different employers, sir.

20        THE COURT:  Your Honor, I'd invite -- well, I'll

21   approach on the employer issue.

22   Q    That's not the question I asked you, sir.  The question I

23   asked you was, you have 19 violations by About Tyme.  These are

24   motor carrier violations, yes?

25   A    I answered that, sir.  I said yes.

Allen - Cross / By Mr. Moye                    100

1   Q    And then the next question was this, sir.  These don't

2   apply to leased drivers; is that true, sir?

3   A    Well, part of it does, sir.  For example, there's no

4   medical certificate.  That is a driver violation and a company

5   violation, sir.  So part of them would be, sir.

6   Q    Part of them would.  Most of them would not apply in a

7   situation involving a leased driver; is that fair, sir?

8   A    No, sir, because leased driver, they're also required to

9   have a driver qualification filed on a leased driver and make

10  sure that they are in compliance, they're qualified, and

11  everything, sir.  So it doesn't matter whether there's a

12  company driver or a leased driver, sir.

13  Q    Well, if I'm a lease driver and I don't have DOT authority

14  and I lease only with a company, none of these apply to me.

15  These are motor carrier violations, right?

16  A    Sir, but you're a commercial driver.  You're -- you've got

17  to have proper license, you have to have proper training, you

18  have to be medically qualified, you have to know the rules and

19  regulations, you have to know the hours of service.  So it

20  still does apply to you, sir, as a driver, a leased driver, or

21  whether you were a company driver, sir.

22  Q    Sir, I'm not asking you about anything other than the 19

23  things that you put down where it's About Tyme.  Those are

24  motor carrier issues that don't apply to leased drivers.  You

25  wrote them because you thought About Tyme was the motor

Allen - Cross / By Mr. Moye                                    101

1    carrier, right?

2    A    Well, sir, they was the -- About Tyme is a motor carrier,

3    which I spell out.  I showed what their DOT number was, I

4    showed -- they were required to know the Federal regulations

5    and make sure all their drivers were qualified, and they had to

6    keep driver qualification filed.  So that's what I'm referring

7    to.  They didn't have their recordkeeping that they were

8    required to have as a motor carrier.

9    Q    As a motor carrier, we'll agree.  Now, you have four

10   violations against RCX and that's it, right?

11        **(Pause)**

12   A    No, sir -- well, I've listed that they're -- about their

13   paperwork, but there's more violations about -- ones about not

14   having the proper broker authority, sir, which we've been

15   talking about all day.

16   Q    And that's fine, but your report, you wrote four things.

17   A    Sir --

18   Q    Did you not?

19   A    I'm talking there, sir, on -- if you're talking about on

20   page 19, I'm talking about the lease agreement, the tractor

21   being operated, general -- and what's required.  That's where I

22   refer to.  But then if you go back to page 20, then again I'm

23   talking about the lease agreement, what's required, and the

24   definition of "employer," and drivers furnished by other

25   carriers.  So it's all in there, sir.

1   Q     No, I --

2   A     I just laid it out in a different manner, sir.

3   Q     Sir, you laid it out this way.  You actually say:  "The

4   following is a list of violations."  And my question was, sir,

5   you listed only four things; is that right?

6   A     On that page, that is correct, sir.

7   Q     Yes.  And, again, you don't have any of the 19 violations

8   against About Tyme also against RCX, do you, sir?

9   A     I laid out the two different carriers, the violations.

10  The only one I didn't put in there was about the broker, but I

11  mentioned it earlier, we talked about in my deposition, and

12  we've talked about it today, sir.

13  Q     I understand that you have an opinion that they didn't

14  have brokerage authority, and you have offered us your opinions

15  on that, that's fine.  My question, though, to you was, you

16  listed 19 motor carrier violations against About Tyme in your

17  report and you listed four against RCX; is that not a true

18  statement?

19  A     Four on that page, sir, but there's others on other pages.

20  Q     Well, I don't think there are because you have FMCSR

21  violations by About Tyme, you had 19; then you have only four

22  listed against RCX.

23  A     All right, at -- okay, I didn't list about the not having

24  the broker in that which should have been, but I've been

25  talking about it, sir.

1   Q    Well, in the "conclusion section" -- I assume "conclusion"

2   is the normal definition of "conclusion," right?

3   A    Yes, sir.

4   Q    Not I'm guessing or I'm hypothesizing or I kind of know;

5   these are my conclusions I'm signing February of 2016.

6   A    That's correct, sir.

7   Q    And your conclusion, you have an opinion About Tyme is

8   there, right?

9   A    About Tyme, they were all, sir, and that's what I've been

10  saying all day, sir.

11  Q    Well, specific on the page 21 were preventable accident

12  manual, the incident that occurred on January 9th was

13  preventable on the part of About Tyme and on the part of Ronald

14  Brown; didn't list RCX there, did you?

15  A    No, I didn't say RCX, but RCX was the carrier.  It should

16  have been listed there, sir, and that's --

17  Q    Well, --

18  A    -- my mistake, sir.

19  Q    Your mistake in February you didn't put them, but today

20  you think they should be there.

21  A    Sir, we talked about that.  I said that in my deposition,

22  too, sir.

23  Q    I didn't ask you the question in the deposition on

24  preventability.

25  A    Wait a minute, sir.  We talked about the problems and

Allen - Cross / By Mr. Moye                              104

1    paperwork and this.  I've said all along RCX was the motor

2    carrier at this particular time, sir.  So anything violation at

3    the time of the accident would be with both carriers, sir.

4    Q    And, again, preventability, commercial vehicle,

5    preventable accident manual, that's something a motor carrier

6    is involved with, right?

7    A    It's also the driver's because that's what you're

8    determined, was did the driver do anything wrong to prevent --

9    to cause it.  And the fact is, it says a preventable accident

10   is one where the driver fails to take corrective actions to

11   prevent it.

12   Q    Yeah, preventable accident on the part of a motor carrier

13   means the following.

14   A    Correct.

15   Q    And that section you just mentioned is a motor carrier and

16   driver section that the only people you listed were about Tyme

17   and Ron Brown, right?

18   A    That's correct, sir.  RCX should have been there, sir.

19   Q    Should have been?

20   A    I didn't say it precisely but I've said it along because

21   they were involved in it, they were a motor carrier, so that

22   reflects back to both motor carriers, sir.

23   Q    Well, on page -- at the bottom of 21 you have in bold:

24   "About Tyme exhibits poor supervision."  In bold, right?

25   A    That's true, sir.

1  Q    And then you mentioned RCX and About Tyme in that

2  paragraph.

3  A    I do, sir.

4  Q    And then in bold:  "About Tyme exhibited inadequate

5  training."  Right?

6  A    Yes, sir.

7  Q    Then you mentioned About Tyme and RCX.

8  A    That's true, sir.

9  Q    Then on the bottom in bold you finally list RCX in bold,

10 about lax policies, right?

11 A    That's true, sir.

12 Q    And then you gave:  "My opinions are as follows" colon,

13 and you have two things about RCX, right?

14 A    What page are you on, sir?

15 Q    Page 23, my apologies.

16 A    Yes, sir.

17          **MR. MOYE:**  You don't show that.

18 Q    And in there you've got two things against RCX, that you

19 say they're negligent for their use of leased drivers without

20 qualifying them or training them as required, and then you have

21 RCX is negligent in their lease of equipment without executing

22 a proper lease agreement, right?

23 A    That's right, sir.

24 Q    Then I turn the page and then you have About Tyme is

25 negligent in their failure to implement a culture of safety by

Allen - Cross / By Mr. Moye                          106

1   cutting corners in their hiring and training.  You have About

2   Tyme is negligent in their failure to implement a driver

3   training program.  You have About Tyme is negligent in their

4   failure to develop a safety department dedicated to driving and

5   in compliance with the FMCSR.  You have About Tyme is negligent

6   in their failure to properly qualify Ronald Brown when he was

7   hired.  You have About Tyme is negligent in their failure to

8   property train Mr. Brown when he was hired.  Did I read that

9   right, sir?

