IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALEXANDRO PUGA AND | § | |
| NORMA PUGA | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 2:15-CV-00073 |
| | § | |
| ABOUT TYME TRANSPORT, INC., | § | |
| XTRA LEASE, LLC AND RCX | § | |
| SOLUTIONS, INC. | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANT RCX SOLUTIONS INC.'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW, OR,
IN THE ALTERNATIVE, FOR NEW TRIAL**

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendant RCX Solutions, Inc. ("RCX")[1] files this renewed Motion for Judgment

as a Matter of Law under Federal Rule of Civil Procedure 50(b) and shows the following:

## Introduction

On December 19, 2017, this Court entered judgment in favor of Alexandro and

Norma Puga, (ECF Doc. No. 236). RCX is entitled to judgment in its favor, or, in the

alternative, a new trial, for the following reasons:

1) **No evidence supports the jury finding in Question 1 (Doc. 208, p. 8) that
   Ronald Brown was negligent or that his negligence caused the accident.**

---

[1] Unless specifically noted otherwise, all references in this brief to RCX include RCX Solutions, Inc. and RCX Supply Chain. The arguments set forth herein mirror, in large part, the arguments previously set forth in RCX's opposition to Plaintiffs' motion for the entry of judgment. ECF Doc. No. 235.

The trooper investigating the accident could not say exactly how Brown was negligent. On this record one could *infer* that Brown was not negligent or that he was negligent—neither of which was shown to be more probable. This record does not have sufficient information on causation, in part because a typical accident reconstruction was not performed and the DPS made no calculations of important factors such as Brown's speed. *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729–30 (Tex. 2003) (holding that on the record before it, the circumstances "could give rise to any number of inferences, none more probable than another"). As a result, Trooper Smith's opinions that Brown was negligent are unsupported by data.

2) **Question 2 failed to ask if RCX was the motor carrier.** The language in Question 2 failed to fully track the language in the statute. In the form as given to the jury, the Question applies to both a person acting as a motor carrier and a person acting as a broker. As a result, the affirmative answer to Question 2 does not find that RCX Solutions or RCX Supply Chain was the motor carrier in the transaction with Brown/About Tyme.

3) **Plaintiffs did not otherwise prove as a matter of law that RCX was the motor carrier in the transaction.** Plaintiffs had the burden of proving that About Tyme or Brown entered into a lease with RCX. No direct testimony was given that RCX entered into a lease with Ronald Brown or About Tyme for this trip. Further, all of the documentary evidence, including the written agreement between About Tyme and RCX designating RCX Solutions as a broker and About Tyme as the carrier, supports a conclusion that About Tyme—not RCX—was the motor carrier in the transaction.

4) **The Loss of household services and loss of consortium damage awards are not supported by sufficient evidence.**

5) **Defendant RCX is entitled to a settlement credit for the settlement monies Plaintiffs received from Defendant Brown's company, About Tyme.**

## Statement of Issues

**Issue 1:**     Does the evidence support a finding that Brown/About Tyme was negligent or that his negligence caused the accident?

**Issue 2:**     Does Question 2 require the jury to find that RCX was acting as a motor carrier for this transaction?

**Issue 3:**     Does the evidence prove as a matter of law that RCX was acting as a motor carrier and not as a broker in the transaction with Brown?

**Issue 4:**     Does the evidence support the jury's awards for loss of household services and past and future loss of consortium in Question 4?

## Standard of Review

When a federal court sits in diversity jurisdiction over a traditional state law tort action, the court looks to applicable state law, even if federal regulations are implicated in the lawsuit. *See Lohr v. Zehner*, 2:12-CV533-MHT, 2014 WL 2504574, at *3 (M.D. Ala. June 3, 2014) ("The court will therefore look to Alabama state law to determine the scope of vicarious liability of a lessee under a federally regulated carrier lease.").

Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue. FED. R. CIV. P. 50(a). A motion for judgment as a matter of law after a jury verdict has been returned "is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Heck v. Triche*, 775 F.3d 265, 273 (5th Cir. 2014).

The decision to grant a new trial is within the court's discretion. FED. R. CIV. P. 59(a)(1)(A) (noting that a Court may grant a motion for a new trial for any reason which a new trial has before been granted). While Rule 59(a) does not list specific grounds for a new trial, the Fifth Circuit has held that a new trial may be granted if the "verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1027 (5th Cir. 1998). Rule 59 permits a court in its discretion to grant a new trial "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict . . . if the court finds that the trial

was unfair or marred by prejudicial error." *Grace v. Board of Trustees for State Colleges and Universities*, 8 F.3d 23, at *7 (5th Cir. 1993), *citing Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

<u>**Argument and Authorities**</u>

**I.**     **No Evidence Supports the Jury Finding that Ronald Brown was Negligent.**

    **A.**     **No evidence proves that *negligence* caused the truck to hydroplane.**

The evidence at trial proved that the About Tyme tractor and trailer went into the opposite lane of traffic on Highway 77, but no evidence proved what caused the tractor to do this—beyond the opinion that the tractor hydroplaned during rain. No trial witness was travelling behind the tractor to see if any particular event caused the tractor to cross the highway.

