# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-41282

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2019

Lyle W. Cayce
Clerk

ALEXANDRO PUGA; NORMA PUGA,

> Plaintiffs - Appellees

v.

RCX SOLUTIONS, INCORPORATED,

> Defendant - Appellant

United States Courts
Southern District of Texas
**FILED**

MAY - 9 2019

David J. Bradley, Clerk of Court

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

CARL E. STEWART, Chief Judge:

IT IS ORDERED that the pending joint motion for clarification of this court's opinion is GRANTED and our prior panel opinion, *Puga v. RCX Solutions, Inc.*, 914 F.3d 976 (5th Cir. Feb. 1, 2019), is WITHDRAWN. The following opinion is SUBSTITUTED therefor.

RCX Solutions, Incorporated is a licensed motor carrier that contracted with a driver, Ronald Brown, to transport a load across Texas. During his drive, Brown crossed the median into oncoming traffic and crashed into Alexandro Puga's truck, leaving Puga with significant injuries. The Pugas sued. After a week-long trial with expert testimony, a jury found RCX liable

No. 17-41282

for Brown's negligence and awarded Mr. Puga a variety of damages and his wife, Norma Puga, loss of consortium damages.

RCX now launches a multitude of challenges at the district court's handling of the case. RCX claims that the district court wrongly interpreted the Federal Motor Carrier Safety Regulations because it failed to take account of regulatory amendments. RCX contends that this misinterpretation subjected RCX to liability where none should exist. RCX also argues that the district court used faulty jury instructions, improperly allowed the Pugas' expert to testify, and upheld an excessive jury award for Mrs. Puga's loss of consortium. Finally, RCX claims that the district court erred in not applying a settlement credit to the final damages award. After reviewing the record, we AFFIRM the district court's rulings with respect to all issues except (1) Mrs. Puga's award for past consortium damages and (2) the settlement credit. We REVERSE and REMAND to the district court to calculate the appropriate amount of past consortium damages and settlement credit amount, and then modify its final judgment accordingly.

## I.

Sunset Transportation entered into a brokerage account with L'Oreal. In its role as a broker, Sunset was responsible for choosing a motor carrier for individual L'Oreal shipments on a load-by-load basis. Sunset chose RCX to transport the L'Oreal load involved in the accident. RCX did not have a contract with L'Oreal.

When it came time for RCX to transport L'Oreal's load, RCX ran into equipment problems. So RCX contacted Ronald Brown to transport the load. Conveniently, Brown already had an RCX trailer in his possession. RCX had leased the trailer from another company, Xtra Lease, and RCX assumed responsibility for the trailer's operation under the lease agreement. The bill of

No. 17-41282

lading listed RCX as the carrier for the load. Brown also signed the bill of lading, apparently on behalf of RCX.[1]

While transporting the load, Brown swerved across the median into oncoming traffic, hitting Alexandro Puga's truck. Brown did not survive the accident. Mr. Puga suffered a variety of injuries, including burns on large parts of his body and fractures in his spine, legs, pelvis, and fingers. Mr. Puga was still undergoing treatment and surgeries two-and-a-half years after the accident.

Following the accident, Mr. Puga and his wife, Norma, sued RCX, About Tyme, and Xtra Lease, claiming that Brown's negligent driving caused Mr. Puga's injuries. Prior to trial, RCX filed a motion under Rule 50(a) of the Federal Rules of Civil Procedure, requesting the court to enter judgment as a matter of law because the Pugas lacked sufficient evidence for a jury to find that (1) Brown was employed by RCX and (2) Brown acted negligently when the crash occurred. The district court denied the motion.

At trial, the Pugas designated Trooper Andrew Smith as an expert witness. Smith was the first responder to the accident and saw the explosion from the accident from afar. RCX sought to exclude Smith's testimony regarding the cause of the accident. The district court denied RCX's motion.

The trial concluded with a jury verdict in favor of the Pugas. The jury determined that RCX was "using motor vehicle(s) it did not own to transport property under an arrangement with Ronald Brown." As a result, the jury awarded the Pugas a variety of damages. The jury specifically awarded Mrs.