10  A    You did.

11  Q    So your conclusion section has two issues with RCX about

12  not doing a lease the way you believe it should, and then all

13  these other opinions about About Tyme, right?

14  A    That's what it says, sir.  But all through the report,

15  sir, we talk about RCX, we talk about them not having a proper

16  license.  Sir, that's all been discussed through the entire

17  report, sir.

18  Q    I understand about the license, you keep wanting to go

19  there.  I'm focused on what the words in the report say and

20  that's what I asked you.  That's all I asked you.

21  A    Well, sir, wait a minute.  You're trying to get around

22  about the license.  Sir, you as a lawyer have to have a license

23  and you can't practice law without a license.  A trucking -- a

24  broker cannot broker loads without a license, sir.

25  Q    Can --

Allen - Cross / By Mr. Moye                               107

1    A    That's the way it is.

2    Q    Can someone without a license to broker loads then become

3    an unlicensed broker?

4    A    Sir, they're not doing it according to the Federal Motor

5    Carrier Safety Regulations, sir.  And that's what the

6    regulations govern the transportation industry and to do with

7    interstate commerce, the transportation between states.  And

8    that's what the states also -- if they're active as interstate

9    carrier, meaning within, they have to be a broker, sir, before

10   they can have a broker's license before they can broker loads.

11   Q    My question was, sir, can they operate as an unlicensed

12   broker?

13   A    Well, sir, I guess anybody could do whatever they want.

14   Somebody could go out and drive a truck that's not qualified,

15   isn't nothing stopping it, but it doesn't mean they're

16   following regulations by doing it.

17   Q    And you testified that you can be an unlicensed broker,

18   did you not, sir?

19   A    You can be an unlicensed broker, sir, but you're not --

20   you're -- but a motor carrier that has authority that does

21   something beyond their authority is in violation of the Federal

22   regulations and can be heavily fined and even have their

23   operating authority in jeopardizing for doing something that's

24   behind the scope of what their authority they been granted for.

25   Q    You're a driver -- and I know you've testified in driver

Allen - Cross / By Mr. Moye                          108

1    cases.  I know you've testified in cases involving a lack of

2    paperwork for a driver.  The driver's not properly qualified,

3    is he still a driver?

4    A    That's true, sir, but it means he shouldn't legally be

5    behind the wheel of that truck.

6    Q    But he is behind the wheel of that truck and whatever

7    happens that day, he's responsible for as a driver, even though

8    he's an unlicensed driver, right?

9    A    No, but that makes it the responsibility of the motor

10   carrier because the motor carrier is -- has a duty not to allow

11   an unqualified driver to drive -- operate their equipment at

12   any time, sir.  So it's not only the company -- or the driver,

13   excuse me, it's also the responsibility of the company.

14   Q    So we agree a -- the rule on brokerage requires a broker

15   to have a license, but one can operate as an unlicensed broker,

16   just like someone can operate a car without a driver's license.

17   That makes them both unlicensed; is that fair, sir?

18   A    Sir, I don't think that's a good comparison because, sir,

19   it's so much different.  As I said earlier, the transportation

20   industry is so much more regulated, sir.  If you didn't have a

21   license, you couldn't be standing up here as a lawyer in this

22   court, sir.  The broker can't do that -- be -- if he doesn't

23   have a license, he can't act as a broker, sir.

24   Q    What about a driver right now on the highway driving to

25   San Antonio without a license; does that mean that person's not

Allen - Cross / By Mr. Moye                    109

1   driving that car?

2   A    I didn't say that, sir.  But when you're talking about

3   somebody driving a car and somebody that's making money by

4   doing something that's illegal and that's involved in

5   interstate commerce, then that becomes a Federal problem, sir.

6   Q    In your conversations about the shipper and the broker and

7   the customer, you mentioned there can be more than one broker

8   involved, right?

9   A    It's possible as long as it's from one broker to another

10  broker or to a motor carrier that has operating authority and

11  broker authority.

12  Q    So if RCX had broker's authority that day, they would have

13  double-brokered the load and you wouldn't have any concerns

14  about it, right?

15  A    If they had broker license, but they didn't.

16  Q    Fair enough.  And you saw the pictures of the roadway

17  afterwards and the cosmetics and what not.

18  A    Saw pictures of what, sir?

19  Q    Did you see any pictures of the cosmetic cases and things?

20  A    I don't remember, sir.

21  Q    You know the bill of lading was hauling cosmetic

22  materials, tubes, or something like that.

23  A    Yes, sir.

24  Q    And who pays the cargo; does About Tyme pay it or RCX pay

25  it?

1  A    The shipper, I remember who it says on the bill of lading,

2  but on the bill of lading it says who's paying the freight

3  charge.

4  Q    Do you have evidence sitting here today to dispute that

5  About Tyme paid the freight damage?

6  A    I don't have any idea, sir.

7  Q    Is that consistent with one operating under their own DOT

8  authority if they paid the freight damage?

9  A    No, sir, I -- that's not enough.  I don't know, sir.  I

10  have not seen anything.

11  Q    I didn't say it was enough.  I said is it consistent

12  with?

13  A    Well, there could be more than one person responsible,

14  sir, so I don't know.  It depends on where the claim was filed.

15  I can't answer your question, sir, without having more

16  information.

17  Q    You never tried to find out who paid the freight damage

18  then?

19  A    No, no, sir.  It wasn't my job.

20  Q    But it's your job, though, to do what, to say who the

21  motor carrier is and if there's a lease or not a lease or

22  there's a broker, they're not licensed; is that your job?

23  A    Sir, I think I've explained it.  My job on any case is to

24  go look at every -- all the motor carriers, the drivers, see

25  who's in compliance, who's not in compliance, who has the

Allen - Cross / By Mr. Moye                         111

1    proper license, who doesn't have it.  We have two motor

2    carriers involved this, we have two brokers' companies, and

3    that's what I did.  I looked at all of them and I've given you

4    my opinion about all of them, sir.

5    Q    You said there's two motor carriers involved in this?

6    A    Well, RCX and All Tyme (sic).

7    Q    Okay, do you believe About Tyme was a motor carrier at the

8    time of the loss?

9    A    No, sir, they had operating authority.  You're turning

10   around what I'm saying, sir.  I've splayed it down, I've --

11   each section I talked about About Tyme, their authority, their

12   DOT number, how many pieces of equipment.  And then later on I

13   talked about RCX, I did -- there was two different motor

14   carriers involved.  I did the research on both of them like I

15   do every case, sir.

16   Q    Okay.  And you arrived at a conclusion in February that

17   RCX was the responsible motor carrier.

18   A    That's correct, sir, because their load, it was under

19   their control, and they give it to All Tyme (sic) as a broker

20   when they legally could not give it to them as a broker.  That

21   makes them the motor carrier, sir.

22   Q    All right, and you had that opinion in February when you

23   wrote the report with 19 motor carrier violations against About

24   Tyme, all the communications about About Tyme being negligent

25   in the case, that was your opinion back then.

Allen - Cross / By Mr. Moye                              112

1   A    That's my opinion, it's spelled out, sir, and it lists

2   both carriers and the violations of both of them and what

3   they're all in responsible.  I made that clear from day one

4   when I wrote my report, sir.

5   Q    Well, in your report you don't say RCX is the motor

6   carrier and About Tyme has motor carrier authority but isn't

7   responsible for the load.  You point out 19 motor carrier

8   violations and say they're negligent, right?

9   A    I also said RCX is because it's the same thing, sir.  They

10  didn't follow the regulations, they didn't have the proper

11  paperwork, they're both in violation, sir.  But I've said all

12  along RCX is the motor carrier, sir.

13  Q    And did you see the second -- or the answer that About

14  Tyme filed in response to the first amended complaint?  Did

15  anybody ever give you that?