The only conclusion the trooper reached was that the tractor hydroplaned. The trooper did not know (*i*) how fast Brown was going (2 RR 65, 69, 71–74), (*ii*) whether inattention was a cause (2 RR 78), (*iii*) whether any action Brown took caused the truck to hydroplane (2 RR 69-75), (*iv*) whether Brown's brakes were defective (2 RR 66), (*v*) how heavy the trailer and its contents were (2 RR 67), (*vi*) whether Brown improperly applied his brakes before or after the truck hydroplaned (2 RR 75), (*vii*) whether Brown lost control and overcorrected (2 RR 75, 87), (*viii*) the state of Brown's tires (2 RR 71), or (*ix*) what caused the truck to hydroplane to begin with (2 RR 74–75).

The trooper did testify that a tractor can hydroplane even when going as slow as 30 mph. (2 RR 73) and that conditions on the road, such as a puddle, can cause a vehicle to hydroplane (2 RR 75). He said he did not think that the truck was going 30 mph when it

hydroplaned, but he never stated—and could not—how fast the truck was going. He opined that Brown was traveling at an unsafe speed and took faulty evasive measures *simply because the tractor hydroplaned* and Brown lost control. (2 RR 34–5, 37, 69–72, 75) And he opined Brown was negligent *only because the accident occurred*. (2 RR 71–5)

**B.   Texas substantive case law does not support a negligence finding on this testimony.**

Under substantive Texas law, this testimony will not support a finding of negligence. "A finding of cause in fact [i.e., one of the prongs of proximate cause] may be based on either direct or circumstantial evidence, but ***cannot be supported by mere conjecture, guess, or speculation***." *Pitzner*, 106 S.W.3d at 727 (emphasis added). That Brown's truck hydroplaned, by itself does not prove that he was negligent and therefore that his negligence caused the accident.

For example, in *Pitzner*, the plaintiff was working on air conditioners on the roof of Marathon after hours. He was found lying on the ground with head and other injuries. *Id*. at 727–29. The premises violated several Dallas City building and mechanical codes, one of which required a certain amount of work-space by the units' access panels; the plaintiff argued that these violations caused his injuries. *Id.* But the plaintiff was unable to testify what happened because he could not remember what caused him to fall. *Id*. at 726.

The Texas Supreme Court held that no evidence showed that the code violations or other potential reasons for the fall caused the plaintiff's injuries, saying "On this record, the circumstances 'could give rise to any number of inferences, none more probable than another.'" *Id*. at 729. The court noted,

5

> The factfinder could only speculate as to (1) whether Pitzner
> actually fell from the roof, (2) whether he actually came into
> contact with a high-voltage wire on Marathon's roof, and (3)
> whether and how the lack of a power disconnect on the roof or
> the lack of additional space between the air conditioning units
> was a substantial factor in causing Pitzner's injuries.

*Id*.

The Texas Supreme Court has reached this same conclusion on more than one occasion. In *Doe v. Boys Clubs of Greater Dallas, Inc.* the Court held that "merely given a negligent act and an injury, it does not logically follow that 'the two must be causally connected.'" 907 S.W.2d 472, 481 (Tex. 1995). And in *General Motors Corp. v. Saenz*, it held the following:

> According to the dissent, if there is an inadequate warning and
> an accident, the two must be causally connected. This is not
> true in logic or law. Causation remains an element of liability,
> and it cannot be proved simply by proving that a warning was
> inadequate. If this were true, causation would not be an element
> of liability; proof of inadequacy would suffice.

873 S.W.2d 353, 361, n.6 (Tex. 1993) (opinion by then Associate Justice Nathan Hecht).

These opinions have been validated in later cases, including one issued September 29, 2017, where the Texas Supreme Court reaffirmed the principle:

> When the only evidence of a vital fact is circumstantial, the
> expert cannot merely draw possible inferences from the
> evidence and state that . . . the injury was caused by the
> defendant's negligence. The expert must explain why the
> inferences drawn are more . . . preferable to competing
> inferences that are equally consistent with the known facts.

*Bustamante v. Ponte*, No. 15-0509, ___ S.W.3d ___, slip op. at 13 (Tex. September 29, 2017) (emphasis in original), quoting from *Jelenik v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010).