---

[1] RCX claims, however, that Brown was employed by About Tyme, another carrier. RCX had a trailer interchange agreement with About Tyme, under which they could use the other company's trailers. And About Tyme's logo was also on the trailer when the accident occurred. Brown had also listed About Tyme in his logbook.

No. 17-41282

Puga damages for loss of consortium, $1.6 million for past loss of consortium and $1.8 million for future loss of consortium.

After the trial, RCX filed a renewed Rule 50(b) motion, again requesting judgment as a matter of law, this time because amendments to Federal Motor Carrier Regulations precluded the jury from finding for the Pugas. The district court again denied the motion and entered judgment in favor of the Pugas. RCX now appeals.

II.

RCX first argues that federal law does not allow courts to hold motor carriers liable for the acts of independent contractors, a concept both parties refer to as the statutory-employee doctrine. RCX raised this argument for the first time in its post-verdict Rule 50(b) motion.

Rule 50(a) of the Federal Rules of Civil Procedure allows a party to move for judgment as a matter of law at trial before the jury renders its verdict. Under Rule 50(a), the movant must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). If the pre-verdict motion is denied, then the party can renew its motion under Rule 50(b). But the renewed Rule 50(b) is "technically only a renewal of the [Rule 50(a) motion for judgment as a matter of law]." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985) (internal quotation marks and citation omitted). As a result, courts prohibit parties from using a Rule 50(b) motion to "assert a ground that was not included in the [original] motion." *Id.*; *see also In re Isbell Records, Inc.*, 774 F.3d 859, 867 (5th Cir. 2014) ("By not raising this argument at trial or in its Rule 50(a) motion, [the appellant] has waived its right to bring a Rule 50(b) motion on this ground."); *Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 247 (5th Cir. 2005) ("If a party fails to raise an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion.") (citation omitted); 9B Charles Alan Wright & Arthur K. Miller,

4

No. 17-41282

*Federal Practice and Procedure* § 2537 (3d ed. 2018) ("[T]he district court only can grant the Rule 50(b) motion on the grounds advanced in the preverdict motion, because the former is conceived of as only a renewal of the latter.").

This rule makes sense in light of Rule 50(b)'s purposes. Rule 50(b) is designed to prevent a litigant from ambushing both the district court and opposing counsel after trial. *See Dimmitt Agri Indus., Inc. v. CPC Int'l. Inc.*, 679 F.2d 516, 521 (5th Cir. 1982) ("The rationale for the rule that a [Rule 50(b) motion] cannot assert a ground not included in a motion for directed verdict is obviously to avoid 'ambushing' the trial court and opposing counsel.") (internal quotation marks and citation omitted); *Quinn v. Sw. Wood Prods., Inc.*, 597 F.2d 1018, 1025 (5th Cir. 1979) ("When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend his case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error."). By requiring a litigant to raise all arguments in its initial Rule 50(a) motion, the trial court is able to "re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant," and opposing counsel is alerted to any "insufficiency before the case is submitted to the jury," giving the opposing party a chance to cure any defects in its legal theories or proof should the motion have merit. *Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996) (internal quotation marks and citation omitted).

Here, RCX did not argue that the statutory-employee doctrine was overruled in its Rule 50(a) motion, precluding it from raising the argument in its Rule 50(b) motion. In its oral Rule 50(a) motion, RCX argued that judgment

No. 17-41282

as a matter of law was appropriate because the record contained insufficient evidence to determine that (1) Brown was a statutory employee of RCX and (2) Brown acted negligently when the accident occurred. Even in its earlier summary judgment briefing, RCX only attacked the evidentiary bases for determining that Brown was an employee of RCX. At no time prior to its Rule 50(b) motion did RCX argue that the entire statutory-employee doctrine is now defunct. By failing to raise this argument in its initial Rule 50(a) motion, RCX waived it.[2] *See McCann v. Tex. City Ref., Inc.*, 984 F.2d 667, 672-73 (5th Cir. 1993) (denying a post-judgment challenge when the party's argument differed from its 50(a) motion); *Allied Bank-West., N.A. v. Stein*, 996 F.2d 111, 115 (5th Cir. 1993) (overturning grant of judgment as a matter of law on different ground than that in the initial directed verdict); *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 846 (5th Cir. 1975) (holding that plaintiff could not receive post-judgment relief on claims it did not raise at trial or in its original Rule 50 motion).