16  A    I'm not sure, sir.

17  Q    This is what About Tyme filed in this very courtroom.

18  They admitted that Ron Brown was their employer -- or employee

19  at the time the accident occurred; did you know they admitted

20  that?

21  A    Yes, sir.  And I don't disagree, he was their employee.

22  He was driving their truck.  But this load at this accident

23  wasn't being operated on About Tyme's authority, it was being

24  operated on RCX, so that also now makes him an employee of RCX

25  under the regulations, sir.

Allen - Cross / By Mr. Moye                              113

1   Q    My question, sir, was did you know they admitted that?

2   That's all I asked you.

3   A    Well, sir, I answered your question.  I said yes.

4   Q    And then Robert Thomas testified under oath in your file

5   he said it was our DOT authority, right?

6   A    That's what he said, sir.

7   Q    So About Tyme says, no, it's not RCX's authority, it's our

8   authority; they said that, did they not, sir?

9   A    They did say that, but it's wrong.

10  Q    Why do you care if it's wrong?  If they admitted it's

11  their DOT authority, why are you sitting up here concerned

12  about that?

13  A    Because --

14        MR. HUNNICUTT:  Your Honor, I need to object.  Number

15  one, it's argumentative.  But, number two, Robert Thomas also

16  said he didn't know anything about the deal, the arrangement,

17  he wasn't -- whatever knowledge there was of Ron Brown --

18        THE COURT:  Well, that's either going to come in

19  through Thomas or you're going to redirect this witness or

20  whatever it may be, so overruled.

21  BY MR. MOYE:

22  Q    You read the deposition of Robert Thomas, whether he was

23  involved with everything.  He's the only human being left on

24  earth for About Tyme and he said it was our authority, not

25  RCX's, that's what the man said under oath, right?

1   A    He said that, sir.

2   Q    Okay.

3   A    But it's wrong.

4   Q    Well, and it's wrong that About Tyme in a legal document

5   admits that Ron Brown was operating within the course and scope

6   of his employment with About Tyme at the time of the accident,

7   you think that's wrong, too.

8   A    Yes, sir.  He was driving a truck that was owned by About

9   Tyme but it wasn't being operated on their authority because

10  they couldn't give it to them because of the different

11  documents that are missing that we've been talking about that

12  was required for them to be able to haul this load.  It was

13  RCX's load, sir.

14  Q    And you made that opinion in February of 2016, and all you

15  had to go off of was Randy Clifton's deposition, About Tyme's

16  deposition, and the carrier agreement, and you made that

17  opinion back then, right?

18  A    Well, wait a minute, sir.  I've talked about the carrier

19  agreement, it's not a legal document.  The training -- as far

20  as the --

21           **MR. MOYE:**  Objection, --

22  A    -- Federal regulations go --

23           **MR. MOYE:**  -- he's offering --

24           **THE COURT:**  Sustained.

25           **MR. MOYE:**  -- legalities.

Allen - Cross / By Mr. Moye                    115

1       **THE COURT:**  Sustained.

2  A    The trailer interchange is not in compliance with the

3  Federal Motor Carrier Safety layer.  The carrier agreement is

4  not in compliance with the Federal Motor Carrier Safety

5  Regulations.  Under the Federal Motor Carrier Safety

6  Regulations, this was a load that shouldn't have been hauled

7  because they didn't have the proper license to do it, sir.

8  Q    Do you think that answered my question?

9  A    I think it did, sir.

10 Q    Okay, so when I ask you when you gave your opinions in

11 February that About Tyme is not the motor carrier on their

12 authority, that RCX was the motor carrier on their authority,

13 you had and only had the deposition of About Tyme saying it's

14 us, the deposition of RCX saying it's them, and the carrier

15 agreement.  You didn't have the interchange, you didn't have

16 the bill of lading, but you made those opinions based only on

17 that, right?

18 A    Based on the information I had, I came up with that

19 opinion when I wrote the report, sir.  The report is based on

20 all the information I had at that time, sir.  I've said that

21 over and over.

22 Q    An admission it's us, an admission it's them, and you

23 wrote a report blaming both; did you not?

24 A    I wrote a report based on all the documents and

25 information I had, the depositions, everything I had, I was

Allen - Cross / By Mr. Moye                     116

1   able to come up with that opinion.  And that's always been my

2   opinion, sir.  It's never changed.

3   Q    Always.

4   A    That's correct, sir.

5   Q    Well, the carrier agreement, let's talk about that.  It is

6   called "carrier agreement," right?

7   A    That's what it's called, sir.

8   Q    Was in your file when you -- the only thing in your file

9   document-wise when you made your opinions in February, right?

10  A    That's correct, sir.

11  Q    And in defiance of the document that lists About Tyme as

12  the carrier and RCX solutions as broker, you arrived at the

13  opinion that, no, RCX is the carrier; is that a fair statement

14  of your position, sir?

15  A    Fair statement is their -- RCX is representing it was a

16  broker, which they couldn't do, so this document is misleading.

17  Plus, a carrier agreement has to have a lot more information

18  explaining the equipment that is being operated under,

19  including VIN number, make, year, license plate number, and all

20  that.  This has nothing on it.  This carrier agreement is not

21  in compliance, sir, with the Federal Motor Carrier Safety

22  Regulations.

23  Q    There's a rule about not the interchange but a carrier

24  agreement, there's a rule about the VIN numbers and all that

25  stuff?

Allen - Cross / By Mr. Moye                           117

1    A    Yes, sir.

2    Q    Okay.  Now, you said -- you were asked questions earlier

3    about they're misrepresenting their business, when you haven't

4    see the 47 or 43 other billing load confirmation sheets to show

5    that they were out brokering loads; you haven't see those, have

6    you?

7    A    Sir, I know RCX Logistics did not have a broker agreement

8    -- or license.  I've said that over and over.  That makes this

9    document as a false document misrepresenting what RCX is and

10   what they're telling the public and what they're telling the

11   motor carriers.  They are not a licensed broker.

12   Q    Yeah, we agree.  This document is an agreement between two

13   parties that you weren't a party to, right?

14   A    (No audible response)

15   Q    Two people that signed it, About Tyme and RCX, right?

16   A    Sir, it's still -- the document's not in compliance with

17   the regulations.

18   Q    That's not my question, sir.  My question, sir, who signed

19   this document?

20   A    RCX and About Tyme, sir.

21   Q    And in this document there's a provision that doesn't

22   grant anybody from About Tyme to do anything on RCX's

23   authority; did you see that?

24   A    Say the question again.

25   Q    Sure.  You talked about the bill of lading and who signed

1   it.

2   A     Later, yes.

3   Q     This carrier agreement says that we're not giving

4   authority, RCX isn't giving authority for anybody to sign on

5   their behalf; that's what this agreement says, right?

6   A     That's what it says, sir.

7   Q     And then it establishes the relationship that we're the

8   broker, you're the motor carrier, we're not responsible for

9   each other's employees, you do your thing, we'll do our thing,

10  right?  That's what the document says.

11  A     That's what it says, sir, but they're violating under the

12  Federal regulations by brokering a load when they didn't have a

13  broker authority.  And it goes even against what Sunset was

14  doing, who had the agreement.  They would only use authorized

15  carriers so --

16  Q     About Tyme accepted the load from a broker, from a guy

17  down the street, from me, they're driving under their authority

18  and they admit it's under their authority, it doesn't matter if

19  it's unlicensed, right?

20  A     That's your opinion, sir, not mine.  I totally disagree

21  with it.  You're -- the idea is to do everything the correct

22  way, the safe way.  It goes back to protecting the general

23  motor public when our vehicles are being operated on the

24  highway.  It's about safety, sir, and about doing it the right

25  way, sir.

1   Q     Okay, safety, the brokerage of this wasn't safe?

2   A     I didn't say it was the driving of the load.  A -- it --

3   sir, I have explained this over and over today.  I don't know

4   what else I can say.