The same logic applies here. That an accident occurred is not proof that Brown was negligent. Plaintiffs still had to prove that Brown was negligent and that his negligence caused the accident. The Trooper was not qualified to reconstruct the accident and no one else reconstructed the accident, nor did anyone attempt to calculate Brown's speed. The Trooper's conclusion that Brown was negligent was an assumption lacking any stated foundation. The trooper did not say that faulty evasive tactics or unsafe speed were more likely than that Brown hydroplaned without any negligence. Without proof that any negligence of Brown caused his vehicle to hydroplane, the Court and jury cannot pick between potential causes, some of which involve negligence, some of which do not, and none of which have been shown to have occurred. *See Reinecke v. Aeroground, Inc.*, 167 S.W.3d 385, 389–91 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding that the unexplained actions of a driver of van that slowly veered off road and hit truck, killing occupants of van, did not constitute evidence that potential negligence of truck driver of disabled truck parked on shoulder of freeway caused the driver to veer off the road).

### C.    The officer's testimony fails the standards experts must meet.

Over objection, the officer was designated a non-retained expert. This designation allowed him to give opinions he would not otherwise be allowed to give. Because experts are allowed to give opinions and because jurors give expert opinion more weight, expert testimony is subject to strict standards and scrutiny to ensure they are valid. *E.I. du Pont*

*de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 553 (Tex. 1995) (noting that a witness who has been sanctioned as an expert by the court seems inherently more credible and that courts must impose a reliability standard on experts to avoid prejudice from unreliable opinions).

When viewed under standards for expert testimony, the officer's testimony falls short of proving negligence. *See Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837 (Tex. 2010). In *Merrell* the question was what caused a fire and smoke in a rental home whose two occupants died. Fire fighters found numerous smoking paraphernalia and candles, a badly burned recliner and other furniture covered in soot and smoke and a damaged "pole-style" floor lamp. They declared the fire an accident of unknown origins. An expert for the plaintiffs concluded that a "nonpassive failure of the lamp" caused the fire because it was "consistent with the facts of the case and . . . wholly consistent with our knowledge of fire science." *Id.* at 838. The Texas Supreme Court held this testimony was insufficient to establish that the lamp caused the fire. The Court concluded the expert failed to show why a burning cigarette or other burning materials could not have caused the fire. *Id.* at 839–40.

As the Court stated, "An expert's failure to explain or adequately disprove alternative theories of causation makes his or her own theory speculative and conclusory." *Id.* at 840. The court ended, saying that the expert's testimony lack[ed] objective, evidence-based support for its conclusions." *Id.; see also, Bustamante,* No. 15-0509, slip op. at 13; *Jelenik*, 328 S.W.3d at 536.

The trooper's testimony here suffers the same deficits.

8

**D.** **The cases Plaintiffs cite in their Reply (Doc. 232) do not support a finding of negligence.**

In their Reply, Plaintiffs spend a number of pages restating the investigating officer's conclusions, suggesting that they support the negligence finding. This misses the point. Defendant does not dispute that Officer Smith reached these conclusions—that Brown took faulty evasive action and was driving at an unsafe speed. (Doc. 232, p. 3-4)

Defendant claims that the officer's conclusions do not constitute evidence of negligence, because they are conclusory, as addressed in section C above. In fact, the very case on which Plaintiffs rely heavily for this point goes against their argument, holding that conclusory statements are not competent evidence. *See Viterbo v. Dow Chemical Co*., 826 F. 2d 420, 422 (5th Cir. 1987).

Plaintiffs also supply a quote allegedly from *Viterbo* (referred to by Plaintiffs as *Verbo*) that a plaintiff need not rule out other potential causes of an accident if the plaintiff has proof of a defendant's negligence. (Doc. 232, p.4) Two fundamental problems surround this quote and their reliance on it. First, that quote is not in *Viterbo*, although the court says something similar regarding admissibility of expert opinion. *See Id*. at 424. Second, the quote also misses Defendant's point. To rely on the claim that other potential causes need not be ruled out, there first must be proof of the defendant's negligence. Here, Defendant claims that no proof shows that Brown was negligent. In fact, the same problems undermining Officer Smith's opinions, undermined the expert testimony in *Viterbo*:

> We do not hold, of course, that admissibility of an expert opinion depends on the expert disproving or discrediting every possible cause other than the one espoused by him. Here, however, Dr. Johnson has admitted that Viterbo's symptoms

> could have numerous causes and, without support save
> Viterbo's oral history, simply picks the cause that is most
> advantageous to Viterbo's claim.