Accordingly, we AFFIRM the district court's decision to deny RCX's Rule 50(b) motion.

## III.

RCX next argues that the district court used improper jury instructions. More specifically, RCX argues that the district court's jury instructions were

---

[2] RCX argues that it can raise and appeal a purely legal issue in a Rule 50(b) motion even though it did not raise that issue in its original Rule 50(a) motion. But RCX provides no support for this proposition. In fact, the case it cites cuts the opposite direction. In *Feld Motor Sports*, this court held that it could only review an appeal of a district court's purely legal conclusions if the challenging party "sufficiently preserved [it objections] in a Rule 50 motion." *Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 596 (5th Cir. 2017). The court later reaffirmed the rule that a party only "sufficiently preserve[s]" an argument using Rule 50 when it raises the argument in a Rule 50(a) and then renews it in a Rule 50(b) motion. *Id.* Here, as detailed above, RCX did not sufficiently preserve its statutory-employee arguments.

6

No. 17-41282

incorrect because they did not require the jury to find that RCX met the definition of "motor carrier."

This court reviews jury instructions under a two-prong standard of review. "First, the challenger must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether" the instructions "properly guided" the jury "in its deliberations." *Pelt v. U.S. Bank Tr. Nat. Ass'n*, 359 F.3d 764, 767 (5th Cir. 2004) (quoting *Johnson v. Sawyer*, 120 F.3d 1307, 1315 (5th Cir. 1997)). Second, even if the court finds that the jury instructions were erroneous, it will not reverse if it determines, "based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Id.* (quoting *Sawyer*, 120 F.3d at 1315).

RCX's arguments do not raise any doubt about the district court's jury instructions.[3] The district court instructed the jury to determine whether RCX was "using motor vehicle(s) it did not own to transport property under an arrangement with Ronald Brown." RCX correctly points out that this instruction does not follow the federal definition of motor carrier. The federal

---

[3] There are three main statutes at issue here. First, the definition of motor carrier: "The term 'motor carrier' means a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Second, the definition of broker:

> The term "broker" means a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation.

49 U.S.C. § 13102(2).

Third, the statute giving the Secretary of Transportation the power to regulate motor carriers who lease trucking equipment: "The Secretary may require a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 that uses motor vehicles not owned by it to transport property under an arrangement with another party." 49 U.S.C. § 14102(a).

No. 17-41282

definition of a motor carrier is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). But this definition of motor carrier is overbroad for this case because it does not distinguish between (1) a motor carrier using its own equipment and (2) a motor carrier using leased equipment. That distinction matters.

The relevant federal regulations only apply to motor carriers who use leased equipment. As Section 14102 makes clear, the Secretary of Transportation can only issue regulations requiring a motor carrier to "have control of and be responsible for" how employees operate equipment if the motor carrier "uses motor vehicles *not owned by it* to transport property under an arrangement with another party." 49 U.S.C. § 14102(a) (emphasis added). The district court rightly based its jury instructions on this section because it excludes carriers using their own trucking equipment. Without a finding that the motor carrier used a leased vehicle, the regulations would not apply.