5   Q     Well, --

6   A     I can't -- I keep after -- answering the same questions

7   over and over.

8   Q     You keep doing the same answers over and over.  I don't

9   know if you're answering the same question over and over.

10  There are agreements signed in the carrier rate agreement and

11  there are two depositions that confirm that agreement; would

12  you agree with that?  The interpretation of those depositions

13  you had in February, the two of them and only those two, are

14  consistent with this agreement, are they not?

15  A     They signed a document that is not in compliance with the

16  regulations.  What it says in here is what it says.

17  Q     My question was, testimony from the parties is consistent

18  with that document, right?

19  A     It's consistent, but it's not in compliance, sir.

20  Q     Carrier rate confirmation sheets, documents that are given

21  by brokers to their motor carriers, right?

22  A     A licensed broker will give that to the carrier they use

23  when they're offering them a load to be transported, that is

24  true, sir.  It shows a shipper, it shows a destination, it

25  shows the compensation that they're going to be paid for, sir.

Allen - Cross / By Mr. Moye                                    120

1    Q    What does this say, bill to?

2    A    I'm sorry, sir, I can't hear you.

3    Q    Up at the top on the letterhead it says:  "Bill to RCX

4    Solutions, Inc.," and underneath it, it says what?  What's that

5    say?

6    A    It says:  "Bill to RCX Solutions."

7    Q    What does this say?

8    A    "Carrier About Tyme."

9    Q    And then does it indicate who brokered the load?

10   A    According to that, RCX brokered the load.

11   Q    Okay, --

12   A    Right there, Randy Clifton.

13   Q    And there's 43 of those, right?

14   A    I don't remember how many, sir.

15   Q    And the -- well, you relied on testimony from Jason Butler

16   that said, well, we don't broker loads, right?

17   A    That's what they say.

18   Q    Have you seen any documents Jason Butler's listed as a

19   broker?

20   A    No, sir.  But I would like to turn all these documents

21   over to the DOT and show them that this motor carrier is doing

22   -- not following their own authority of what they can do

23   because this is not in compliance with the regulations, sir.

24   Q    Again, do you think that's responsive to the question,

25   have you see any documents where Jason Butler indicated he was

Allen - Cross / By Mr. Moye                                121

1    brokering loads for RCX?

2    A     I don't remember that name, sir.

3    Q     Okay, I just --

4    A     I --

5    Q     -- asked it to you one --

6    A     Sir, --

7    Q     -- minute a go.

8    A     I don't remember seeing any names on that of that, sir.

9    Q     So you've never seen the documents that have Jason Butler

10   listed as broker, nobody showed them to you.

11   A     I don't remember, sir, I don't think so.

12   Q     Owner/operator files, things that a truck company's

13   supposed to keep on their leased drivers, right?

14   A     Say it again, sir.

15   Q     Owner/operator files, things that motor carriers are

16   supposed to keep on their leased drivers, right?

17   A     Owner/operators are going to be leased to somebody if they

18   don't have their own authority.

19   Q     So a motor carrier keeps an owner/operator file.

20   A     It's called a driver qualification file, sir.

21   Q     Okay.

22   A     And with a lease agreement and a driver of that truck now

23   becomes their employee while they're under their dispatch.

24   Q     And you've seen or have you seen driver qualification

25   files and leases that RCX entered into with their

Allen - Cross / By Mr. Moye                          122

1   owner/operators?

2   A    I've seen what (indiscernible) they had an owner/operator

3   lease agreement for the --

4   Q    My question was, have you seen the DQ files from the

5   leased drivers at RCX?

6   A    No, I answered that question earlier, sir.  I haven't seen

7   it.

8   Q    It's appropriate for a motor carrier to keep those per the

9   rules, right?

10  A    I said that earlier also, sir.

11  Q    Brokers don't keep those, do they?

12  A    No, because brokers don't have drivers.

13  Q    Brokers don't qualify lease drivers, right?

14  A    No, they don't have drivers if they're strictly a broker,

15  unless they also have operating authority to go along with

16  broker authority, sir.

17  Q    And if that motor carrier with brokerage authority brokers

18  a load on outside carrier, he doesn't have to have or she

19  doesn't have to have any of the leased driver information as a

20  broker, they don't.

21  A    Say that again, sir.

22  Q    Sure.  The brokers don't maintain leased driver operator -

23  - owner/operator DQ-type stuff.

24  A    That's what I already said, sir.

25  Q    A broker --

EXCEPTIONAL REPORTING SERVICES, INC

Allen - Cross / By Mr. Moye                              123

1   A     Broker --

2   Q     -- is supposed to confirm that whoever they're brokering

3   the load to has the requisite DOT authority, right?

4   A     That's correct, sir, and --

5   Q     And you understand --

6   A     -- also -- sir, may I finish answering?  They also have a

7   duty to check that motor carrier to make sure that they are

8   safe carrier and check to see if they have safe history of

9   being safe.  You do -- you're looking at just like you're doing

10  investigation on like you would new employees, sir.

11  Q     That's not relevant to you here because you don't think

12  RCX brokered the load anyway, right?

13  A     Sir, I'm trying to explain the way it's done.  And I think

14  I'm answering your question, sir.  I am trying my best.

15  Q     Well, answer this very basic question.  Did RCX Solutions

16  have DOT authority, yes --

17  A     They had DOT authority.

18  Q     About Tyme Transport had DOT authority, right?

19  A     Yes, sir, I said that about both of them.  I've answered

20  that.

21  Q     And you've seen documents where RCX Solutions looked into

22  whether or not About Tyme had over-the-road DOT operating

23  authority, haven't you?

24  A     I don't remember, sir.

25  Q     You don't remember seeing the carrier file, there was a

Allen - Cross / By Mr. Moye                    124

1    Safer System page, there was a determination that they had

2    operating authority?

3    A     Sir, I may, I just don't remember, sir.

4    Q     But that would be something a broker would do.

5    A     Oh,  yes, sir.

6    Q     Absolutely.  Is that also something a broker would make

7    sure that a over-the-road motor carrier has not only authority,

8    but that other issues which are required under the Motor

9    Carrier Act, correct?

10   A     True.

11   Q     And that was done in this case, was it not?

12   A     I think so, sir.  I'm sorry, I don't remember all the

13   documents that was in that file, sir.

14   Q     Bill of lading could not have factored into your opinion

15   that RCX was the motor carrier, About Tyme was not the motor

16   carrier, because you didn't have it when you formed that

17   opinion in February, right?

18   A     I answered that question earlier, I agreed with that, sir.

19   That just backed up what my opinion was when we got those

20   documents, sir.

21   Q     Well, Ron Brown's not here to tell us why he signed it.

22   Mr. Hunnicutt asked you that.  How are you able then to

23   determine the mindset that Mr. Brown was in when he signed that

24   document?

25   A     Sir, when a driver goes to a shipper and picks up a load

Allen - Cross / By Mr. Moye                              125

1    of freight, the shipper's not going to let him leave until he

2    signs that bill of lading that he accepted that load.  He was

3    accepting that load for RCX because that's who authority was

4    being operated on.

5    Q    Where's the evidence that you have that Ronald Brown

6    thought he was operating on anything other than About Tyme

7    authority, in light of the fact they've admitted it and his

8    partner admitted it?

9    A    The bill of lading is clear, it says Sunset and RCX, so he

10   signed it for Sunset.  We know Sunset doesn't have operating

11   authority, we know that they were a broker and had brokered the

12   load to RCX.

13   Q    In fact, this document's so clear, it lists the carrier

14   name as the broker, doesn't it?

15   A    It says:  "Sunset" and slash "RCX," sir.

16   Q    Sunset motor carrier.

17   A    I just answered that, sir, they're not, they're a broker.

18   Q    Exactly.

19   A    RCX is the carrier, sir.

20   Q    So the very clear document's not even filled out

21   correctly, is it?