*Id*. Here, Officer Smith has done essentially the same as the *Viterbo* expert, except he picked causes in support of his preconceived notion that Brown was negligent simply because the accident happened. To resolve the doubt remaining from the lack of data Officer Smith collected, Plaintiffs could have hired and presented the testimony and calculations of an accident reconstructionist. They chose not to do so.

In short, Plaintiffs have failed to prove that Brown was negligent or that his negligence caused the accident. The court cannot enter judgment in favor of Plaintiffs.

## II.    Jury Question 2 does not establish that RCX was a motor carrier because it lacks significant, necessary language from the statute.

This Court stated during trial that whether RCX was a motor carrier was a fact issue. The Court assumed that Question 2 established that RCX was a motor carrier, but the question contains a fatal flaw preventing it from establishing that fact. The pertinent part of the question asked, "[W]as RCX Solutions, Inc. using motor vehicle(s) it did not own to transport property under an arrangement with Ronald Brown?"

The Court took this language from 49 U.S.C.A. § 14102, but the question the court gave the jury left out a crucial, qualifying fact contained in the section's language. Here is the pertinent language from the statue:

> …[A] **motor carrier**…that uses motor vehicles not owned by it to transport property under an arrangement with another party [must do the following things]

10

*Id.* (emphasis added). The language Congress used specified that for the "arrangement" to be a lease, a *motor carrier* must enter into the arrangement. This qualification was necessary, because both brokers and motor carriers use motor vehicles they do not own to transport property. In fact, as the highlighted language below shows, depending on the situation, the definitions of motor carrier and broker are almost identical:

> **Motor Carrier. The term "motor carrier" means a person providing motor vehicle transportation for compensation.**

49 U.S.C.A. § 13102 (14) (emphasis added).

> **Broker.** The term **"broker" means a person, other than a motor carrier** or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, **providing, or arranging for, transportation by motor carrier for compensation.**

*Id.* at § 13102(2) (emphasis added).

Thus, the definition this Court gave the jury would include not only a motor carrier, but a broker. As all parties and the Court agreed, if Brown was a statutory employee, he could be the statutory employee *only of a motor carrier*—not a broker. Because the affirmative answer to Question 2 did not establish that RCX was a motor carrier, it could not establish that Brown was RCX's employee, statutory or otherwise. The Plaintiff failed to secure a jury finding that RCX was a motor carrier under the charge as submitted.

11

**III.    Plaintiffs did not prove as a matter of law that RCX was a motor carrier in this transaction.**

**A.    The evidence at trial failed to prove that RCX leased Brown's truck for this or any other trip.**

To establish that Brown was RCX's statutory employee[2], at the very least Plaintiffs had to prove that RCX leased Brown's vehicle for this trip. Under the statutes, employee status can arise only if the driver is employed by the company—i.e., motor carrier—or if the motor carrier has leased the truck and driver. *See* 49 U.S.C.A. § 14102; 49 C.F.R. §§ 376.11-12. No evidence in the record proves that RCX had a lease with About Tyme or Brown.

To begin, the ***documentary*** evidence does not prove that RCX Solutions leased Brown's truck—the documents show otherwise.

- RCX and About Tyme entered into a carrier agreement, which designated RCX as the broker and About Tyme as the carrier. (Day 2, 118-119; DX 16)

- RCX had no documents or other information on About Tyme—such as log books, employee information, information on trips, copies of freight bills, methods of payment, etc.—that RCX kept for its employees and owner/operators whose trucks it leased.

- At the time of the accident, About Tyme was a licensed motor carrier in its own right.

---

[2]    RCX does not concede that Brown automatically would be its statutory employee if the Court were to find RCX was a motor carrier on this transaction.

- Brown's truck had an About Tyme placard and an About Tyme log book, which are consistent with it acting as the motor carrier.

- RCX's files did not contain a lease for Brown's truck.

- RCX's files did not contain a lease with About Tyme.

Nor does the **testimony** prove that RCX leased Brown's truck or entered into a lease with About Tyme.

- Jason Butler, the employee who worked for RCX Solutions and RCX Supply Chain and contacted Brown to haul the load, did not testify that he entered into a lease agreement with Brown or About Tyme.

- The question by Plaintiffs' lawyer suggesting that Jason Butler *might* have hired Brown for a "trip lease" and the answer to it were mere speculation unsupported by any facts. (4 RR 112-113)

- Randy Clifton, the President of RCX testified that the company had never leased from About Tyme and did not lease Brown's truck on this occasion. (4 RR 42-3, 66)

- The employee who gave the lease to Brown, testified that he gave load to Brown through RCX Supply Chain, who had a broker's license. (3 RR 30-31) He also testified that he did not have the authority to designate a company as a lessor or outside carrier; the company itself would do that. (3 RR 35)

- RCX's expert, Jennings, testified that he found no leases with Brown or About Tyme. (4 RR 94)

13

- Although, RCX employees testified that RCX Solutions had a motor carrier license, none of them testified that RCX leased Brown's truck for this trip.