RCX's arguments to the contrary are unconvincing. RCX first argues that the instructions did not require the jury to find that RCX was acting as a motor carrier. Second, and relatedly, RCX argues that the instructions are so broad that they wrap in brokers, as well as motor carriers. We disagree. The main difference between a motor carrier and a broker is the actual operation of the leased equipment. This difference stands out when looking at the definitions of motor carrier and broker in the Act. While a broker is responsible for "providing, or arranging for, transportation by motor carrier," 49 U.S.C. § 13102(2), a motor carrier provides "motor vehicle transportation," 49 U.S.C. § 13102(14). Put briefly, a motor carrier transports, and a broker provides a motor carrier. Because the jury here determined that RCX used motor vehicles to transport property, it necessarily determined that RCX was a motor carrier. Consequently, the jury also necessarily determined that RCX did not act as a broker who merely provided access to a motor carrier.

No. 17-41282

In sum, the district court did not err. On the contrary, the district court closely examined the statute, avoided the obvious, overbroad definition of motor carrier, and picked out the correct, limited definition. We AFFIRM the district court's jury instructions.

## IV.

RCX next challenges the district court's decision to admit State Trooper Smith as an expert witness on accident investigation. According to RCX, Smith's opinion was irrelevant because he testified that he (1) could not find any defects on the road, (2) could not find any skid marks on the road, (3) did not determine how fast Brown was driving, and (4) did not know the weight of the trailer or its contents.[4]

A trial court's decision to admit expert evidence is reviewed for abuse of discretion. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citation omitted). The trial judge has "wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (internal quotation marks and citation omitted); *see also Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010). A manifest error is one that "is plain and indisputable, and that amounts to a complete disregard of the controlling law." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (internal quotation marks and citation omitted); *see also SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 775 (5th Cir. 2017).

---

[4] Both parties implicitly assume that an accident investigator can serve as an expert witness. Because RCX merely attacks Smith's opinion and does not challenge the idea that an accident investigator can serve as an expert at all, we reserve that more fundamental question for a later date.

9

No. 17-41282

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and reports.  When evaluating expert testimony, the overarching concern is generally whether the testimony is relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  To be reliable, expert testimony must "be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief."[5]  *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal citation omitted).  To be relevant, the expert's "reasoning or methodology [must] be properly applied to the facts in issue."  *Id.* (internal citation omitted).

When performing this analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact.  *See Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449 (5th Cir. 1990) (citing Fed. R. Evid. 702 advisory committee's notes (1972)).  Assisting the trier of fact means "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (internal quotation marks and citation omitted).  As this court has noted, however, the "helpfulness threshold is low: it is principally . . . a matter of relevance."  *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 459 n.14 (5th Cir. 2013) (en banc) (internal quotation marks and citations omitted).

---

[5] Courts also look to *Dabuert*'s list of non-exclusive factors when determining whether testimony is reliable:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Arkema, Inc.*, 685 F.3d at 459.

No. 17-41282

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. *See Rock v. Arkansas*, 483 U.S. 44, 61 (1987). Particularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003). At no point should the trial court replace "the adversary system." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002). As the Supreme Court explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's notes (2000) (internal citations omitted).

Here, RCX only challenges the relevance of Smith's opinion.[6] But its arguments are not persuasive. The district court did not abuse its discretion in allowing Smith to offer an expert opinion on the cause of the accident—Smith considered an appropriate amount of physical evidence at the scene of the crime to offer his opinion, and RCX had ample opportunity to show the jury any flaws in his opinion.

---

[6] RCX does not challenge Smith's qualifications. Officer Smith has worked on accident investigations since he became a Texas State Trooper in 2010. He received training on accident investigation when he became a trooper. He also took an advanced course on accident investigation. He has investigated "[o]ver a hundred" accidents.

No. 17-41282

No Fifth Circuit case applies Rule 702 and *Daubert* to an accident investigator.[7] But the majority of in-circuit district courts choose to admit accident investigators as experts.[8] District courts use a contextual analysis when making this determination, looking to see if the investigating officer bases his opinion on a sufficient amount of physical evidence from the accident.