22   A    No, that's the way they do it when a broker get -- the

23   shipper still wants to know who is going to be the carrier

24   carries it.  They did it.  Sunset is their customer and they

25   put RCX because Sunset told them that's who's going to haul the

Allen - Cross / By Mr. Moye                                    126

1   load.  So when somebody comes to pick up this load, they're

2   going to have the information, they're going to have a copy of

3   that, and they'll look and see it's an RCX truck or driver, so

4   they know they're -- it's going to the right person, sir.

5   Q    How many -- well, this says:  "Carrier name:  Sunset/RCX."

6   How many people from Sunset have you talked to about the intent

7   of their transaction?

8   A    I haven't talked to anybody.

9   Q    How many --

10  A    Sir, I was a truck broker for 11 years.  This is the way

11  the industry is, this is the way the paperwork is handled.

12  Q    When were you a truck driver?

13  A    What years, sir?

14  Q    Yeah.

15  A    Be '73 to '84 or '85, I forget, sir.

16  Q    And your testimony is the bill of lading is supposed to

17  list the broker's name under the carrier column?

18  A    Back then it was -- all right, that was before

19  deregulations, so it would have the name of the carrier -- at

20  that time, all owner oppers had to be leased to a motor carrier

21  that had operating authority, so they'd have to put the name of

22  the carrier on it so they know if there's a claim, they know

23  who to go to.  Plus, they're paying the freight charges so they

24  know that they're going to be billed for these freight charges.

25  That's the whole purpose of a bill of lading, to give all the

Allen - Cross / By Mr. Moye                                    127

1   information.  And bill of ladings have to be carried in the

2   truck while the load is being transported so if they get

3   stopped, they can prove what's in that truck, where it's going,

4   and who has the authority to haul it, sir.

5   Q    My question was that's not filled out correctly, is it,

6   sir?

7   A    It's not billed correctly?

8   Q    It's not filled out correctly.  You're not supposed to

9   list the broker under the carrier column.  If I Google how to

10  fill out a bill of lading, it tells me it's got to say the

11  carrier there and not to -- not broker.

12           **MR. HUNNICUTT:**  Your Honor, I kind of object --

13           **THE COURT:**  Sustained.

14           **MR. HUNNICUTT:**  -- to the attorney testifying.

15           **THE COURT:**  Sustained.

16  **BY MR. MOYE:**

17  Q    Because the brokers are listed there, right?

18  A    Sir, when the Sunset signed the agreement with it, it

19  would -- the agreement would have said, Sunset, you're going to

20  be handle brokering our loads, so they're going to put Sunset's

21  names on it, and then expect Sunset to tell them who the actual

22  carrier is.  That's the way it's done, sir.

23  Q    How many times did you talk to the shipper, customer in

24  this case?

25  A    I've been doing this all my life.  I've had lots of cases

**EXCEPTIONAL REPORTING SERVICES, INC**

Allen - Cross / By Mr. Moye                                      128

1    that dealt with brokers, sir.  I've testified numerous times

2    about broker cases.  This is the way the bill of ladings are

3    filled out.

4    Q    My question was, sir, very plainly, very basically, very

5    simply, how many times did you talk to the shipper, the

6    customer in this case?

7    A    I have not talked to the shipper or customer in this case,

8    sir.

9    Q    There is no written lease contract between About Tyme and

10   RCX; is that true, sir?

11   A    Sir, I said that over and over, there isn't.  There should

12   have been but there wasn't.

13   Q    Because the interpretation of the regulations -- strike

14   that.

15           The regulations require a motor carrier to execute a

16   written lease with their owner/operator lease drivers, right?

17   A    That's correct, sir.

18   Q    And in this case, you've seen no testimony by anyone from

19   About Tyme or RCX that there was an intent to have a written

20   lease agreement between About Tyme and RCX; is that true, sir?

21   A    That's true, sir.

22   Q    And you've seen no testimony where there was intent to

23   form an oral lease between About Tyme and RCX; is that true,

24   sir?

25   A    Oral lease wouldn't be legal but it would be -- there's

EXCEPTIONAL REPORTING SERVICES, INC

Allen - Cross / By Mr. Moye                          129

1    agreement being made.  If there was, then a -- if they're doing

2    an oral agreement, then the next step would be doing a written

3    lease, sir.

4    Q    In this case there is no facts to support a lease

5    arrangement between About Tyme and RCX; is that true, sir?

6    A    Well, I don't agree with that because when they called

7    Mr. Brown, told him to pick the load up, there -- that makes it

8    a verbal agreement, sir.

9    Q    Sir, have you testified differently?

10   A    I can't hear you, sir.

11   Q    Have you ever testified differently to the question about

12   the facts in this situation with a lease arrangement between

13   About Tyme and RCX?

14   A    I don't remember exact circumstances like we've got here,

15   sir.  Can I say for sure?  I don't know, sir.

16   Q    Well, you're under oath.  You have your deposition in

17   front of you?

18   A    I have the copy you give me, sir.

19        **(Pause)**

20   Q    I'm going to start at 122 and read -- actually I'll start

21   at 121, Line 23.

22        "QUESTION:  Okay.  So, what are the facts that you're

23   relying on that there was a lease arrangement of any kind

24   between Mr. Brown and RCX or About Tyme and RCX?

25        "ANSWER:  There should have been a lease, sir.

1          "QUESTION:  Okay.  That's not my question.

2          "ANSWER:  No, no, yes.  It should have been a lease.

3     There wasn't a lease.  That's the reason I said they're in

4     violation of it, sir."

5          **MR. SPEAKER:**  I did.

6          **MR. MOYE:**  Thank you.

7     **BY MR. MOYE:**

8          "QUESTION:  I understand my question is different

9     than that, sir.  I'm asking you made lease arrangement, what

10    facts do you have to support that there was a lease arrangement

11    between RCX and About Tyme or RCX and Mr. Brown at the time of

12    the accident?

13         "ANSWER:  Sir, I think that I made it very clear

14    there wasn't a lease when there should have been one."

15         Going down to Line 22.

16         "QUESTION:  What facts do you have to support that

17    there was a lease arrangement of any kind between RCX and

18    Mr. Brown or RCX and About Tyme?

19         "ANSWER:  I didn't say there was; I said that's the

20    problem."

21         You admitted --

22    A    Well, sir --

23    Q    -- under oath that you had no facts that there was a lease

24    arrangement of any kind between About Tyme and RCX or RCX and

25    Ronald Brown; is that your statement, sir?

Allen - Cross / By Mr. Moye                                    131

1          **MR. HUNNICUTT:**  Objection.  Argumentative and

2    misstates the testimony.

3          **THE COURT:**  Overruled.  You can answer.

4          **THE WITNESS:**  Sir, there had to be some type

5    arrangement or Mr. Brown wouldn't have known to go pick the

6    load up.  My understanding it was done over the phone.  So, was

7    there an arrangement made?  I didn't think about the phone

8    conversation at the time, but how does he know how to go to

9    pick a load up if he doesn't have some type of conversation

10   with him of where to go and what load he's going to pick up?

11   So, there had to be a conversation that Mr. Brown was involved

12   in, sir.

13   **BY MR. MOYE:**

14   Q    So, your testimony on any arrangement which you didn't

15   give us then, you're giving us now that there must have been a

16   phone call that you weren't a part of, don't know what was

17   said, and don't know what happened.  Is that the sum total of

18   it today?

19   A    Sir, all I know Mr. Brown went and picked a load up.  He

20   signed for it.  He had to know when and where to go to pick up

21   the load, sir.  So, he had to have some type of information.

22   Whether it was a phone call, a text message, I don't know, but

23   there had to be some type of communication, sir.

24   Q    And you don't have it in your file?  Text message or email

25   or anything else, obviously.