- RCX employees testified that About Tyme was a motor carrier. (2 RR 123 (lines 8-24), 125; 3 RR 28-29)

- Brown's partner in About Tyme testified that About Tyme was acting as the motor carrier in the transaction. (3 RR 159)

- Clifton testified that 99 percent of owners who had their motor carrier licenses—as did About Tyme—preferred to be the carrier in transactions rather than to lease their vehicle. (4 RR 55)

- Owners make more money by being the motor carrier than if they lease their vehicle. (4 RR 71)

- The testimony by Plaintiff's expert that RCX Solutions had to be the motor carrier in the transaction because it did not have a broker's license was speculation and a legal conclusion not supported by the statutes. The statutes assume that companies will illegally broker transactions because they impose fines for illegally brokering. Nothing in the statutes suggests that one who illegally brokers a transaction is deemed a motor carrier rather than a broker.

- About Tyme has already settled with Plaintiffs under the insurance policy About Tyme was required to procure as a motor carrier.

14

**B.** **To hold that Plaintiffs proved that RCX was a motor carrier for this transaction and not a broker, one must rely on flawed assumptions.**

Plaintiffs bore the burden of proving that RCX was the motor carrier in the transaction with Brown. Plaintiffs rely heavily on the opinions of their expert, Allen, that RCX was a motor carrier. (Doc. 232, p. 6–7)

But Allen's conclusion is based on a flawed assumption: RCX could not be the broker in the transaction (and therefore must be the motor carrier) because RCX was not licensed to be a broker, which would mean that it was operating illegally as a broker. This is like saying a defendant could not have committed a crime because the act committed was illegal. Neither assumption is valid. And in this case, Allen's assumption contradicts documentary evidence showing that RCX Solutions had an outstanding agreement with Brown (the carrier agreement) designating Brown as the motor carrier and Defendant RCX Solutions as the broker. (DX 16) Further, Clifton, the owner of RCX testified that RCX was brokering trips when this accident occurred. (Day 4, 50, 75-6)

Plaintiffs also claim employee testimony supports a conclusion that RCX was acting as the motor carrier in this transaction. This is not so. As shown above, the employees testified that RCX Solutions had a motor carrier license but no broker's license and that RCX Supply Chain was a licensed broker. But none testified that RCX was acting as the motor carrier in this transaction and not the broker.

Finally, uncontradicted expert testimony RCX presented and summarized above supports the conclusion that RCX was the broker.

**IV.    At the threshold, Federal law does not create automatic statutory employee liability.**

    **A.    The evolution of the law on "statutory employee."**

The verdict in this case is based entirely on Plaintiffs' theory that federal law creates automatic "statutory employee" liability for motor carriers in certain circumstances. While this may have been so in the past, *see, e.g., Price v. Westmoreland*, 727 F.2d 494, 495 (5th Cir. 1984), under a proper reading of the current statute and its interpreting regulations, Plaintiffs' theory of the case is incorrect. In fact, a plaintiff seeking to recover against a motor carrier under federal law must prove that the motor carrier is vicariously liable for the acts of the lessee under normal state law principles. Plaintiff has not and cannot do so here. As a result, although the verdict must also be set aside because there was no lease between Brown or About Tyme and RCX (as well as for many other reasons) the Court should hold that Plaintiffs' claim is fundamentally baseless under current law.

In their initial pleadings, Plaintiffs cited 49 U.S.C. §11107 and 49 C.F.R. § 1057 as the basis of its claims in this case, *see e.g.,* ECF No. 94, at 8 (opposition to motion for summary judgment). In fact, the current statute governing claims against motor carriers is codified at 49 U.S.C. § 14102—and the correct regulations set forth at 49 C.F.R. §376.12(c)(4). These rules, as amended in 1992, are materially different than those Plaintiffs cited, as is the recent case law interpreting the amended rules. In particular, the ICC amended the regulations in 1992 to specifically state that "[n]othing in [the lease provisions required by the regulations are] intended to affect whether the lessor or driver

provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." *See* §376.12(c)(4).