For example, in *Stevens*, the district court allowed an officer to testify based on "the position of Defendants' trailer after the accident, the tire marks visible at the scene, and his conversation at the scene with . . . the driver of Plaintiffs' tractor-trailer." *Stevens*, 2016 WL 9244669, at *4. Another court allowed an expert to testify based on his "his accident report, some photographs

---

[7] Smith offered testimony as an accident investigator, not an accident recreator, which requires additional training and attention to detail. Accident investigation merely consists of "responding to the scene, looking at the evidence, taking statements from witnesses, making a preliminary determination about what may have been a contributing factor to the crash, [and] writing [and] submitting the initial crash report." *Stevens Transp., Inc. v. Glob. Transp., LLC*, No. 6:15-CV-552-MHS-JDL, 2016 WL 9244669, at *3 (E.D. Tex. May 24, 2016) (internal citations omitted).

While this court has held that an investigating officer may not offer *lay* testimony on causation, *Duhon v. Marceaux*, 33 F. App'x 703 (5th Cir. 2002) (unpublished), lay opinions are analyzed differently than expert opinions. *See generally Smith v. Progressive Cty. Mut. Ins. Co.*, No. 11-CV-872, 2012 WL 702061, at *2 (E.D. La. Mar. 1, 2012) (discussing the differences between lay and expert opinion testimony for investigating officers).

[8] *See, e.g., Stevens Transport*, 2016 WL 9244669, at *2-4 (permitting DPS lead investigator to offer expert opinion on the cause of the accident); *Cartwright v. Am. Honda Motor Co., Inc.*, No. 9:09-CV-2015, 2011 WL 3648565, at *4 (E.D. Tex. Aug. 15, 2011) (permitting investigating officer to offer an expert opinion regarding the cause of the accident); *Vigil v. Michelin N. Am., Inc.*, No. EP-05-CV-001-KC, 2007 WL 2778233, at *4 (W.D. Tex. Aug. 23, 2007) (permitting the investigating officer to offer expert opinion on the cause of the accident); *Martin v. Pride Offshore Co.*, No. 97-CV-3754, 1999 WL 4921, at *1 (E.D. La. Jan. 6, 1999) (permitting an investigating officer to offer expert testimony on the cause of the accident), *aff'd*, 198 F.3d 241 (5th Cir. 1999); *Main v. Eichorn*, No. W-10-CV-158, 2011 WL 11027844, at *3 (W.D. Tex. Mar. 10, 2011) (allowing an investigating officer to testify as an expert); *but see Koenig v. Beekmans*, No. 5:15-CV-00822-RCL-RBF, 2018 WL 358307, at *5 (W.D. Tex. Jan. 9, 2018) (excluding an accident investigator who admitted that he was simply "speculating as to who was in whose lane.").

No. 17-41282

and his notes." *Vigil*, 2007 WL 2778233, at *4. Yet another court allowed an investigating officer to testify as an expert because, even though he "did not take any measurements or photographs, or speak to any witnesses to the accident, he did personally survey the accident scene, talk to the other officers on the scene, and subsequently reviewed photographs of the scene." *Main*, 2011 WL 11027844, at *4. The only case to exclude an expert involved markedly different facts. In that case, the officer could not determine which lane the driver was in, expressed doubts about his qualifications, and could not say with any certainty whether the defendant caused the accident. *Koenig*, 2018 WL 358307, at *5.

Here, Smith considered numerous facts and did not state that he was speculating about the cause of the accident. Smith was driving some distance behind Brown when the accident occurred and saw it happen from afar. He found wet, dark conditions. He determined which lane Brown was using. He determined that Brown was talking on his cell phone. He examined marks in the median showing the path of Brown's truck. He took photographs of the scene. He spoke to witnesses. He determined that Brown hydroplaned based on skid marks. He determined based on experience and training that Brown must have been driving too fast or used faulty evasive maneuvers to cross the median and end up on the other side of the road. He also relied on an accident reconstruction put together by another expert. Smith also admitted on cross-examination that he did not examine Brown's truck, the brakes, the weight of the truck, or attempt to estimate his speed. But he stuck to his opinion that Brown must have been driving too fast for the conditions or taken a faulty evasive maneuver.