1   A    No, sir.

2   Q    Okay.

3   A    But we couldn't have picked the load up without all that

4   information, sir.

5   Q    Well, hypothetically, what if an unlicensed broker tells

6   one of their outside carriers to go pick up a load?  That's how

7   someone could arrive and pick up the load, true?

8   A    Sir, that's an arrangement.

9   Q    So, your arrangement is unlicensed brokership is an

10  arrangement as well?

11  A    They're not in compliance, sir.  They don't have authority

12  to broker loads.  I've said this over and over today, sir.

13  They begin not being a licensed broker.  The only way they can

14  give a load to another carrier is through a lease agreement.

15  Q    And you said there were arrangement in box (indiscernible)

16  today.  You didn't say it once in your report.  You didn't say,

17  well, there was arrangements; there must have been a phone

18  call.

19  A    Sir, I can't remember to tell you every little detail.  I

20  have -- I swore that day, I swore today that I would tell the

21  truth.  I have told you the truth a hundred percent.  I've sat

22  here and tried to get the jury to understand why this works,

23  how it worked.

24        But that man, Mr. Brown, could not have went and

25  picked up that load unless somebody told him to do.  How they

Allen - Cross / By Mr. Moye                    133

1   told him, I don't know, sir.

2   Q    I agree with you he's not clairvoyant and he's just going

3   to stumble on alone.  Somebody told him where to go.  That's

4   the sum total of your opinions in this case factually speaking,

5   right?

6   A    That is not the sum total.  That's one of my opinions,

7   sir.

8   Q    Well, you understand being under oath, when I ask you a

9   question, there's an expectation that I get the testimony then.

10  A    Sir, I am trying.  I have tried the day of my depo, I'm

11  trying today to answer every question you've asked in the right

12  way, sir.

13  Q    Do you think sitting here today that About Tyme's actions

14  caused or contributed to the injuries sustained by Mr. Puga?

15  A    About Tyme wasn't a carrier when it was involved in this

16  collision; RCX was, sir.

17          **MR. MOYE:**  Your Honor, may we approach?

18          **THE COURT:**  Yes.

19      **(Begin Bench Conference)**

20          **THE COURT:**  (Indiscernible)

21          **MR. MOYE:**  I'm almost done.  He has listed now 19

22  violations that are only four motor carriers.  He listed four

23  complaints of us about not having a written lease, and he said

24  he's always had the opinion that About Tyme was not the motor

25  carrier --

                    Allen - Cross / By Mr. Moye                    134

1          **THE COURT:**  Okay.

2          **MR. MOYE:**  -- and he's given a written report that

3   says that they were.  He did not have the second amended

4   petition -- or did have the second amended petition after.  He

5   did not have their answer.

6          **THE COURT:**  What do you want?

7          **MR. MOYE:**  I want to impeach him with the sum that we

8   discussed before.

9          **THE COURT:**  Do you have approach?

10         **MR. HUNNICUTT:**  And his -- if I may just be allowed.

11  Your Honor, I have a big problem with that.

12         His report, he's always been consistent with his

13  testimony.  He said they both are motor carriers.  He said

14  they're both employers.

15         And these questions don't block (indiscernible) even

16  consistent with his deposition testimony.

17         **MR. MOYE:**  I agree.

18         **MR. HUNNICUTT:**  He also -- if I can finish.  He also

19  testified in his report and then consistently in his deposition

20  that it was RCX that was acting as the carrier.

21         **MR. MOYE:**  Mr. Hunnicutt just said he's testified

22  consistently that they were both the motor carriers.  He just

23  said two minutes ago they weren't.

24         **MR. HUNNICUTT:**  And oh, yeah, there's, you know,

25  there's a difference.

Allen - Cross / By Mr. Moye                          135

1          **THE COURT:**  The Court is going to overrule

2   Plaintiffs' objection, but it's very limited.  All right.

3          **(End Bench Conference)**

4   **BY MR. MOYE:**

5   Q    Your opinion that About Tyme was not the motor carrier at

6   the time, that you've always had that opinion, that it's always

7   been RCX, is a result of your learning that About Tyme was no

8   longer in the case due to a settlement; is that true, sir?

9   A    That is --

10         **MR. HUNNICUTT:**  Objection.  Excuse me, Mr. Allen.

11         Your Honor, I need to object under Rule 408.  This is

12  an improper offer of alleged evidence of his --

13         **THE COURT:**  We've discussed the matter at the bench,

14  so your objection is preserved and it's overruled.

15         **MR. HUNNICUTT:**  Your Honor, may we have an

16  instruction to the jury to disregard --

17         **THE COURT:**  Counsel, why don't you-all approach?

18         **(Begin Bench Conference)**

19         **THE COURT:**  Go ahead.

20         **MR. HUNNICUTT:**  We'd like an instruction that -- to

21  the jury to disregard and not consider whether there -- what

22  the amount of any settlement may have been.

23         **THE COURT:**  I asked you-all about a limiting

24  instruction.  I think it's appropriate or we submit the charge

25  or the instructions to the jury to do it.  I hate to start

1   moving things up and discussing an amount and why he's going

2   into that.  So, if you see what the evidence is and see how to

3   properly instruct them.

4            **MR. HUNNICUTT:**  Okay.  I'll do that.

5            **(End Bench Conference)**

6   **BY MR. MOYE:**

7   Q    Your file materials you testified earlier highlighted by

8   you on matters that you may have to come back to or that are

9   otherwise relevant.  Do you remember that testimony?

10  A    Sometimes that's what it means, sir.

11  Q    Okay.  And in fact you wrote the timeline.  You wrote,

12  "Report in February", correct?

13  A    Yes, sir.

14  Q    You gave a deposition in September, right?

15  A    Yes, sir.

16  Q    And then intervening, you were provided a document that

17  indicated About Tyme had resolved their claim with the

18  Plaintiffs and that RCX was the only Defendant left, and you

19  highlighted it in your work product, did you not, sir?

20  A    Yes, sir.  Now that I see it.  Yes, I did, sir.

21  Q    You highlighted Paragraph 4.

22           **MR. HUNNICUTT:**  Your Honor, we object to their

23  showing on the overhead Document 69 filed on 5/23/16.  We

24  object under Rule 408.  This is prejudice.

25           **THE COURT:**  Where is that coming from?

Allen - Cross / By Mr. Moye                                    137

1             **MR. MOYE:**  I'm sorry?

2             **THE COURT:**  Where is that coming from?  His report?

3             **MR. MOYE:**  His file.

4             **THE COURT:**  Yeah.  Overruled.

5   **BY MR. MOYE:**

6   Q    And that red Bates stamp up there that you received, is

7   that June 2016?

8   A    That's what it looks like, sir.

9   Q    Okay.  And you weren't deposed until November, correct?

10  A    That's correct, sir.

11  Q    And there was no supplement report at any point in this

12  case, correct?

13  A    No, sir, there was not.  My opinions have never changed,

14  sir.

15  Q    And you had then, because you highlighted it, knowledge of

16  the settlement between About Tyme and Plaintiffs before I asked

17  you a single question at your deposition in November; is that

18  true, sir?

19  A    Now that I see that apparently I did.  I didn't remember,

20  sir.

21            **MR. MOYE:**  Your Honor, I pass the witness.

22            **MR. HUNNICUTT:**  Would you bring up his report?  His

23  report.

24  //

25  //

**REDIRECT EXAMINATION**

**BY MR. HUNNICUTT:**

1

2

3    Q    All Right.  Mr. Allen, let's talk about your report a

4    little bit.  At the time of your report, on Mr. Hoyt's prompt,

5    just Page 1.

6            At the time of your report, who did you say were the

7    employers of Ronald Brown?

8    A    Who the employer?  About Tyme and RCX.

9    Q    Okay.  Now, let's talk about that for just a second.  In

10   the -- in the motor carrier industry, transportation industry,

11   can drivers have more than one employer?