The 1992 amendment was made in response to concerns from the motor carrier industry that courts had misinterpreted the control regulations set forth in §14102 to somehow preempt state vicarious liability law. *See, e.g., Jackson v. O'Shields*, 101 F.3d 1083, 1087 (5th Cir. 1996) (explaining that 1986 amendments were made to address concerns from motor carriers about facing unwarranted tort liability). Both the 1986 and the 1992 amendments were intended to resolve and clarify the entire nature of the relationship between drivers and motor carriers. In 1986, the Interstate Commerce Commission stated that it "did not intend that its leasing regulations would supersede otherwise applicable **principles of state tort, contract, and agency law** and create carrier liability where none would otherwise exist." *See* 49 C.F.R. Part 1057; I.C.C. 2d 92, 1986 WL 62968. (emphasis added). The Commission later clarified the 1992 amendments, stating they were "to give notice to the courts in that [376.12(c)(1)] . . . is not intended to affect the relationship between a motor carrier lessee and the independent owner-operator lessor." *Pet. to Amend Lease and Interchange of Vehicle Regulations*, 8 I.C.C.2d 669, 670 (1992).

As a result, recently courts have held that the so-called "statutory employee" doctrine is no longer viable under the 1992 amendments, and therefore that plaintiffs must show that the motor carrier is vicariously liable under normal state-law principles. "[In 1992], "the ICC clarified that the control regulations were not intended to create a federal theory of liability supplanting otherwise applicable state law concepts of agency,

independent contractor, and the like." *Jeff v. Van Eerden Trucking Co.*, NO. Civ-10-1073-HE, 2012 WL 37504, at *4 (W.D. Oklahoma, 2012). *See also Lohr v. Zehner*, 2014 WL 2504574, at *3 (M.D. Alabama, 2014) ("The text of the regulation requires certain language within lease agreements, but it does not impose any liability scheme directly."); *Bays v. Summit Trucking, LLC*, 691 F. Supp.2d 725, 729 (W.D. Kentucky, 2010) (rejecting strict liability for motor carriers under federal law); *UPS Ground Freight, Inc. v. Farran*, 990 F. Supp.2d 848, 857 (S.D. Ohio, 2014) (same). As those courts have explained, the addition of Section 376.12(c)(4) was *intended* to respond to motor carrier's concerns about run-away liability. *See, e.g., Edwards v. McElliotts Trucking, LLC*, ___ F. Supp.3d ___, 2017 WL 3279168, at *7 (S.D.W.V. 2017).  Thus, it would make no sense to "cling" to pre-1992 interpretations of the relevant regulations. The automatic statutory employee liability scheme on which Plaintiff relies is incorrect.[3]

### B.   Plaintiffs' claim that Texas recognizes an irrebuttable presumption statutory employee concept, is based on old law.

Plaintiffs' Reply on the statutory employee issue—arguing that Texas cases have recognized the statutory employee concept—also misses the mark. Texas courts have done so, but they relied on pre-amendment language. In fact, one primary case on which Plaintiffs rely—*Morris v. JTM Materials, Inc.*, 78 S.W. 3d 28, 37-8 (Tex. App.—Fort Worth 2002, no pet.)—has been questioned by the Texas Supreme Court and by state and federal courts. The Texas Supreme Court noted that *Morris* "stood for the general

---

[3]   Some courts have held that federal law creates a rebuttable presumption that a statutory employee relationship exists between the motor carrier and the lessor. *See Edwards*, 2017 WL 3279168, at *7. Even if this is so, however, any such presumption has been amply rebutted by the trial evidence here.

proposition that '[a] motor carrier is vicariously liable for the negligence of its 'statutory employee' drivers," but then the Court expressly withheld voicing an opinion on this holding's viability. *Gonzales v. Ramirez*, 463 S.W. 3d 499, 503, n.13; *see also Bays v. Summit Trucking*, 69 F. Supp. 2d 725, 728–323 (W.D. Ky 2007 (rejecting an irrebuttable presumption of statutory employee); *Saullo V. Douglas*, 957 So. 2d 80, 83–6 (5th Dist. Fla.2007) (refusing to recognize strict vicarious liability for an independent contractor).

Plaintiffs have *no* evidence that RCX is vicariously liable for Brown's actions under Texas state law. And to the extent there is evidence, it shows the opposite—that About Tyme and Brown were independent contractors.[4] In short, no jury finding supports a conclusion that About Tyme or Brown were RCX's employee and in fact the record supports the opposite as a matter of law.

---

[4] The Fifth Circuit has never squarely addressed the continued vitality of the statutory employee doctrine after the 1992 amendments. The closest it has come is in *Jackson v. O'Shields*, 101 F.3d 1083 (5th Cir. 1996). But in that case, the Court addressed only the question of whether a lease "cannot be effectively terminated until a carrier removes its placard and obtains a receipt." *Id.* at 1087. It held that the 1986 amendments to the statute and regulations had undermined existing precedents holding that the placard itself could impose liability on the motor carrier. *Id.* But the Court did not address whether the broader statutory employee concept retained viability—after all, in that case (and unlike here) there *was* a written lease that assigned total responsibility to the motor carrier. *Id.* The question was whether that obligation survived the end of the lease. *Id. Simpson v. Empire Truck Lines, Inc.*, 571 F.3d 475 (5th Cir. 2009), which addresses the question of whether state workers' compensation law is preempted by Section 14102, is similarly irrelevant.