In sum, Smith's opinion was based on a multitude of facts. It did not take into account every possible explanation for the accident, and some measurements were missing. But he was the closest to the scene when the

13

No. 17-41282

accident happened, observed the conditions on the road, knew Brown was talking on the phone, and looked at various tire markings in the median and on the pavement. Numerous district courts have allowed an investigating officer to testify as an expert based on less. If Smith missed any important facts, the oversight should go to the weight of his opinion, not its admissibility. We AFFIRM the district court's decision to allow Smith to testify as an expert witness on causation.

## V.

Next, RCX argues that the district court erroneously affirmed the jury's award of consortium damages to Mrs. Puga.

This court reviews the district court's decision to deny a motion for a new trial or remittitur for abuse of discretion.[9] *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002) ("We review denial of remittitur for abuse of discretion"); *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) ("The

---

[9] This court has not spoken definitively about the appropriate standard of review for overturning a jury's award of damages. There are three that stand out in the case law. *See generally Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008) (discussing the three different standards). The first is abuse of discretion. *Salinas*, 286 F.3d at 830 ("We review denial of remittitur for abuse of discretion.") (internal citation omitted); *see also Foradori*, 523 F.3d at 503 (reviewing other cases). The second is the "strongest showing" standard. *Lebron v. United States*, 279 F.3d 321, 325 (5th Cir. 2002) (internal citation omitted); *see also Enter. Ref. Co. v. Sector Ref. Inc.*, 781 F.2d 1116, 1118 (5th Cir. 1986); *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985); *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 934 (5th Cir. 1982); *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 880 (5th Cir. 1977); *Wackman v. Rubasmen*, 602 F.3d 391, 405 (5th Cir. 2010); *Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1378 (5th Cir. 1992). The third standard is the "shocks the conscience" standard. *Caldarera*, 705 F.2d at 784 (internal citation and quotation marks omitted); *see also Wackman*, 602 F.3d at 404-05; *Allen v. Seacoast Prods., Inc.*, 623 F.2d 355, 364 (5th Cir. 1980); *Bridges*, 553 F.2d at 880); *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501, 506 (5th Cir. 1989) (quoting *Caldarera*, 705 F.2d at 784); *see also Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.*, 293 F.3d 912, 924 (5th Cir. 2002) (citing *Caldarera*, 705 F.2d at 784).

Because RCX challenges the district court's decision to affirm the jury's award, as opposed to directly challenging the jury's award, we apply the abuse of discretion standard. *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 482 (5th Cir. 2015).

No. 17-41282

decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse"); *Brooks v. Great Lakes Dredge-Dock Co.*, 754 F.2d 539, 541 (5th Cir. 1985) ("The standard of review of the denial of such a motion is whether the district court abused its discretion.").

The Supreme Court of Texas defines loss of consortium as the loss of companionship, emotional support, love, felicity, and sexual relations necessary to a successful marriage. *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1089 (5th Cir. 1991) (citing *Whittlesey v. Miller*, 572 S.W.2d 665, 666 (Tex. 1978)). Damages for loss of consortium are non-pecuniary damages, which "do not require certainty of actual monetized loss." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014). They are, instead, "measured by an amount that a reasonable person could possibly estimate as fair compensation." *Id.* (internal quotation marks and citation omitted).

While "translating the subjective nature of this loss into monetary terms" is difficult, Texas courts trust "the ability of the jury to calculate an appropriate award based on the evidence." *Id.* at 1089 (citing *P.T. & E. Co. v. Beasley*, 698 S.W.2d 190, 196 (Tex. App.—Beaumont 1985)); *Whittlesey*, 572 S.W.2d at 667 ("[T]he issue generally must be resolved by the impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence." (internal quotation marks and citation omitted)). Even so, this trust is limited—juries cannot simply pull a number out of a hat. All damages must be tied to some evidence. *Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 403 (Tex. App.—Houston [14th Dist.] 2010) (citing *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied)). Direct evidence, however, is not required. A jury can infer loss of consortium damages "from [indirect] evidence showing the

15

nature and extent of a spouse's injuries." *Glasscock*, 946 F.2d at 1090.[10] When considering indirect evidence, juries can rely on "(1) the nature of the marital relationship prior to the spouse's injury, (2) the deterioration of the marital relationship following the injury, and (3) the extent and duration of the spouse's injuries." *Id.* (citing *Whittlesey*, 572 S.W.2d at 667; *Monsanto Co. v. Johnson*, 675 S.W.2d 305, 312 (Tex. App.—Houston [1st Dist.] 1984)).