12   A    Oh, absolutely.

13   Q    Okay.  What are some of the examples of how that comes

14   about?

15   A    All right.  There's numerous ways.  One, a motor carrier

16   will lease their truck and driver to another motor carrier or

17   loan them to another motor carrier.  In that case, he's an

18   employee of the original carrier, but once he starts driving on

19   that other -- those other people's truck, he is now their

20   employee, too.  So, there's a case he has two employers.  He's

21   probably paid by the one that leased him or loaned him over to

22   it.

23            Then you've got a leased driver where if somebody has

24   a tractor-trailer, they'll put it under lease to a motor

25   carrier that has authority, has all the requirements and

1  everything, and the lease agreement will say that they have

2  exclusive use of that equipment for that period of time for

3  that lease.  Now, he's still an employee of the people that

4  owns the truck, but now because his vehicle is under their

5  authority, he's also their -- he's also their employee.  So,

6  you have that on numerous different ways.

7  Q    Okay.  And without going through all of the requirements,

8  just whenever somebody is in a situation where they have two

9  employers, under the Federal Rules, are both employers supposed

10 to follow the rules?

11 A    Absolutely.

12 Q    So, the driver qualification file we've talked about, for

13 instance, if the jury decides that RCX Solutions was the

14 employer and About Tyme was the employer, then both of those

15 companies are supposed to have a driver qualification file.

16 A    Right.  They're required to follow all the rules and make

17 sure he's a qualified driver, do all the background checks, MVR

18 checks.  They would both have to do it.

19 Q    Okay.

20       **MR. HUNNICUTT:**  Turn to Page 13 of the report,

21 Mr. Hoyt.

22 Q    Mr. Moye kept talking about the 19 violations.  And let's

23 just go down through here.

24       If the jury decides that RCX was also an employer of

25 Ronald Brown in addition to About Tyme, how many of these 19

1  violations would then automatically apply to RCX?

2  A    Okay.  You would go down to starting the third one down,

3  390.3, 390.13, 391.11, 391.23, 391.25, 391.27, 391.31, 391.33,

4  391.43, 391.45, 391.51, 391.53 --

5          **MR. HUNNICUTT:**  Would you go to the next page?  There

6  you go.

7  A    -- 392.1, 392.2, 395.8, and 396.3.

8  Q    All right.  Now, Mr. Hoyt, could you turn to Page -- and

9  Mr. Allen, turn to Page 17.  At the time of your report --

10         **MR. HUNNICUTT:**  Could you go ahead and enlarge this

11  paragraph?

12  Q    At the time of this report, did you address this whole

13  issue about broker and motor carrier?  And I've just gone to

14  one paragraph, but you actually have a few pages on this,

15  right?

16  A    Absolutely.

17  Q    Okay.  Now, in this paragraph you talk about the carrier

18  agreement, right?

19  A    Correct.

20  Q    Okay.  Where RCX has written out that they're the broker

21  and About Tyme is supposed to be the motor carrier, the user,

22  right?

23  A    Correct.

24  Q    Okay.  Now, you also mentioned at that time in your report

25  that RCX Solutions is not authorized for broker authority, only

Allen - Redirect / By Mr. Hunnicutt                      141

1    for motor carrier operating authority.  You said that back in,

2    and what's this, February of 2016.

3    A    That's correct, sir.

4    Q    Okay.  And by the way, you've been involved in these types

5    of lawsuits for many, many years.  Have you noticed before that

6    -- that sometimes over a couple of years, information keeps

7    coming out and who you might have thought was -- was a party,

8    at one point it changes?

9    A    Sir, that happens on a regular basis.

10   Q    Okay.

11   A    It changes all the time.  New people come in, some people

12   are dropped out.  It's just -- that's normal.

13   Q    Okay.  And in fact, as of February of 2016, counsel keeps

14   mentioning that you only had Mr. Clifton's deposition,

15   Mr. Johnson's deposition, and Robert Thomas.  The other

16   depositions that the jury is going to hear later this afternoon

17   and this morning, they hadn't even occurred yet, had they?

18   A    No, sir, they had not.

19   Q    Okay.  After you read those depositions, did -- did your

20   -- did you have to change any of your opinions?

21   A    Oh, no, sir; just reconfirmed.

22   Q    Just reconfirmed.

23   A    Yes, sir.

24   Q    Okay.  Now, looking at this, this is what you had at the

25   time.  Now, Mr. Clifton testified on Page 22 in his deposition

Allen - Redirect / By Mr. Hunnicutt                    142

1    that RCX hauls loads for L'Oreal through Sunset Transportation

2    who has a contract with L'Oreal.  Do you remember that in the

3    testimony?

4    A    Yes, sir.

5    Q    Okay.  So, this -- on this day, before Ronald Brown and

6    whoever at RCX had their arrangement, who was supposed to

7    transport the load?

8    A    RCX.

9    Q    Okay.  And in fact, Mr. Clifton testified to that.  He

10   testified Jim Williams is the owner of Sunset Transportation,

11   and Jim Williams was aware that RCX would be providing a leased

12   driver and trailer, right.

13   A    Correct.

14   Q    And you remember the other witnesses that the jury is

15   going to hear later testified that nobody had contacted Sunset

16   to tell them that that was going to change.

17   A    That's correct, sir.

18   Q    Okay.  Now, going back up to the top of this paragraph,

19   let me understand.  If RCX Solutions is not a broker, which

20   everybody admits.

21   A    That's correct.

22   Q    And they are a carrier, which everybody admits.

23   A    They're a carrier.

24   Q    RCX is standing there in a situation where their driver,

25   his equipment breaks down.  And they've got a choice.  They can

Allen - Redirect / By Mr. Hunnicutt                         143

1   either just call Sunset and say, our -- you know, we don't have

2   equipment; we don't have a driver.  We're a motor carrier and

3   we don't have a driver and we don't have equipment.

4   A    Correct.

5   Q    You know, whatever combination.  Or they can get a driver,

6   make an arrangement with him to use his equipment, his tractor,

7   to transport their load so they can save their fee, right?

8   A    Yes, sir.  That would be considered a trip lease.  They

9   could have done one of two things.  They could have returned

10  the load, say we can't haul it, or they could have got somebody

11  and put them under a lease.

12  Q    Okay.  And that's an arrangement, isn't it?

13  A    Sure it is.

14  Q    Okay.  So, it could have been that simple.  That exactly

15  consistent with the bill of lading that there was an

16  arrangement made with -- for RCX Solutions to use Ronald

17  Brown's tractor to fulfill this obligation to this client that

18  they considered a good client.

19  A    Correct.

20  Q    And isn't that what happened?

21  A    That's what it looks like to me, sir.

22  Q    Okay.  Now, we also have at the same time we know that

23  Randy Clifton is sitting there knowing that his broker's

24  license on his other company that should be doing this, and the

25  jury is going to hear all these witnesses say, this is a

1   mistake; it should have been Supply Chain.  Their license had

2   been suspended, right?

3   A    That's correct, sir.

4   Q    Okay.  Now, under DOT regs based on your experience and

5   training, if somebody is a carrier and is involved in a deal

6   with a -- with a client to transport goods as the carrier,

7   they're in that box.  They're in the carrier box.

8   A    That's correct.

9   Q    If they want to suddenly shift from the carrier box to the

10  broker box, they have to dot their i's and cross their t's,

11  don't they?

12  A    That's correct, sir.

13  Q    And if they don't dot their i's and cross their t's --

14  A    They're still --

15  Q    -- they're still a carrier, aren't they?

16  A    They're still the carrier.

17  Q    All right.

18       **MR. HUNNICUTT:**  Can you open up another section?

19  Q    The -- well, I don't want to get into all this language,

20  but there are multiple places in these paragraphs where you

21  talk about RCX being -- being earnest that RCX is the employer,

22  correct?