In short, because the law changed in 1992, this Court is not bound by pre-1992 decisions of the Fifth Circuit, nor by decisions of the Fifth Circuit where it was not asked to determine the continued existence of the statutory employee doctrine.

**V.     The jury's findings in parts 2–4 of Question 4 are not supported by the record.**

**A.     The testimony in support of loss of household services is insufficient.**

The jury's finding of $286,650 for loss of household services, $1,600,000 in past loss of consortium damages for Mrs. Puga, and $1,800,000 future loss of consortium damages for Mrs. Puga are not supported by the record.

Mrs. Puga's entire testimony on loss of household services takes up two lines of testimony. She said her husband worked at the house 8-10 hours a week, but we have no idea what work he did or if he performed work his wife could not do, because there is no evidence explaining this. This testimony constitutes no evidence for support loss of household services and certainly insufficient evidence to support $286,650.

Plaintiffs recite what they claim is sufficient testimony from Mr. and Mrs. Puga, but both their testimonies suffer from the same problem: they give only vague testimony of what had to be done at one point without saying how long they needed help, whether they would always need help, and for what specific jobs they needed help. (Day 1 at 170-71, 323–24)

**B.     The consortium awards are supported by insufficient evidence.**

The consortium awards also are supported by insufficient evidence. The court's charge defined consortium as the "mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, love, and felicity necessary to a successful marriage." (Doc. 208 at 12) Mrs. Puga's testimony regarding these elements does not support the amount of the past and future awards.

20

Although Mrs. Puga testified about the physical help that she had to provide to her husband, and the things that he could no longer do with his children, this testimony is insufficient to support an award of $1,600,000 for three years of *her* loss. 3 RR 309–10. The majority of Mrs. Puga's testimony regarding impact of her husband's injury on *her* life was her testimony that she had to seek mental treatment.  But this testimony cannot support the jury's finding because "[l]oss of consortium does not include an element of mental anguish." *Reeder v. Allport*, 218 S.W.3d 817, 819 (Tex. App.—Beaumont 2007, no pet.) (citing *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990), on reh'g in part (Mar. 6, 1991)).

Mrs. Puga's testimony that her husband couldn't dance with her at a wedding, that she became frustrated with him, that there is tension in their marriage and that there was a decrease in their marital relations simply does not support the jury's award of an average of over $500,000 a year for past loss of consortium for the three years before trial or $1,800,000 in future loss of consortium.

The excessiveness of this award is evident when compared with the facts of *Reeder v. Allport*. 218 S.W. 3d at 819. There, a wife brought claims for loss of consortium after her husband was paralyzed in an accident. *Id.* The jury found for the wife in an amount of $76,000 in past loss of consortium and $1,000,000 for the future. *Id.*

Here there is no doubt that Mr. Puga was seriously injured in this accident, but unlike the husband in *Reeder,* he was not paralyzed. Yet this jury gave Mrs. Puga $2,324,000 more for loss of consortium without testimony to support such a difference.

The excessiveness of the loss of consortium award also is evident when compared to the amount the jury awarded to Mr. Puga for future mental anguish. The jury awarded Mrs. Puga essentially two-thirds more for future loss of consortium than it awarded her husband for future mental anguish. The award for future loss of consortium was $1,800,000 versus $625,000 for future mental anguish.

Plaintiffs have not cited a single case in which damages close to this amount were awarded for loss of consortium.

**C.    The Fifth Circuit law Plaintiffs cite regarding excessive damages does not apply here.**

Plaintiffs argue that this Court must apply Fifth Circuit case law on excessive damages, citing to *Grunenthal v. Long Island Ry. Co*., 393 U.S. 156, 159 n.4, 89 S.Ct. 331, 333 n. 4, 21 L.Ed.2d 309 (1968). Neither *Grunenthal* nor the Fifth[th] Circuit case citing it, *Perricone v. Kansas City Southern Ry. Co*., 640 F.2d 317, 320 (5th Cir. 1980), apply here to determine the excessiveness of these awards. The most recent explanation of the proper application of law is found in *Foradori v. Harris*, 523 F.3d 477, 497–98 (5th Cir. 2008). There the court explained the interplay between state and federal law on excessiveness in a diversity case such as this:

> The Supreme Court in *Gasperini,* 518 U.S. at 419, 434, 116 S.Ct. 2211, held that, in an action based on state law but tried in federal court by reason of diversity of citizenship, *a district court must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy*, and appellate control of the district court's ruling is limited to review for "abuse of discretion." "Within the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the district court, not the

> court of appeals, primary responsibility for application of [the
> state's new trial or remittitur standard].