When determining the excessiveness of a jury verdict, courts "must review each case on its own facts." *Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003) (citing *Winbourne v. E. Airlines, Inc.*, 758 F.2d 1016, 1018 (5th Cir. 1984)). Past verdicts can "provide an objective frame of reference, but they do not control our assessment of individual circumstances." *Wheat v. United States*, 860 F.2d 1256, 1259-60 (5th Cir. 1988). If an award "exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so." *Caldarera*, 705 F.2d at 784 (internal citation omitted).

This court uses the "maximum recovery rule" to determine whether an award is excessive. Under the maximum recovery rule, this court "will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Lebron*, 279 F.3d at 326 (internal citations and quotations omitted). We measure disproportionality by applying a percentage enhancement to past similar awards. This enhancement is 50% for jury trials. *See Salinas*, 286 F.3d at 831 & n.6 (noting 50% enhancement has been applied only in jury trials); *see also*

---

[10] *See also Elizondo v. Krist*, 338 S.W.3d 17, 29 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 415 S.W.3d 259 (Tex. 2013) ("[T]estimony that the primary victim's injuries interfere with family activities is sufficient."); *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex. 1993) (holding that testimony that, as a result of wife's injuries, couple no longer engages in their former outdoor activities and that travel has become difficult is "at least some evidence" of loss-of-consortium damages).

No. 17-41282

*Moore*, 353 F.3d at 384. Refusing to overturn jury awards that are within 150% of the highest comparable award prevents the court from substituting its own opinion for that of a jury. The relevant jurisdiction for purposes of the maximum recovery rule "is the state providing the substantive law for the claim." *Vogler*, 352 F.3d at 156. Here, the relevant jurisdiction consists of Texas loss of consortium cases and "Fifth Circuit cases applying Texas [loss of consortium] law." *Id.*

The jury awarded Mrs. Puga $1.8 million for her future loss of consortium and $1.6 million for her past loss of consortium. Applying the maximum recovery rule, neither award is clearly excessive.

The award for future loss of consortium falls within this court's 50% multiplier. The highest decision we found awarded a wife $1 million for loss of future consortium in a case where the husband did not die.[11] *Reeder v. Allport*, 218 S.W.3d 817, 820 (Tex. App.—Beaumont 2007) (affirming a jury's award of "$1,000,000 for future loss of consortium."); *accord Lebron v. United States*, 279 F.3d 321, 327 (5th Cir. 2002) (basing a maximum recovery rule finding in a loss-of-consortium case on the "the highest award" the court could find). That verdict was rendered in 2007 dollars. Accounting for inflation, that award is

---

[11] We found other verdicts that were higher, but we do not rely on these verdicts because a higher court reversed them. The higher courts did not reverse because the jury awards were excessive—they reversed for other reasons. *See, e.g., U-Haul Int'l, Inc. v. Waldrip*, 322 S.W.3d 821, 857 (Tex. App.—Dallas 2010) (affirming the jury's award of a $1.6 million future consortium loss), *aff'd in part, rev'd in part on other grounds*, 380 S.W.3d 118 (Tex. 2012); *Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 459 (Tex. App.—Dallas 2007) (reversing a jury's $2 million loss of consortium claim, but on other grounds). While this court on one other occasion relied on a partially reversed jury verdict, we specifically affirmed the lower court's loss of spousal consortium ruling, which makes it distinguishable from the cases above. *See Vogler*, 352 F.3d at 157 (relying on the jury's award in *Douglass v. Delta Air Lines, Inc.*, 709 F. Supp. 745 (W.D. Tex. 1989), *aff'd in part, rev'd in part*, 897 F.2d 1336 (5th Cir. 1990)).