23  A    That's correct, sir.

24  Q    All right.

25       **MR. HUNNICUTT:**  Could you open up the first page

Allen - Redirect / By Mr. Hunnicutt                    145

1    again, Mr. Hoyt?  And go ahead and scroll slowly through all of

2    these documents.

3    Q    At the time of your report, you had all of this

4    information to rely upon, correct?

5    A    That's correct, sir.

6    Q    Including, in addition to the depositions, you had --

7    you had the SAFER information about the -- about RCX Supply

8    Chain's --

9              **MR. MOYE:**  May we approach?

10             **THE COURT:**  Yes.

11        **(Begin Bench Conference)**

12             **MR. MOYE:**  I don't know that it's intentional, but

13   there's a reference to insurance on that, so they'll need to

14   redact that.

15             **MR. HUNNICUTT:**  Okay.

16        **(End Bench Conference)**

17   **BY MR. HUNNICUTT:**

18   Q    So, suffice it to say you had quite a bit of information

19   when you wrote your report, correct?

20   A    Oh, absolutely.

21   Q    And then you got more information before your deposition.

22   A    That's correct, sir.

23   Q    And Mr. Moye himself grilled you for a couple of hours,

24   didn't he?

25   A    More than a couple, yes, sir.

Allen - Redirect / By Mr. Hunnicutt                    146

1    Q    Yes, it was.  Have your opinions ever changed?

2    A    Has never changed, sir; never.

3    Q    Okay.  Now, let me ask you about a leased driver.  RCX

4    Solutions has fulltime employed drivers and leased drivers,

5    right?

6    A    That's correct, sir.

7    Q    Okay.  Under the <u>Federal Motor Carrier Act</u>, if some -- if

8    a person is a leased driver, the motor carrier is considered to

9    be their employer even though they might try to call themselves

10   an independent contractor, right?

11   A    That's correct, sir.

12   Q    Okay.  And the motor carrier regulations are set up that

13   way so that motor carriers can't try to avoid their

14   responsibilities by calling drivers independent contractors,

15   right?

16   A    That's the reason it specifically says that in 39.5 under

17   "definitions", even an independent owner -- independent is

18   still considered an employee of that company.

19   Q    Okay.  So, there is a big difference between a motor

20   carrier whose authority is being used for a load and employer,

21   right?

22   A    Yes, sir.

23   Q    Because you can have a couple of companies that end up

24   being the employer, but there's -- you have a motor carrier

25   that ends up being responsible for the load.

Allen - Redirect / By Mr. Hunnicutt                    147

1    A    Right.

2    Q    Okay.  But at the same time of those two companies that

3    are employers, they can both be motor carriers.

4    A    That's absolutely right, sir.

5    Q    All right.  Now, is it appropriate for a motor carrier to

6    just flippantly say, oh, we have bad bookkeeping when it comes

7    to the Federal Motor Carrier Act?

8    A    No, sir.  The regulations of Federal Motor Carrier --

9    Federal Motor Carrier regulations are very strict about that;

10   about the documents that's required to keep, and there's even

11   regulations about how they keep the records and where they have

12   to keep them.  And if they go out of business, how they have to

13   store the -- store the documents.

14         Saying we don't have them puts them in violation and

15   then they're -- they could be fined and their authority could

16   even be canceled.

17   Q    Okay.  Now, with respect to the difference between hiring

18   a leased driver or what a company has to do for a driver versus

19   what a broker -- a broker would have to do for a carrier, both

20   have to investigate who their contractor is, right?

21   A    That's correct.

22   Q    Both have obligations to make sure that it's a good

23   company and a safe company.

24   A    Correct.

25   Q    All right.  You found 19 violations on About Tyme?

Allen - Redirect / By Mr. Hunnicutt                          148

1   A    That's correct, sir.

2   Q    Was it reasonable or prudent --

3            MR. MOYE:  Your Honor, I'd object and approach.

4            THE COURT:  Okay.

5        (Begin Bench Conference)

6            MR. MOYE:  Your Honor overruled all direct negligence

7   claims.  The only thing that's left is my carrier's liability.

8   He's trying to use this witness to create a broker's liability

9   case against us that he's disavowed.  He said that we can't be

10  a broker and (indiscernible) under law.  It's inconsistent with

11  his (indiscernible).

12           THE COURT:  (Indiscernible)  What are you doing?

13           MR. HUNNICUTT:  Well, I think he's opened the door

14  for a negligent -- in trust for negligent conduct approach

15  (indiscernible).

16           THE COURT:  Not at this point.

17           MR. HUNNICUTT:  You disagree?

18           THE COURT:  Not at this point --

19           MR. HUNNICUTT:  Okay.  Thank you.

20           THE COURT:  -- and Plaintiffs...

21       (End Bench Conference)

22  BY MR. HUNNICUTT:

23  Q    All right.  Have any of the questions that Mr. Moye asked

24  you changed your opinion from your report or your deposition or

25  your direct testimony?

Allen - Recross / By Mr. Moye                            149

1  A    Not a one, sir.

2  Q    Thank you.

3          **MR. HUNNICUTT**:  Pass the witness.

4          **THE COURT**:  Anything else?

5          **MR. MOYE**:  I'm sorry?

6          **THE COURT**:  Anything else?

7          **MR. MOYE**:  Very brief --

8          **THE COURT**:  Okay.

9          **MR. MOYE**:  -- knowing that my limitations are what

10 they are.

11                    **RECROSS EXAMINATION**

12 **BY MR. MOYE**:

13 Q    Mr. Allen, based on the regulations and your experience

14 with the regulations, you can only have one employer at a time

15 on a load, right?

16          You can have more than one employer, but on the

17 actual load, there can only be one employer at a time, right?

18 A    That's right.

19          **MR. HUNNICUTT**:  Objection, form and that misstates

20 the law.

21          **MR. MOYE**:  Based on the regulations.

22          **THE COURT**:  Overruled.  He can answer.

23          **THE WITNESS**:  Say the question again, please, sir.

24 //

25 //

1    **BY MR. MOYE:**

2    Q    Sure.  Based on the regulations, in the exclusive use,

3    right to control, while you can be employed by more than one

4    motor carrier, for a given load, you can only be employed by

5    one; is that a true statement, sir?

6              **MR. HUNNICUTT:**  Same objection.

7              **THE COURT:**  Overruled.

8              **THE WITNESS:**  Okay, because there should have been a

9    lease agreement, that means he would have been hauling for that

10   motor carrier.  That would have been his employer at the time

11   whose authority the load was being operated on.  In this case,

12   it was RCX.

13   **BY MR. MOYE:**

14   Q    Sir, my question was, and I'll re-ask it.  Based on the

15   regulations, and I asked you this in your deposition.  Based on

16   the regulations, for the load at issue, can you have more than

17   one employer at a time?

18   A    You could still have more than one employer, but for that

19   particular load, there's only one motor carrier that is totally

20   responsible for the load and the driver.

21   Q    Thanks for your time.

22             **THE COURT:**  Anything else?

23             **MR. HUNNICUTT:**  Nothing further.

24             **THE COURT:**  All right.  Let's take our afternoon

25   break.  Let's take about a 15-minute break and then we'll

1  continue.

2          **COURT SECURITY OFFICER:**  All rise.

3      **(Jurors exit courtroom at 3:00 p.m.)**

4          **MR. HUNNICUTT:**  Your Honor, may Mr. Allen be

5  released?

6          **MR. MOYE:**  No objection, your Honor.

7          **THE COURT:**  All right.  Thank you, sir.  You can step

8  down.  You're free to leave the courthouse.

9          **THE WITNESS:**  Thank you, ma'am.

10     **(Witness Excused)**

11         **THE COURT:**  Who is your next witness?

12     **(Requested transcription concluded at 3:01 p.m.;**

13  **proceeding continued)**

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATION**</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>July 25, 2017</u>

         Signed                                      Dated



        *TONI HUDSON, TRANSCRIBER*