*Id.* (emphasis added).

In short, state law controls on whether the awards are excessive. Jurors cannot pick a number out of the air for an award. All damages must be tied to some testimony. *See Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 403 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (stating that a rational basis must exist for the jury's damage calculation and that "a jury may not arbitrarily assess an amount not authorized or supported by evidence at trial; in other words, a jury may not "pull figures out of a hat").

Defendant does not argue that Mrs. Puga is entitled to no damages for loss of consortium; it argues that the amount awarded must be tied to specific testimony. The specific testimony cited above that Mrs. Puga gave regarding her relationship with Mr. Puga does not support a total of $3,400,000 in loss of consortium damages, especially considering that loss of consortium does not include mental anguish.

The amounts awarded should be greatly reduced.

## VI.   RCX is entitled to a settlement credit for the settlement amount Ronald Brown's company, About Tyme, paid to Plaintiffs.

Attached as exhibit A is a settlement agreement between About Tyme, the company Ronald Brown owned, and Plaintiffs in which About Tyme paid Plaintiffs a total of $1,000,000.  Under Texas law, this settlement of the claims based on the Pugas' injuries from the single accident should be applied to the judgment. *See* TEX. CIV. PRAC. & REM. CODE § 33.012(b) (stating that the amount the claimant recovers from a defendant must be reduced by the full amount of a settlement with other defendants). The Fifth Circuit has

recognized that Texas law is clear on this issue and should be applied to a judgment in federal court. *See Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 510 (5th Cir. 2014).

**VII.    In the alternative, RCX should be granted a new trial.**

In the event the Court does not agree that RCX should be granted judgment as a matter of law, for all the reasons above RCX is entitled to a new trial. In short, the overwhelming weight of the evidence is against the jury's findings with respect to RCX's liability in this matter.

<u>**Conclusion**</u>

RCX Solutions respectfully requests that the Court grant judgment as a matter of law in its favor or, in the alternative, grant a new trial.

Respectfully submitted,

*/s/ Wanda McKee Fowler*
William R. Moye
(Attorney-In-Charge)
State Bar No. 24027553
Southern District Bar No. 34007
THOMPSON, COE, COUSINS,
& IRONS, LLP
One Riverway, Suite 1400
Houston, Texas  77056
Telephone: 713-403-8210
Facsimile: 713-403-8299
wmoye@thompsoncoe.com

Thomas C. Wright
Federal ID No. 2729
State Bar No. 22059400
Wanda McKee Fowler
Federal ID No. 111122
State Bar No. 13698700

24

Andrea C. Geohegan
Federal ID No. 1673359
State Bar No. 24079467
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: 713-572-4321
Facsimile: 713-572-4320
wright@wrightclose.com
fowler@wrightclose.com
geohegan@wrightclose.com

ATTORNEYS FOR DEFENDANT,
RCX SOLUTIONS, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on counsel of record through the Court's electronic filing service on December 28, 2017.

David L. Ortega
Erik L. Krudop
NAMAN, HOWELL, SMITH &
LEE, PLLC
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
dortega@namanhowell.com
ekrudop@namanhowell.com

COUNSEL FOR DEFENDANT
ABOUT TYME TRANSPORT, INC.

William R Moye
Andrew McCluggage
THOMPSON, COE, COUSINS & IRONS, LLP
One Riverway, Suite 1400
Houston, TX 77056-1988
wmoye@thompsoncoe.com
amccluggage@thompsoncoe.com

ATTORNEYS FOR DEFENDANT, RCX
SOLUTIONS, INC.

Les Pickett
Ron T. Capehart
GALLOWAY, JOHNSON, TOMPKINS, BURR &
SMITH
1301 McKinney Suite 1400
Houston, Texas 77010
lpickett@gallowayjohnson.com
rcapehart@gallowayjohnson.com

COUNSEL FOR DEFENDANT XTRA
LEASE, LLC

Thomas J. Henry
Richard W. Hunnicutt, III
THE LAW OFFICES OF THOMAS J. HENRY
5711 University Heights Blvd., Suite 101
San Antonio, Texas 78249
rhunnicutt-svc@tjhlaw.com

ATTORNEYS FOR PLAINTIFFS

*/s/ Wanda McKee Fowler*
Wanda McKee Fowler