No. 17-41282

over $1.2 million in 2018 dollars.[12] *Cf. Ledet v. Smith Marine Towing Corp.*, 455 F. App'x 417, 423 (5th Cir. 2011) (unpublished) (accounting for inflation when applying the maximum recovery rule to a prior jury verdict). The jury's $1.8 million verdict falls within 150% of the prior award over $1.2 million.

The parties did not point us to a factually similar case that specifically granted past loss of consortium damages.[13] *See Vogler*, 352 F.3d at 156–57, 157 n.7 (finding that prior cases were not factually similar when they did not distinguish between past and future loss of consortium). In our own research, however, we found a case in which the plaintiff-husband, like here, survived an accident but suffered physically and emotionally from his injuries. *See W. Star Transp., Inc. v. Robison*, 457 S.W.3d 178, 189 (Tex. App.—Amarillo 2015) (upholding a past loss of consortium award of $250,000 where the husband suffered a traumatic brain injury that would "significantly affect him for the remainder of his life"). In *Robison*, the jury awarded the plaintiff's wife $250,000 for past loss of consortium on January 18, 2013. Adjusting for inflation, that award translates to roughly $272,750.00. And adding our 150%

---

[12] We performed this conversion using the Bureau of Labor Statistics's CPI Inflation Calculator, available at https://data.bls.gov/cgi-bin/cpicalc.pl. *See Ledet*, 455 F. App'x at 423 n.1 (using the Bureau of Labor Statistics's CPI Inflation Calculator).

[13] The largest award we found for loss of past consortium was $300,000. *Douglass*, 709 F. Supp. at 763 (W.D. Tex. 1989). That award was rendered in 1989. Converted to 2018 dollars, $300,000 translates to roughly $625,000. *Douglass*, however, is not factually similar.

The most important reference point for determining factual similarity is whether the primary victim lived or died. For example, in *Lebron*, this court merely looked to see whether the child in past cases had died or lived when determining the correct comparison point for parental loss of consortium. *Lebron*, 279 F.3d at 327; *see also Moore*, 353 F.3d at 384 ("Poignant factual distinctions are that Plaintiff herein lost no other family member from this accident"). The facts here do not mirror *Douglass*. In *Douglass*, the father died in a plane crash. Mr. Puga lived. The difference between life and death makes the cases meaningfully different.

18

No. 17-41282

multiplier to that number, the maximum recovery rule limits Mrs. Puga's recovery to $409,125.00.

Accordingly, we AFFIRM the district court's decision to affirm the jury's award of future consortium damages. However, we REVERSE the district court's decision to affirm the jury's award of past consortium damages and REMAND for the exact calculation of Mrs. Puga's maximum recovery in light of *West Star Transportation, Inc. v. Robison*, 457 S.W.3d 178.

## VI.

Finally, RCX argues that it is entitled to a settlement credit under Texas law—an issue the district court did not consider. The Pugas agree that RCX is entitled to a settlement credit. *See RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 862 (5th Cir. 2010) (applying a settlement credit in a Texas law diversity case).

We, therefore, REVERSE the district court's decision not to apply a settlement credit and REMAND for the district court to calculate the appropriate settlement credit amount and modify the final judgment accordingly.

## VII.

For the foregoing reasons, we AFFIRM the district court's choice of jury instructions; we AFFIRM that Trooper Smith was properly admitted to testify as an expert on accident investigation; and we AFFIRM the district court's decision to uphold the jury's award for future loss of consortium. We REVERSE the district court's decision to uphold the full amount of the jury's award for past consortium damages and REMAND to the district court to calculate the appropriate amount of past consortium damages. We also REMAND to the district court so that it can calculate the settlement credit to which RCX is entitled and modify its final judgment accordingly.

19